UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA                              :

   -v.-                                                              :          S2 15 Cr. 706 (VSB)

SHIWEI YAN,                                                       :
  a/k/a "Sheri Yan,"

                                      :

                 Defendant.
                                   :

------------------------------------------------------------x


## THE GOVERNMENT'S SENTENCING MEMORANDUM


PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States of America


Daniel C. Richenthal
Janis M. Echenberg
Douglas S. Zolkind
Assistant United States Attorneys
- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -v.-                                     :          S2 15 Cr. 706 (VSB)

SHIWEI YAN,                                  :
  a/k/a "Sheri Yan,"

                          :
             Defendant.
                          :

-------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

Sentencing in this matter is scheduled for next Tuesday, July 26, 2016, at 9:00 a.m.  The

Government respectfully submits this memorandum in connection with that sentencing and in

response to defendant's sentencing memorandum dated July 11, 2016 ("Def. Mem.").

## PRELIMINARY STATEMENT

For more than a year and a half, the defendant, a former CEO and founder of multiple

businesses, engaged in repeated bribery of a senior official at the United Nations ("UN") and

Antigua and Barbuda ("Antigua").  From all outward appearances, the defendant was a

successful businesswoman and entrepreneur, who had turned her attention in recent years to

promoting sustainable economic development, both in China, where she was from and resided,

and elsewhere.  But during the same period, the defendant was using her experience and her

contacts to engage in significant corruption, helping herself and others to cheat their way to titles

and business opportunities, while doing little, if anything, to meaningfully promote sustainable

economic development.

The defendant's Guidelines range reflects the severity of her repeated conduct.  For her

crime, the defendant has a United States Sentencing Guidelines ("Guidelines") range of 70 to 87

months' imprisonment, as set forth in the United States Probation Office's ("Probation Office")

Presentence Investigation Report ("PSR"), in which the Probation Office recommends a sentence

of 70 months' imprisonment and a fine.  In order to serve the legitimate purposes of sentencing,

including promotion of respect for the law and general deterrence, the Government respectfully

requests that the Court impose a sentence within the applicable Guidelines range and order a

meaningful fine.

## **BACKGROUND**

**A.      The Defendant's Offense Conduct**

As described in the Presentence Investigation Report, and in Complaint 15 Mag. 3562

("Compl."), which is enclosed herewith as Exhibit ("Ex.") A, between at least in or about April

2012 and at least in or about November 2013, the defendant and her co-conspirators agreed to

and did engage in a massive, international bribery scheme.  That scheme involved paying John

W. Ashe ("Ashe"), then-Permanent Representative of Antigua, who also served for a year as the

elected President of the UN General Assembly ("PGA"), more than $800,000, in various forms,

to promote the interests of multiple foreign businesspeople, both in his capacity as Permanent

Representative and in his capacity as PGA.  (PSR ¶¶ 11-12, 22-55.)

In return for agreeing to pay and paying bribes to Ashe, the defendant also received

diplomatic appointments from Ashe, which she touted in her biography and used to promote

herself and her non-governmental organization ("NGO"), the Global Sustainability Foundation

("GSF") (or its predecessor, the Global Sustainable Development Foundation ("GSDF")), which

she purportedly created for charitable purposes, and used to pay or cover payments to officials,

and to sponsor dinners, concerts, and other events, commonly featuring Ashe.  (PSR ¶¶ 33, 52,

108-113; Ex. B (Email from Defendant to Ashe concerning "titles" that could help "position

ourselves in a way to best assist you on raising fund[s] and building a sustainable business model for the long term"); Ex. C. (Defendant's GSF Biography); Ex. D (Defendant's LinkedIn Profile); s*ee also, e.g.*, https://www.youtube.com/watch?v=phUpK4Q6XPw (video of GSDF "power luncheon" and fashion show).

### 1)      The First Bribe Payment

In or about April 2012, the defendant met Ashe and learned that he expected to be elected PGA.  Soon thereafter, the defendant agreed to and did send $300,000 to Ashe on behalf of a Chinese media executive ("CC-1") who was seeking to invest in Antigua and potentially to obtain Antiguan citizenship, in return for Ashe's promoting CC-1's interests.  (PSR ¶¶ 22-31.)

The defendant was well aware that the bribery funds were meant in part for Ashe, and in part for one or more Antiguan officials.  As Ashe explained to the defendant, the funds are "a show of 'good faith' by [CC-1] re. his interest in developing a base/hub in Antigua and Barbuda AND (equally important) enable me to demonstrate to my interlocutors that he is indeed serious. . . . [The] funds will allow me to 'start the conversations' (my exact words when we last met) when I visit Antigua . . . ."  (PSR ¶ 27.)  Ashe further explained that "[m]ost of what he termed "the initial contribution" will "be used on this trip," during which Ashe intended to work on "opening a direct channel to the top decisionmaker, the Prime Minister."  (PSR ¶¶ 28-29.)

When Ashe returned from his trip, he informed the defendant that he had met "with all the key decision makers to discuss [CC-1's] plans," and that Ashe had "had the initial resources in hand," which were "fully utilized," "certainly served the intended purpose."  (PSR ¶ 30.)

Within weeks, the defendant requested an official appointment from Ashe, which she subsequently received.  (PSR ¶¶ 33, 52; Ex. B.)  She also suggested that Ashe provide such an appointment to another individual in return for more money.  (Ex. B.)

### 2)    The Ongoing Bribe Payments, Purportedly for Ashe's Service as "Honorary Chairman" of the Defendant's Non-Governmental Organization

Ashe was elected PGA in mid-June 2013.  In August 2013, the defendant began paying him approximately $20,000 a month, purportedly to serve as "Honorary Chairman" of the defendant's NGO.  (PSR ¶ 34.)  These payments—which were sent from the defendant's Chinese company, Australia-China Capital Management, to one of Ashe's personal bank accounts in New York—were a sham.  Ashe has no prior experience with or knowledge of the defendant's NGO. (PSR ¶ 35.)  Nor did he appear to have an interest in helping to run the NGO, much less to do so to a degree warranting payment at a rate of nearly $250,000 a year.  (*See id.*)

### 3)    The Bribe Payments on Behalf of a Chinese Security Company

Ashe assumed the Presidency of the UN General Assembly in September 2013.  Within weeks, the defendant agreed to and did arrange for $100,000 to be sent to Ashe by a Chinese security technology executive ("CC-2") who was seeking to have a company with which he was affiliated (the "Chinese Security Company") enter into a contract with Antigua.  (PSR ¶¶ 36-38.)

Approximately one month later, the defendant arranged for co-defendant Heidi Hong Piao, a/k/a "Heidi Park" ("Piao"), Ashe, and CC-2 to travel to Antigua so that CC-2 could meet with Antiguan officials, including a key Antiguan minister, directly.  (PSR ¶¶ 39-40.)

Following the trip, Ashe sought to facilitate a meeting between executives of the Chinese Security Company and officials of another country, Kenya.  (PSR ¶¶ 41-43.)  With Ashe's assistance, the defendant herself subsequently met with a Kenyan official to promote the Chinese Security Company.  (PSR ¶ 44.)

Approximately a month later, the defendant agreed to send Ashe another $100,000, purportedly to pay for a holiday party.  (PSR ¶ 45.)  Ashe asked that the money—which self-evidently was not for a holiday party—be sent to one of the two bank accounts he had set up

4

supposedly to fund activities of the PGA, but was using to pay himself and to cover personal

expenses.  Ashe explained to the defendant:

> Re. the promised $100K, may I suggest the following approach re.
> remitting it to me.  If the entire amount is to be sent in one shot
> then it's best to send it to the PGA account and then I can
> withdraw it in installments without raising any questions by the
> bank.  This is my preferred approach since that account has been
> used for large amounts and would not raise any red flags.
>
> If, on the other hand, you prefer to send it to my personal account
> then I would suggest you do it in the following amounts over a
> period of time:
>
> First amount: $20,000 on Dec 6
> Second amount: $30,000 on Dec 10
> Third amount: $ 20,000 on Dec 15
> Final amount: $30,000 on Dec 20

(PSR ¶ 45; Ex. E (Email from Ashe to Defendant).)  The defendant sent the money to the PGA

account, as Ashe had asked, through a business associate, referred to in the Complaint as

"Individual-1," whom the defendant repeatedly used to send Ashe money.  (PSR ¶ 46.)

Less than two weeks later, Ashe arranged for a conference call between executives of the

Chinese Security Company and Antiguan ministers.  (Compl., Ex. A, ¶ 48(l).)  Ashe thereafter

arranged for Chinese Security Company executives to meet with Antiguan officials in Antigua.

(*Id.* ¶ 48(m)-(n); PSR ¶ 47.)  Two days after that meeting, in an email with the subject line,

"Delivering on a promise," Ashe informed the defendant that a senior Antiguan national security

minister had told Ashe that he had met with the Chinese Security Company executives and had

signed a Memorandum of Understanding with the Chinese Security Company.  (PSR ¶ 47.)

### 4)      The Bribe Payment on Behalf of a Chinese Real Estate Developer

In Fall 2013, Yan agreed to and did arrange for $200,000 to be sent to Ashe by a Chinese

real estate developer ("CC-3") in return for Ashe making an official appearance, as PGA, at a

conference in China arranged by the real estate developer.  (PSR ¶¶ 48-53.)  To facilitate the visit

seeming legitimate, at the request of the defendant and co-defendant Piao, Ashe submitted a

letter to CC-3 asking for arrangements to be made through his alleged "Advisor on Economic

Matters, Ms. Shiwei Yan," and back-dated a letter of appointment to match.  (PSR ¶¶ 51-52.)[1]

### 5)      The Bribe Payments in the Form of Custom Suits and Clothes

In addition to agreeing to pay and paying Ashe directly, the defendant and co-defendant

Piao also agreed to and did pay Ashe in the form of custom suits and other clothing.  For

example, in August 2013, the defendant paid for Ashe to receive nine custom suits, two blazers,

and ten shirts, costing nearly 120,000 Hong Kong dollars (or approximately $15,500).  (PSR

¶ 54.)  Similarly, in October 2013, the defendant paid for Ashe to receive five custom suits and

eight shirts, costing 100,000 Hong Kong dollars (or approximately $13,000).  (PSR ¶ 55.)

---

[1]      To the extent the defendant suggests that this payment to Ashe, as opposed to other
payments, did not constitute a crime in light of *McDonnell* v. *United States*, 136 S. Ct. (2016)
(Def. Mem. 20 n.8), the defendant is incorrect (at least as to her and Piao) for multiple reasons,
even assuming that *McDonnell* applies to 18 U.S.C. § 666, a statute not directly addressed in that
case.  The defendant received an official appointment from Ashe in connection with this
payment, and, more generally, it was part of a course of conduct in which the defendant, Piao,
and Ashe agreed that Ashe would take official action as opportunities arose to assist the
defendant, Piao, and/or their clients.  In any event, that the defendant arranged for Ashe to be
paid hundreds of thousands of dollars so that, in his official capacity, he would attend and speak
at a conference, helping to solidify the defendant's relationship with a wealthy businessman, is a
fact that the Court is entitled to consider in weighing an appropriate sentence.  So too is the
defendant's request for an official appointment and acceptance of a back-dated letter.

**B.**     **The Defendant's Failure to File Tax Returns or to Report Foreign Bank Accounts Prior to and During the Scheme**

While earning well into the six-figures annually and amassing an individual net worth of nearly $2 million, including property worth more than $1 million in the United States, and property in both Australia and China, since 2008, the defendant, a naturalized citizen, failed to file tax returns in the United States.  (PSR ¶¶ 90, 108-118, 130, 140.)

While maintaining multiple bank accounts in both Australia and China, the defendant failed to report such accounts on a Report of Foreign Bank and Financial Accounts.  (PSR ¶¶ 130, 140.)

**C.**     **The Advisory Guidelines Range and the Recommendation of the Probation Office**

The parties and the Probation Office agree that the defendant's advisory Guidelines range is 70 to 87 months' imprisonment, calculated as follows:

- Pursuant to U.S.S.G. § 2C1.1(a)(2), the base offense level is twelve.

- Pursuant to U.S.S.G. § 2C1.1(b)(2), because the value of the bribe payments exceeded $6,500, the base offense level is increased by the number of levels from the table in U.S.S.G. § 2B1.1 corresponding to that amount.  Here, because that amount exceeds $550,000 but does not exceed $1,500,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(H), the base offense level is increased by fourteen levels.

- Pursuant to U.S.S.G. § 2C1.1(b)(3), because the offense involved an elected public official and/or one who was in a high-level decision-making position, the base offense level is increased by four levels.

- Assuming the defendant clearly demonstrates acceptance of responsibility, a two-level reduction is warranted, pursuant to U.S.S.G. § 3E1.1(a).  Assuming the defendant has accepted responsibility, the defendant is also expected to qualify for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of her intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

(PSR ¶¶ 66-76.)

The resulting offense level is 27.  (PSR ¶ 77.)  The defendant has no prior convictions, so her Criminal History Category is I.  (PSR ¶ 81.)  Based on an offense level of 27 and a Criminal History Category of I, the defendant's advisory Guidelines range is 70 to 87 months' imprisonment.  (PSR ¶ 143.)  The Probation Office recommends a sentence of 70 months' imprisonment, based on the seriousness of the offense and the need for deterrence.  (PSR at 36.)

The Probation Office also calculates a Guidelines fine range of $12,500 to $125,000. (PSR ¶ 151.)  It recommends a fine of $12,500, as well as forfeiture, a mandatory special assessment of $100, and two years of supervised release.  (PSR at 35.)[2]

The defendant's advisory Guidelines range is high, but it is based on the Sentencing Commission's considered assessment of the harm caused by bribery.  Indeed, more than a decade ago, the Sentencing Commission increased the offense levels applicable to corruption offenses. *See* Notice, U.S. Sentencing Commission, 69 Fed. Reg. 28994-01 (May 19, 2004).  In doing so, the Commission explained:

> This amendment increases punishment for bribery, gratuity, and "honest services" cases while providing additional enhancements to address previously unrecognized aggravating factors inherent in some of these offenses. This amendment reflects the Commission's conclusion that, in general, public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses.

*Id.* at 29012.

---

[2]      To date, the defendant has not paid the $300,000 forfeiture judgment entered against her. In her submission, the defendant states that she "is planning to satisfy [that] judgment from proceeds of the sale of an apartment that she owns in Arlington, Virginia."  (Def. Mem. 43.)

Accordingly, the Court should give the advisory Guidelines range careful consideration as "the starting point and the initial benchmark" for the appropriate sentence in this case. *Gall* v. *United States*, 552 U.S. 38, 49 (2007); *see also* 18 U.S.C. § 3553(a)(4).[3]

---

[3]        In doing so, the Court should decline the defendant's apparent suggestion (*see* Def. Mem. 42-43 & n.51) that a more appropriate Guidelines range for the Court to consider is what the defendant theorizes Ashe might have faced had he pleaded guilty solely to tax offenses. Because of Ashe's untimely death, one cannot know precisely how his case would have been resolved, including whether he would have faced bribery and/or money laundering charges. Even assuming *arguendo* that the defendant's counter-factual is correct, the question before this Court is what sentence to impose on the defendant, not what sentence the Court might have imposed on Ashe. In any event, Ashe's sentence could have been far above the advisory Guidelines range the defendant theorizes might have applied, because the advisory range, whatever it might have been, would not have constrained the Court. It is not determinative of the appropriate sentence to impose here.

Moreover, as the Probation Office notes, the defendant's Guidelines range, to which she agreed in an agreement that provided substantial benefits to her, would have been higher had she been convicted of more than one count or of money laundering. (PSR ¶ 144.) Nor is the defendant correct that "the bribery guideline treats as equally culpable bribe givers, middlemen, and bribe takers" (Def. Mem. 30). The Guidelines provide for an enhancement for the public official receiving the bribe. U.S.S.G. § 2C1.1(a). The defendant's attack on her Guidelines range also omits that she receives a meaningful enhancement for having bribed an official in a high-level decision-making position. (PSR ¶ 69.) That enhancement—which the defendant does not dispute is warranted—does not turn on "the value of the bribes" (Def. Mem. 30).

## DISCUSSION

**I.     A Guidelines Sentence Is Warranted**

The factors set forth in 18 U.S.C. § 3553(a) weigh in favor of a Guidelines sentence, as the Probation Office recommends.

*First*, the seriousness of the offense warrants such as sentence.  *See* 18 U.S.C. § 3553 (a)(2)(A).  It is difficult to overstate the severity of what the defendant did: repeatedly bribing an ambassador and the elected President of the United Nations General Assembly, for more than a year, in multiple ways, for multiple purposes.  Such conduct—which is markedly more serious than the cases to which the defendant appears to compare her own (Def. Mem. 32-33)— undermines the foundational principle that government officials should act solely in the interest of the public good.  It discourages honest citizens who would otherwise seek out public service from doing so, because it appears that money, above all, drives outcomes.  And it taints those officials who are law-abiding and who serve the public with integrity, and those NGOs that are committed to their charitable mission.

The defendant suggests that she understands all of this, but then asserts, without apparent hesitation, that her repeated bribery did not "injure the public" and was ultimately "victimless." (Def. Mem. 25, 26.)  This assertion defies both the facts and common sense.  Bribery is not victimless.

 When the defendant paid Ashe hundreds of thousands of dollars in bribe payments, knowing that those payments were both for Ashe himself and for other Antiguan officials, in return for promoting the business interests of CC-1, the defendant helped to undermine the trust the citizens of Antigua placed in their senior leaders—trust that they would pursue the interests of Antigua, not prioritize the interests of foreign businessmen who could afford bribes.

10

So too when the defendant sent hundreds of thousands of dollars in bribe payments to Ashe in return for Ashe and others promoting the Chinese Security Company, which ultimately entered into a contract with the Antiguan government.  These bribe payments were particularly nefarious because they appeared to involve Antiguan security.[4]

The defendant's assertion that she allegedly did not "doubt[] the utility" of CC-1's or CC-2's business interests to Antigua (Def. Mem. 25) is both unsupported by the evidence and irrelevant.  The defendant cannot reasonably ask this Court to impose a lower sentence on the ground that although she paid hundreds of thousands of dollars in bribes, she thought that the business interests of those on whose behalf she paid bribes might align, at least in part, with her understanding of the interests of Antigua.  As the defendant well knew, CC-1's and CC-2's proposals should have been debated on the merits, not prioritized in return for money.

In claiming that her conduct was nevertheless harmless, the defendant states that the "government of Antigua and Barbuda has taken the view that the actions of Mr. Ashe were 'in the interest and for the good of Antigua and Barbuda.'"  (Def. Mem. 26 (quoting Def. Mem. Ex. 3, at 2).)  The government of Antigua has done no such thing.  The letter from which the defendant quotes is signed by the former-Prime Minister of Antigua, Baldwin Spencer, who is alleged to have been involved in certain of Ashe's misconduct.  But even if this letter were deemed the official view of Antigua—and the defendant offers no basis for such a conclusion— the letter does not say that the defendant paying Ashe hundreds of thousands of dollars in bribes was good for Antigua.  It merely says, in pertinent part: "[A]ctions taken by Dr. Ashe when he was President of the United Nations General Assembly that were done in the interest and for the good of Antigua and Barbuda are also deemed acts done in his official capacity."  (Def. Mem.

---

[4]      The defendant's suggestion that this conduct was somehow less serious because she sourced some of these bribe payments (but not all) from an affiliated company (rather than solely from the Chinese Security Company itself) (Def. Mem. 26 n.21) does not make sense.

Ex. 3, at 2.)  This sentence does not answer the question of what is "done in the interest and for the good of Antigua and Barbuda."  Bribery, plainly, is not.  Indeed, bribery is illegal in Antigua.

The defendant's actions also harmed the UN (as the Secretary-General has stated)).  (*See* PSR ¶¶ 61-62 & p. 36.)  In pleading guilty, the defendant, under oath, admitted not only paying Ashe in his capacity as Permanent Representative to the UN, but also paying Ashe in his capacity as PGA.  The defendant does not now assert to the contrary.  Rather, she suggests that any harm she caused to the UN is the fault of the UN, which allegedly "created conditions that made it possible for Mr. Ashe to seek and obtain funds to enrich himself, from Ms. Yan and others, while escaping detection."  (Def. Mem. 26-27; *see also id.* 27 ("[I]t is plain that U.N. failings set the stage for Mr. Ashe's exploitation.").)  The Court should reject the defendant's attempt to blame a victim.  The UN no more caused the defendant to bribe one of its top officials than New York State caused individuals to bribe Sheldon Silver or Dean Skelos.

*Second*, the history and characteristics of the defendant, the nature and circumstances of the offense, and the need for the sentence imposed to promote respect for the law warrant a Guidelines sentence.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A).  The defendant did not commit bribery hesitantly, fleetingly, or in a small amount.  She committed bribery for more than a year, in massive amounts, without any apparent hesitation, seeking to corrupt both the UN's and Antigua's decision making with respect to multiple matters, including Antigua's selection of a company for a security-related contract.  While the defendant is correct that the bribes she paid and arranged for others to pay were principally designed to benefit others, at least in the short term (*see* Def. Mem. 29, 30), it is apparent that the defendant also benefited from her bribes, including by receiving two diplomatic positions and using her relationship with Ashe to promote herself and GSF, an entity that paid her more than $100,000 a year and that she used to increase

12

her personal and professional profile.  Moreover, to extent the defendant paid bribes to benefit

others, she did not do so to advance what she somehow perceived to be the "greater good" or

otherwise for an innocuous purpose.  Rather, the defendant paid bribes on behalf of

businesspeople looking to make money—precisely the kind of conduct most worthy of

condemnation.

Nor is there merit to the defendant's claims that she was "naïve" about how the world

worked (Def. Mem. 23), and acted in a "ham-handed" manner (*id.* 29), reflecting that she had no

more than "a rudimentary understanding of the ethical and legal environment" in which she

operated (*id.* 34).  The evidence shows that, on the contrary, the defendant, a sixty-year old

former CEO and founder of multiple businesses in multiple countries, knew what she was doing,

and knew it was wrong (as she admitted in pleading guilty).  Indeed, the evidence shows that the

defendant both originated and executed a plan (*see, e.g.*, Ex. B), and took steps, including

sending money to Ashe from multiple sources, and pretending that he was being paid for his

service to her NGO, to conceal and make more difficult to detect her actions.  Moreover, in

Spring 2015, after Ashe had left the UN, the defendant agreed to and did pay $200,000 to

another senior foreign official, then in the United States, from an account of GSF, who

subsequently visited GSF and met with the defendant and a business associate to discuss

potential business opportunities.  (PSR ¶ 78.)  Irrespective of whether this payment, in and of

itself, constituted a federal crime (*see* Def. Mem. 30 n.38), the defendant's willingness to pay

hundreds of thousands of dollars to another foreign official through GSF demonstrates that her

course of conduct with Ashe was not the result of a "naïve" person (*id.* 23) merely giving in to

"pressure" from Ashe (*id.* 24).  It was a choice, made repeatedly, and over time.  She should be

sentenced accordingly.

*Finally*, the need for general deterrence weighs in favor of a Guidelines sentence.  *See* 18 U.S.C. § 3553(a)(2)(B).  It is particularly challenging to investigate and prosecute successfully international bribery schemes, particularly where, as here, the scheme involves individuals in multiple foreign countries, individuals at the UN, multiple bank accounts, multiple NGOs, and assertions of immunity.  This means that when such a scheme is uncovered, and individuals are successfully prosecuted and convicted, substantial sentences are warranted.  *See, e.g.*, *United States* v. *Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("Deterrence is a crucial factor in sentencing decisions for economic and public corruption crimes[.]"); *United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

## II.     A Meaningful Fine Is Warranted

Title 18, United States Code, Section 3572(a) sets forth the factors to be considered before imposing a fine, in addition to the factors set forth in Section 3553(a).  Such factors include: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that the fine will impose upon the defendant and any of his or her dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the government of any imprisonment.  18 U.S.C. § 3572(a).   The Guidelines provide, in turn, that a district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  U.S.S.G. § 5E1.2(a).

In determining the size of any fine, the sentencing court shall consider:

> (1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;
> (2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;
> (3) the burden that the fine places on the defendant and his dependents relative to alternative punishments;
> (4) any restitution or reparation that the defendant has made or is obligated to make;
> (5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;
> (6) whether the defendant previously has been fined for a similar offense;
> (7) the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and
> (8) any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d).  The Guidelines further provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive."  *Id.*  The defendant bears the burden of demonstrating an inability to pay a fine.  *See United States* v. *Camargo*, 393 F. App'x 796, 798 (2d Cir. 2010); *United States* v. *Salameh*, 261 F.3d 271, 276 (2d Cir. 2001).

Here, the defendant amassed an individual net worth of nearly $2 million (and a joint net worth of nearly $4 million), paid herself more than $100,000 a year, and failed to file United States tax returns, or to report her multiple foreign bank accounts, during any of the years in which she engaged in the bribery scheme.  Accordingly, the Government respectfully submits that the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to deter others, and to provide just punishment, combined with the defendant's demonstrated ability to pay, warrants the imposition of a meaningful fine.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 70 to 87 months' imprisonment, and order a meaningful fine, a sentence that is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Dated:  New York, New York
        July 19, 2016

                                    Respectfully submitted,

                                    PREET BHARARA
                                    United States Attorney

                          By:      s/Daniel C. Richenthal
                                    Daniel C. Richenthal
                                    Janis M. Echenberg
                                    Douglas S. Zokind
                                    Assistant United States Attorneys
                                    (212) 637-2109/2597/2418