UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      v.

SHIWEI YAN, a/k/a "Sheri Yan,"

      Defendant.

S2 15 Cr. 706 (VSB)

# DEFENDANT SHIWEI ("SHERI") YAN'S RESPONSE TO ORDER SETTING FORTH QUESTIONS RELATING TO SENTENCING

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Christine H. Chung
Samantha Gillespie
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

CLAYMAN & ROSENBERG
Isabelle A. Kirshner
305 Madison Avenue, Suite 1301
New York, New York 10165
(212) 922-1080

*Attorneys for Defendant Shiwei Yan*

July 28, 2016

Defendant Shiwei (Sheri) Yan, by and through undersigned counsel, respectfully submits these responses to the questions set forth in the Order dated July 25, 2016. Ms. Yan's counsel also will be prepared to respond or further discuss the questions at sentencing.

Question 1.

In paragraph 10 of the Presentence Report ("PSR") it says that "Neither YAN nor PIAO is alleged to have known about or participated in the bribery conspiracy involving SENG, LORENZO, and YIN." Although Defendant Yan was unaware of the other bribery scheme what evidence is there in the record that Yan knew Lorenzo, Ng and Yin?

Answer to Question 1.

Ms. Yan knew Mr. Lorenzo but not Mr. Ng and Mr. Yin. Ms. Yan met Mr. Lorenzo in Beijing in early 2012. She attended two meetings in New York in 2012 and within a day of one another, with Mr. Lorenzo, Mr. Ashe, and CC-1 at which a potential collaboration between South South News (the organization with which Mr. Lorenzo was affiliated) and CC-1's business was discussed. Nothing came of the discussions, as far as Ms. Yan was aware. Ms. Yan first saw or learned of Mr. Ng and Mr. Yin after their arrest.

Question 2.

Paragraph 20 of the PSR indicates that Defendants Yan and Piao began paying Ashe $20,000.00 a month in August 2013. Over what period of time were these payments made? In other words, when did these payments cease.

Answer to Question 2.

Paragraph 34 of the Presentence Report makes reference to Ms. Piao and Ms. Yan making monthly payments to Mr. Ashe after he was elected President of the U.N. General

Assembly ("PGA") in June 2013 and "under the guise of being the 'Honorary Chairman' of NGO-2."

Ms. Yan and Ms. Piao paid Mr. Ashe $20,000 monthly from August 2013 to February 2014, plus an additional payment of $20,000 for October 2013, for a total of $160,000. To be precise, these payments were made to Mr. Ashe in connection with his role as a member of the Advisory Board of Australia China Capital Management ("ACCM"), a for-profit company incorporated in Hong Kong and owned by Ms. Piao and Ms. Yan. Annexed as Exhibit A is an email dated July 29, 2013 attaching invitations to Mr. Ashe and others to join the Advisory Board of ACCM. Bank records also establish that the payments were made from an ACCM account in Hong Kong. "NGO-2," which refers to the Global Sustainable Development Foundation ("GSDF"), was not incorporated until January 2014,[1] and did not launch until September 2014.

Mr. Ashe's term as PGA ended in September 2014. Following the end of his term as PGA, ACCM made a $30,000 payment to Mr. Ashe in October 2014. Another ACCM payment to Mr. Ashe, of $20,000, was made only after Mr. Ashe also left his diplomatic post.

Question 3.

What evidence is there that the Global Sustainability Development Foundation Ltd. worked on projects and/or cooperative partnerships that utilized "scientific and technological innovations for social good?" (PSR ¶ 109.) What were those projects and/or partnerships?

---

[1] *See* Certificate of Incorporation, dated Jan. 16, 2014, annexed hereto as Exhibit B.

Answer to Question 3.

It was the Global Sustainability Foundation ("GSF") that had as its mission the "scientific and technological innovations for social good," not the GSDF. *See* PSR ¶ 109.[2] GSF was the second of the two foundations that Ms. Yan and Ms. Piao organized. Since her arrest, Ms. Yan has severed ties with GSF. Ian Hutchinson, Esq., the former Chairman of Australia Freehills, now known as Herbert Smith Freehills, has remained on the Board of GSF as Chairman. Mr. Hutchinson submitted a letter in support of Ms. Yan that is annexed as part of Exhibit 1 to Ms. Yan's Sentencing Memorandum and describes GSF before and after Ms. Yan's arrest.

An example of a project or partnership that served the GSF mission was GSF's work with the STEM Education Foundation. STEM is an acronym for Science, Technology, Engineering, and Mathematics. In the spring of 2015, GSF, the STEM Education Foundation in China,[3] and the New York Academy of Sciences[4] entered into a three-party contract to implement the "STEM" education programs.[5] After this agreement was signed, GSF worked with the STEM Education Foundation on a project that had the objective of using long-distance satellite technology to help children in remote areas to obtain education in the sciences.[6]

---

[2] *See also* Mission Statement of GSF, annexed hereto as Exhibit C.

[3] *See* About Us, STEM Education Foundation, http://en.chinastem.org/a/guanyuwomen/jijinhuijieshao/ (last visited July 27, 2016).

[4] *See* Mission & History, The New York Academy of Sciences, http://www.nyas.org/AboutUs/Mission.aspx (last visited July 27, 2016).

[5] *See* Partnership Agreement, dated April 30, 2015, annexed hereto as Exhibit D. This copy of the agreement is signed only by the representative of the New York Academy of Sciences but later articles refer to the cooperation agreement being in place.

[6] *See* Email from ███████████████████████████████, dated July 22, 2015, providing progress report on the "China STEM Distance Satellite Real-Time Education Network" project, annexed hereto as Exhibit E.

3

Attached hereto as Exhibit F are articles from the STEM Education Foundation's website regarding its collaboration with GSF and the New York Academy of Sciences, and the STEM Education Foundation's efforts to bring education to schools in rural China. The project was implemented in many schools in poor, mountainous districts in China and remains a project of GSF today. GSF's contribution to the project was funded by a Chinese real estate company, ███████,[7] and ███████████████████████████████████.[8]

Question 4.

Was the Global Sustainability Development Foundation Ltd. a not-for-profit? If so, did it file Forms 990s? If so, over what period of time? Could I receive representative samples of the Forms 990s filed by the Global Sustainability Development Foundation Ltd.?

Answer to Question 4.

We will again interpret this question to be about GSF, not GSDF. GSF was registered in New York as a corporation and described as a non-profit organization in that registration,[9] but was never registered as a tax exempt charitable organization and therefore did not file Forms 990. The Board of GSF was overseeing preparatory steps to register as a tax-exempt organization, including by hiring an accountant to prepare financial statements for audit, when Ms. Yan and Ms. Piao were arrested.

---

[7] See Introduction, ███████████████████████.com/en/company introductiongy-en/ (last visited July 27, 2016).

[8] See ████████████████████████████████████████/2015/0820/68.html (last visited July 27, 2016).

[9] See GSF Filing with NYS Dept. of State, as of July 27, 2016, annexed hereto as Exhibit G.

We attach hereto as Exhibit H, as an example, an email exchange between Ms. Yan and GSF's lawyer noting GSF's plan to seek 501(c)(3) status.

Question 5.

What evidence is there that the Global Sustainable Development Foundation worked on projects related to Millennium Development Goals? (PSR ¶ 112.) What were those projects?

Answer to Question 5.

GSDF, the predecessor organization to GSF, had as its mission the acceleration of the achievement of the Millennium Development Goals ("MDGs"). *See* PSR ¶ 109.[10] Two examples of instances in which GSDF took preparatory steps—and preparatory steps only—to engage in projects intended to help advance the MDGs and the United Nations' related Sustainable Development Goals ("SDGs")[11] are the "Connect to Learn" and "Next Generation" projects.

Beginning in approximately March 2014, Ms. Yan and GSDF engaged in discussions with representatives of the "Connect to Learn" project. Connect to Learn was launched by the Columbia University Earth Institute and aims to provide universal access to quality education,

---

[10] *See* Mission Statement of GSDF, attached hereto as Exhibit I.

[11] The MDGs are eight goals aimed at eliminating global problems such as poverty, hunger and disease. *See* What They Are, Millennium Project, http://www.unmillenniumproject.org/goals/ (last visited July 27, 2016). The related SDGs are 17 goals adopted by world leaders in 2015 with the intention that they would build on the progress of the MDGs. *See* Sustainable Development Goals, U.N. Development Programme, http://www.undp.org/content/undp/en/home/sdgoverview/post-2015-development-agenda.html (last visited July 27, 2016).

5

particularly for marginalized school-aged girls in poor countries.[12]  GSDF, and GSF once the foundation was reorganized, explored seeking funding for Connect to Learn initiatives.[13]

GSDF also dedicated time to preparing the launch of the "Next Generation" project, a project to support young people throughout the world who have a desire to get involved with the SDGs.[14]  The Next Generation project was ongoing at the time of Ms. Yan's and Ms. Piao's arrest.

Question 6.

Was the Global Sustainable Development Foundation a not-for-profit? If so, did it file Forms 990s? If so, over what period of time? Could I receive representative samples of the Forms 990s filed by the Global Sustainable Development Foundation?

Answer to Question 6.

GSDF was registered in Washington, DC, as a corporation and operated as a not-for-profit organization, but was never registered as a tax exempt charitable organization and therefore did not file Forms 990.  The Board of GSDF intended to register GSDF as a tax exempt charitable organization but concrete preparations did not take place until after GSF was launched.

---

[12]  *See* Mission, Connect to Learn, http://connecttolearn.org/about-us/mission (last visited July 27, 2016).

[13]  *See, e.g.*, Email from ▬▬▬▬▬ to Ms. Yan, copying Ms. Piao, dated Apr. 1 2014, annexed hereto as Exhibit J; Email from ▬▬▬ to Ms. Yan and others, dated Oct. 5, 2015, annexed hereto as Exhibit K.

[14]  *See* GSF Next Generation Project Proposal, attached hereto as Exhibit L.

6

Question 7.

In paragraphs 130 and 133 of the PSR there are various personal loans noted. What were the circumstances under which these loans were made? When were these loans made? What banks did the money come from and where was it deposited? Other than the letters referenced in paragraph 133 of the PSR, is there any documentation for these loans? What are the payment terms for these loans? Have any payments been made on these loans?

Answer to Question 7.

In paragraphs 130 and 133 of the Presentence Report, three loans are noted: two in the total amount of ▓▓▓▓ from Ms. Yan's parents, and a third in the amount of ▓▓▓▓ from Ms. Yan's childhood friend ▓▓▓▓.[15]

The ▓▓▓▓ loan from Ms. Yan's parents had three components.

In 2012, Ms. Yan borrowed approximately ▓▓▓▓ from her parents to help fund a dinner banquet being thrown by South South News in Hong Kong. Ms. Yan borrowed this money shortly after she and Ms. Piao met Forrest Cao, the husband of Vivian Wang. Mr. Cao, who has since passed away, told Ms. Yan and Ms. Piao about South South News and invited Ms. Yan to be Chief Representative of the Asia-Pacific Region of South South News and to attend the opening of the South South News Asia Center—the dinner banquet—in Hong Kong. Mr. Lorenzo then sent to Ms. Yan a letter formalizing her "title."[16]

Mr. Cao later told Ms. Yan that another woman who lived in China, who had been slated to fund the dinner, had withdrawn her funding. He and his wife also told Ms. Yan that because the funder had backed out, and Ms. Yan had accepted her South South News "title," she must

---

[15] *See* Letters from Ms. Yan's parents and ▓▓▓▓, annexed hereto as Exhibit M.

[16] *See* Confirmation of Appointment, dated Feb. 8, 2012 and signed by Mr. Lorenzo, annexed hereto as Exhibit N.

7

herself provide the funding that the other woman had failed to provide. Ms. Yan ended up borrowing the funds from her parents. The borrowed funds were transferred from her parents' bank account at ▇▇▇▇▇▇▇▇▇▇ in Beijing, China to the account of a friend, "Individual-1" in the Complaint, at Bank of China, who then transferred the same amount from his U.S.-based account to South South News. The morning after the banquet, Ms. Yan found that all of the South South News representatives had left their hotel in Hong Kong without telling her.

Ms. Yan's parents also loaned her approximately ▇▇▇, from the same ▇▇▇ account, to help with her living expenses in 2012. These funds were sent to Ms. Yan's account at ▇▇▇▇ in Beijing.

Following her arrest, in October 2015, Ms. Yan's parents loaned her an additional ▇▇▇ to pay for her legal fees, also from the ▇▇▇ account. These funds were sent to the account of Ms. Yan's daughter, Victoria Uren, at ▇▇▇.

The funds loaned by ▇▇▇ came primarily from accounts ▇▇▇ in the United States and an account at ▇▇▇▇▇. These loans were also provided to Ms. Yan to help cover her legal fees. They were also deposited into Ms. Uren's account at ▇▇▇. Since the Presentence Report was finalized, ▇▇▇ has made additional loans such that the total borrowed by Ms. Yan from ▇▇▇ to help pay legal fees of approximately ▇▇▇.

Question 8.

Could I get a copy of the letters related to the loans referenced in paragraph 133 of the PSR?

8

Answer to Question 8.

The letters referenced in Paragraph 133 of the Presentence Report, which verify that the loans were made, are annexed hereto as Exhibit M. The loans remain outstanding, and there are no specific payment terms for the loans, except that Ms. Yan will return the money when she is able.

Question 9.

What is the nature of the lawsuit referenced in paragraph 136 of the PSR?

Answer to Question 9.

The Government has provided a copy of the complaint that was filed in Australia against Ms. Yan on September 23, 2015, a few weeks before she was arrested. The suit has not moved forward in the last ten months, to Ms. Yan's knowledge.

Question 10.

What evidence is there that Defendant Yan filed personal income taxes in Australia between 2008 and 2015? (PSR ¶ 141.) Even if such taxes were filed would Defendant Yan still be required to file taxes in the United States for those years?

Answer to Question 10.

Ms. Yan filed personal income tax returns in Australia for the years 2008, 2009, 2010, and 2013, and in the years 2011, 2012, 2014, and 2015 a tax preparer filed requests for exemptions on her behalf. Rather than filing the information, we will be prepared to hand the tax documentation to the Court at sentencing.

Ms. Yan would still be required to file tax returns in the United States assuming she met the relevant income threshold. As part of pleading guilty and preparing for sentencing, Ms. Yan

has engaged the accounting firm EisnerAmper to prepare U.S. tax returns and Reports of Foreign Bank and Financial Accounts ("FBARs") for past years. The returns and FBARs have been prepared and are nearly ready to file.

Question 11.

In the first paragraph on page 32 of the PSR there are two emails and a letter referenced. Could I have copies of those documents?

Answer to Question 11.

The Government has provided copies of the March 28, 2016 and March 30, 2016 emails and its letter dated April 13, 2016, referenced in the first paragraph on page 32. We annex hereto as Exhibit O the defense letter dated April 7, 2016, referenced in the second paragraph on page 32, which constituted defense objections to the draft Presentence Report.

Question 12.

On page 4 of the defense submission it says "Ms. Yan's mother and father were taken away and forced into labor, or 're-education,' and Ms. Yan and her brother lived on their own, with sporadic chances to see their mother and father." Where did Defendant Yan and her brother live during this time? Were there no adults living with them?

Answer to Question 12.

At the time Ms. Yan's family was separated, when Ms. Yan was 11 years old, they had been living together in a writers' compound in Hefei, Anhui Province. Her parents were separated from one another and sent for re-education in the countryside. Ms. Yan and her brother were separated from their parents, and from each other. Ms. Yan stayed at the writers' compound, living in the quarters formerly occupied by her family. The adults who lived in the

compound were primarily the compound's staff because most artists who had lived there were also sent away for re-education. The adults present did not supervise or care for Ms. Yan. Ms. Yan had little to no interaction with these adults, except for once a month when they would hand out food coupons to the children. Other than that, Ms. Yan fended for herself, by finding her own food or accepting food left at her door by her old nanny. She wore clothes that her mother had left behind. It was at the age of 15 that Ms. Yan joined the dance troupe run by the Red Army.

Question 13.

On pages 21 and 22 there is a discussion of the letter submitted by Bruce Dover. Did Defendant Yan believe that payments of the type made to Ashe were permitted in China?

Answer to Question 13.

The defense intends to respond to this question at sentencing.

Question 14.

Footnote 42 of the defense submission references a review of sentencings for violation of 18 U.S.C. § 666. How many cases were reviewed and in how many cases were there downward variances? Were there any upward variances in the cases reviewed?

Answer to Question 14.

We reviewed cases filed since January 1, 2008, in the Southern and Eastern Districts of New York and the Northern District of Illinois, on the Public Access to Court Electronic Records ("PACER") website. We searched PACER to find defendants charged with a violation of 18 U.S.C. § 666, who either pled guilty or were convicted after trial of that offense. We excluded

cases for which the Guidelines range was not available,[17] cases for which sufficient details of the defendant's conduct were not publicly available, and cases in which the bribery offense was not driving the Guidelines calculation, such as cases involving theft or fraud. We also excluded cases for which there was insufficient publicly available data to determine whether the defendant had cooperated and benefited from a sentence reduction pursuant to Section 5K1.1 of the Guidelines. This generally meant relying on cases in which the Government's sentencing memorandum and/or sentencing transcript was publicly available.

Through this method we arrived at a grouping of 39 cases. The defendant was sentenced below the Guidelines range in 30 of the 39 cases reviewed (approximately 77%). The remaining defendants were sentenced within the Guidelines range; there were no upward variances in any of the cases reviewed. Of the defendants sentenced within the Guidelines range, all but two were sentenced at the very bottom of the range.

Question 15.

Was Ashe going to be charged with bribery and money laundering?

Answer to Question 15.

This question is directed to the Government, and thus we provide no response.

Question 16.

Although Ashe was never charged with bribery or money laundering, assuming Ashe was convicted of tax evasion could I have upwardly departed from the guidelines without violating whatever immunity he may have had?

---

[17] We deemed the Guidelines range available where either the sentencing transcript specified the range adopted by the Court or the Guidelines range advocated by the Government was set forth in the Government's sentencing memorandum.

Answer to Question 16.

The defense will leave the Government to respond to this question in the first instance.

Question 17.

When was the last time Defendant Yan visited her parents?

Answer to Question 17.

Ms. Yan last saw her parents on August 11, 2015, just before she travelled to New York for the stay that ended in her arrest. Between 2013 and 2015, Ms. Yan spent approximately four to five months per year in China, during which time she lived with her parents in Beijing. In 2011 and 2012, Ms. Yan lived with her parents in China for approximately nine and ten months, respectively.

Question 18.

Has Defendant Yan shared her story with the children participating in the Children of Promise programs?

Answer to Question 18.

Ms. Yan informed the management and staff of CPNYC, including director Sharon Content, of her criminal case when she first began volunteering there, in January. As a volunteer, and when she is with the children, Ms. Yan primarily supports the organization's art classes. Although she has no reservation about doing so, she has not shared her story with the children simply because such a discussion would have been out of context in that setting. Also, many of the children are below the age of 10.

Question 19.

On pages 4 and 5 of the Government's submission it says "Ashe asked that the money—which self-evidently was not for a holiday party—be sent to one of the two bank accounts he had set up supposedly to fund activities of the PGA, but was using to pay himself and to cover personal expenses." What is the basis for saying that it is self-evident that the money was not going to be used for a holiday party? Is there evidence in the record concerning whether or not a holiday party occurred?

Answer to Question 19.

The reference is to a $100,000 payment made in December 2013; the Complaint implies that it may have been provided in exchange for action on behalf of the "Chinese Security Company." *See* Complaint 48j-l. In emails sent to Ms. Yan and Ms. Piao, Mr. Ashe informed them that these funds would be used, at least in part, for the PGA Office's year-end holiday party.[18] He also followed up after the party to thank Ms. Yan and Ms. Piao for their contribution which "enabled [him] to pay for it."[19]

Question 20.

Am I correct that the recommendation of the Probation Department was made without the benefit of the defense and Government submissions?

Answer to Question 20.

Yes.

---

[18]  *See* Email from Mr. Ashe to Ms. Yan, dated Dec. 7, 2013, annexed hereto as Exhibit P.

[19]  *See* Email from Mr. Ashe to Ms. Piao and Ms. Yan, dated Dec. 21, 2013, attached hereto as Exhibit Q.

Question 21.

Is it the Government's position that Defendant Yan should be sentenced to more jail time then Dean Skelos?

Answer to Question 21.

This question is directed to the Government, and thus we provide no response.

Question 22.

In the first paragraph on page 11 of the Government's submission there is a reference to a contract with the Antiguan government. Is that contract the memorandum of understanding ("MOU")? If not, what contract is being referenced? If so, did the transaction related to the security company proceed any further than the MOU?

Answer to Question 22.

Ms. Yan is not aware of any action beyond the signing of the MOU. Ms. Yan's emails reflect that after the MOU was signed, the project was delayed as a result of inaction on the Antiguan side and the government contact in Antigua for the project ultimately stopped responding to emails from Ms. Piao attempting to advance the project.[20]

---

[20] *See* Email from Ms. Piao to Mr. Ashe, copying Ms. Yan, dated July 29, 2015, almost four months after the MOU was signed, explaining that the contact for the project on the Antiguan side had "disappeared," annexed hereto as Exhibit R.

15

DATED:   New York, New York            Respectfully submitted,
            July 28, 2016

                                      By: */s/ Christine H. Chung*
                                           QUINN EMANUEL URQUHART &
                                           SULLIVAN, LLP
                                           Christine H. Chung
                                           Samantha Gillespie
                                           51 Madison Avenue, 22nd Floor
                                           New York, New York 10010
                                           (212) 849-7000

                                           CLAYMAN & ROSENBERG LLP
                                           Isabelle A. Kirshner
                                           305 Madison Avenue, Suite 1301
                                           New York, New York 10165
                                           (212) 922-1080

                                           *Attorneys for Defendant Shiwei Yan*