**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

   -  v.  -

NG LAP SENG,

                 Defendant.

No. 15 Cr. 00706 (VSB)

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT NG'S MOTION TO COMPEL DISCOVERY

---

Tai H. Park
Christopher Greer
PARK JENSEN BENNETT, LLP
40 Wall Street, 41st Floor
New York, New York 10005

Hugh H. Mo
LAW FIRM OF HUGH H. MO, P.C.
225 Broadway, Suite 2702
New York, NY 10007 -3080

Alexandra A.E. Shapiro
SHAPIRO ARATO LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110

*Attorneys for Defendant Ng Lap Seng*

### TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS .................................................................................... 5

ARGUMENT ……………………………………………………………………………..9

      THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE THE REQUESTED
DOCUMENTS ................................................................................................ 9

    A.  Conference Center Documents ................................................... 9

        1.  The Requested Documents Constitute Brady Material
           and Are Critical to the Defense................................................ 9

        2.  The Documents Are Within the Government's Control ..................................... 12

    B.  PGA Documents ................................................................ 14

    C.  The Internal Government Documents....................................... 17

        1.  Governing Legal Standard ..................................................... 17

        2.  There is Evidence of Selective Prosecution Justifying
           Grant of Discovery........................................................ 19

CONCLUSION........................................................................................ 27

Table of Authorities

*Cases*                                                                    Page No.

*Berger v. United States*,
   295 U.S. 78, 88 (1935) .................................................................................... 14
*Bond v. Floyd*,
   385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966) ................................................ 19
*Brady v. Maryland*,
   373 U.S. 83 (1963) ......................................................................................... 9
*Giglio v. United States*,
   405 U.S. 150 (1972) ....................................................................................... 9
*Gonzalez v United States*,
   No. 12 Civ. 5226 2013 WL 5289793 (S.D.N.Y. Sept 19, 2013) ............................. 14
*Kyles v. Whitley*,
   514 U.S. 419 (1995) ..................................................................................... 13
*Oyler v. Boles*,
   368 U.S. 448, 456 (1962) ............................................................................... 18
*Schacht v. United States*,
   398 U. S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970) .............................................. 19
*Strickler v. Greene*,
   527 U.S. 263, 280-281 (1999) ......................................................................... 14
*United States v. Al Jibori*,
   30 F.3d 22, 25 (2d Cir. 1996) ...................................................................... 18, 20
*United States v. Armstrong*,
   517 U.S. 456, 465 (1996) ............................................................................... 19
*United States v. Falk*,
   479 F.2d 616 (7th Cir. 1973) ......................................................................... 19
*United States v. Kilroy*,
   523 F. Supp. 206, 215 (E.D. Wisc. 1981) ............................................................ 14
*United States v. Kuznetsov*,
   Case No. 1:05-cr-00819-DAB (S.D.N.Y.) ........................................................... 21
*United States v. Sanjaya Bahel*,
   Case No. 1:06-cr-00918-1-TPG (S.D.N.Y.) ......................................................... 21
*United States v. Stein*,
   488 F.Supp.2d 350, 363 (S.D.N.Y. 2007) ........................................................... 14
*United States v. Taylor*,
   993 F.2d 382, 385 (4th Cir. 1993) .................................................................... 15

*United States v. Yakovlev*,
  Case No. 1:05-cr-00819-DAB (S.D.N.Y.) .................................................................. 21

**Statutes**

18 U.S.C. § 666 ............................................................................................................. 5

**Other Authorities**

Fed. R. Crim. P. 16(d)(2) .............................................................................................. 13
UN Report (A/70/783) ................................................................................................... 9

## PRELIMINARY STATEMENT

Defendant Ng Lap Seng brings this motion to compel discovery from the United States because the prosecutors have refused to produce documents that are vital to Mr. Ng's defense.

In order to understand the materiality of the documents sought, it is important to see this case for what it is and what it is not.  While the prosecution charges a bribery scheme, the case is in fact driven by the U.S. government's geopolitical interest in stopping the United Nations from establishing a Permanent Expo and Conference Center in China.  To achieve this goal, the government has brought an unprecedented prosecution stretching the bounds of federal interest and intruding forcefully into the internal affairs of the United Nations ("U.N.").  The prosecution effectively destroyed all efforts to pursue an idea that would benefit the non G-7 nations of the world.  This idea was to build a Permanent Expo and Conference Center in Macau, China, at no cost to the U.N., so that the southern hemisphere nations may have a permanent center to meet and plan projects that would benefit the billions of people who make up those nations.

The U.S. government has never before brought a case like this for good reason: the federal interest in a criminal prosecution of this conduct is indiscernible, while the intrusion into the internal affairs of a separate quasi-sovereign entity, the U.N., is severe.  The U.N. knows how to govern itself and enforce its internal regulations.  There is no indication that it sought the government's assistance in dealing with its members here.  Similarly, the government of Antigua knows how to govern the conduct of its delegates to the U.N., and, as the Court is aware, the Antiguan government flatly refused to waive diplomatic immunity for its Ambassador in the face of a demand by the U.S. government that it do so.

Thus, this prosecution: (1) of a Chinese citizen, (2) allegedly conspiring with an Antiguan Ambassador, (3) regarding a U.N. project (4) to be built in China, (5) that would not

involve any U.N. funds, implicates no domestic federal interest.  It was not brought to enforce U.N., Antiguan or even U.S. anti-bribery laws.  It was designed to prevent the establishment of a U.N. center for southern hemisphere nations in China.

This underlying governmental purpose is demonstrated by the fact that, after years of investigating Mr. Ng, the government arrested and detained him just as it appeared the U.N. may in fact vote on the idea of the center and vote favorably.  The arrest was made within three days of a scheduled State Visit by the Chinese President to the United States, during which visit he addressed the U.N. and pledged his country's firm support for the southern hemisphere nations and donations of more than $14 billion.  The government arrested Mr. Ng on an obvious "placeholder" charge that he had falsely declared the purpose of the hundreds of thousands of dollars in cash that he regularly brought into the country and that he regularly declared to Customs.  Later, having caused his incarceration, the government took its time to bring the real charges (abandoning the false declaration charges that they knew or should have known to be baseless), and claimed illegal bribery in violation of 18 U.S.C. § 666.

While the unprecedented criminal prosecution is fundamentally unsound, regardless of the outcome of this case, the mere arrest and incarceration of Mr. Ng has had one concrete result: the utter derailment of any plans for a permanent conference center in Macau.  There is every reason to believe that the U.N. has, indeed, completely shelved the idea of such a center.  The U.S. geopolitical interest in slowing the progress of Chinese influence over developing nations has been achieved.

With that as background, the materiality of the following three categories of documents is manifest:

First, documents relating to the U.N.'s consideration of a permanent conference center for the so-called "South South" nations will bear directly on Mr. Ng's state of mind. There is every reason to believe that each time the delegates from these nations considered the idea of a center in Macau, they deemed it worthy of serious consideration.  And why should they not? China is one of the South South nations, not a member of the G-7 elite who largely control the agenda of the U.N.  Such documents will materially aid the defense against charges of corrupt intent to bribe any official whose interest was already well-aligned with that of the South South nations.

Second, documents relating to the findings of the U.N. Task Force that concluded, in essence, that it was customary for the Office of the President of the General Assembly ("PGA") to accept large donations of cash and other gifts from private donors, are also material to the intent element.  Not only has the prosecution intruded into U.N. affairs, it threatens to import American sensibilities and customs into a uniquely international environment that has its own set of customs and expectations.  If the government wishes to prosecute a Chinese citizen premised on assumptions about the morae of an international community of nations, we must be able to oppose that effort with a better understanding of the custom and practice of private donations within the U.N.  The Task Force Report, appended hereto, provides a mere glimpse, in summary form, of this custom, as it concluded that for at least the past ten years, "[t]he financial and human resources needs of the President [of the General Assembly] have been met from voluntary contributions, in cash and in-kind, from various donors, including . . . foundations and nongovernmental organizations" (Report at 3), and that "there are no formal, agreed common principles of ethical conduct or financial disclosure measures for the President and the personnel of the Office, except those serving under United Nations letters of appointment." (*Id.* at 4.)

It is critical to the defense of Mr. Ng, who is alleged to have made contributions to Ambassador Ashe as President of the General Assembly, that every document at the U.N. relevant to the practice and custom regarding private donations be produced promptly.

While the government has claimed that any such document requests should be directed to the U.N., we have done so and received no response whatsoever.  Not surprisingly, the U.N. has shown no interest in cooperating with the defense requests.  But it has publicly declared it is fully cooperating with the government, and there is every reason to believe a sincere request by the United States for production of documents essential to the functioning of our criminal justice system will be met with full compliance.  Under these circumstances, the U.N. documents are within the "control" of the United States as that term is generally understood, and the government should be directed to obtain and produce them pursuant to its Rule 16 and *Brady* obligations.

If the government refuses or the United Nations refuses, Mr. Ng will promptly move for an order dismissing the charges.

Third, we seek internal documents from all agencies of the U.S. government relating to the establishment of a permanent conference center in Macau, China.  As explained below, there is abundant basis for believing that the intelligence agencies (including the case agency here, the FBI) closely tracked Mr. Ng's activities regarding the Macau conference center and viewed his conduct as that of the Chinese government.  The prosecutors have said as much in open court.  A review of all electronic interceptions, computer data mining, and internal governmental communications and analysis, we believe, will reveal that the prosecution was designed to single out Mr. Ng because of his efforts to build a center for South South nations within the territory of China.  This would be an unconstitutional motivation, requiring dismissal of the indictment.

The government should be ordered to collect and produce each of the above categories of documents.

## STATEMENT OF FACTS

By discovery letter dated July 22, 2016, Mr. Ng asked that the government produce certain documents. *See* Declaration of Tai H. Park, dated August 11, 2016 ("Park Dec.") Ex. A.[1] By letter dated August 8, 2016, the government declined to produce the Brady material that are now at issue in this motion to compel. *See* Ex. B.[2]

Specifically, the government declined to provide:

1. All documents related to any contributions, donations or payments by private parties, corporations or nongovernmental organizations to, or for the benefit of, the following Presidents of the General Assembly of the UN ("PGA"):

    a. 56th PGA, Mr. Han Seung-soo, or the Office of the 56th PGA,

    b. 57th PGA, Mr. Jan Kavan, or the Office of the 57th PGA,

    c. 58th PGA, Mr. Julian Robert Hunte, or the Office of the 58th PGA,

    d. 59th PGA, Mr. Jean Ping, or the Office of the 59th PGA,

    e. 60th PGA, Mr. Jan Eliasson, or the Office of 60th PGA,

    f. 61st PGA, Ms. Sheikha Haya Rashed Al Khalifa, or the Office of the 61st PGA,

    g. 62nd PGA, Mr. Srgjan Kerim, or the Office of the 62nd PGA,

    h. 63rd PGA, Mr. Miguel d'Escoto Brockmann, or the Office of the 63rd PGA,

---

[1] All references to Exhibits shall be to documents annexed to the Park Declaration submitted herewith.

[2] In our letter, the defense requested a prompt response from the government so that if it declined to comply with the document requests, we could file a motion to compel that would be in time for the defense to make substantive motions. *See* Ex. A at 2. More than a week after the requested response date, the government filed its letter declining to produce the requested documents and purported to invite the defense to continue discussion of the matter. *See* Ex. B, at 9. In light of the tight deadlines applicable to this case, as well as the near certainty that any such prolonged discussions would be futile, the government's letter is effectively a refusal to accede to our requests.

    i.   64th PGA, Dr. Ali Abdussalam Treki, or the Office of the 64th PGA,

    j.   65th PGA, Mr. Joseph Deiss, or the Office of the 65th PGA,

    k.   66th PGA, Mr. Nassir Abdulaziz Al-Nasser, or the Office of the 66th PGA,

    l.   67th PGA, Mr. Vuk Jeremić, or the Office of the 67th PGA,

    m.   69th PGA, Mr. Sam Kutesa, or the Office of the 69th PGA, or

    n.   70th PGA, Mr. Mogens Lykketoft, and/or the Office of the 70th PGA.

2.   All documents related to or showing contributions, donations or payments made to any account held by or in the name of Mr. John Ashe, or to the Office of the 68th PGA.

3.   All documents, including financial records, results of audits, and notes of interviews of witnesses, relied upon by the Secretary-General's Task Force in reaching the conclusions set forth in the UN Report (A/70/783) ("the Report"), *see* Ex. C, including but not limited to the following conclusions:

    a.   [Referring to the past ten sessions,] "the financial and human resources needs of the [PGA] President have been met from voluntary contributions, in cash and in-kind, from various donors, including . . . foundations and nongovernmental organizations." (Ex. C, at 3.)

    b.   "the funding arrangements for cash and in-kind contributions from Member States and non-United Nations entities are made on an ad hoc basis and at the sole discretion of the President." (*Id.*)

    c.   "a significant number of in-kind contributions, for which no official records are available, are provided directly to the President and the Office by donors."

    d.   "Finally, and perhaps most significantly, the Task Force found that there are no formal, agreed common principles of ethical conduct or financial disclosure measures for the president and the personnel of the Office, except those serving under United Nations letters of appointment." (*Id.* at 4.)

The foregoing document requests 1 through 3(d) shall be referred to hereinafter as the "PGA

Document Requests."

4.   All documents from the United Nations relating to discussions about a permanent conference center for the South South nations (the "Subject") from 2006 through the present, including but not limited to, the following:

    a.   Internal communications within the United Nations, including the PGA, the UNOSSC and other member nations, discussing the Subject;

    b.   Minutes of any meetings held within the United Nations discussing the Subject;

    c.   Documents reflecting any positions taken or arguments made by any member nation representative regarding the Subject;

    d.   Documents reflecting any votes taken on the Subject;

    e.   Documents reflecting feasibility studies on the Subject;

    f.   Documents reflecting a search for suitable locations for a permanent conference center;

    g.   Documents reflecting discussions about a center located in mainland China;

    h.   Documents reflecting discussions about a center located in Macau;

    i.   Documents regarding Ng Lap Seng and/or his company the SKI Group, including, but not limited to, any documents evidencing the UN's awareness of Mr. Ng's support for a permanent conference center for the South South nations in Macau;

    j.   Documents regarding UN discussions and deliberations about a permanent conference center in China after the public arrest and charges against Mr. Ng by the government.

These requests shall be referred to hereinafter as the "Conference Center Document Requests."

5.   All documents evidencing the government's awareness of the facts underlying the above-quoted conclusions in the Task Force Report prior to bringing criminal charges against Ng Lap Seng.

6.   All documents regarding communications between the United States government and the government of Antigua regarding the prosecution of Ambassador John Ashe, including but not limited to:

    a.   Internal State Department analysis of the question whether Ambassador Ashe was immune from prosecution;

    b.   All internal communications or analysis conducted by any U.S. governmental agency regarding the question whether Ambassador Ashe's conduct was condoned or authorized by the Antiguan government or subject to diplomatic immunity;

  c. All communications between representatives of the United States government and Antigua regarding Ambassador Ashe's immunity from prosecution.

7. All internal governmental documents relating in any way to investigation of whether Mr. Ng's support of the Macau conference center was authorized, directed or supported by the Chinese government, including but not limited to the following:

  a. FISA interception of calls that relate in any way to Mr. Ng's activities with the United Nations;

  b. Internal U.S. Attorney's Office, FBI, State Department, NSA or other intelligence agency memoranda or correspondence discussing Mr. Ng's activities in the United States;

  c. Internal U.S. Attorney's Office, FBI, State Department, NSA or other intelligence agency memoranda or correspondence discussing the Chinese government's involvement, if any, with the permanent conference center in China;

  d. Any documents evidencing an U.S. governmental investigation of Antigua's or any other South South nation's communications with the government of China regarding support for a South South nations conference center in China.

8. All documents discussing or relating to the timing of Ng Lap Seng's arrest on or about September 19, 2015, including but not limited to, documents within the U.S. Attorney's Office, the FBI, the State Department or any of the intelligence agencies discussing whether Mr. Ng should be arrested at or near the time when the Chinese President, Xi Jinping, was scheduled for the following agenda:

  a. Arrival in Seattle on September 22, 2015;

  b. Attendance at a State Visit to the United States on September 24-25, 2015;

  c. Attendance at the General Assembly meeting at the United Nations;

  d. Planned speech at the United Nations' Sustainable Development Summit.

    i. In this speech, the Chinese President announced China's donation of $2 billion to achieve post-2015 development goals and $12 billion investment in the least developed states, and China's commitment of $1 billion to the United Nations for a 'peace and development fund.

9. All documents, including communications between the United States Attorney's Office and the Department of State, showing or suggesting that the arrest and prosecution of Mr. Ng was influenced by United States' foreign policy, including but

not limited to the government's interest in halting the development of a permanent
conference center for South South countries in China.

(Ex. A, at 7–10).  The foregoing requests shall be referred to hereinafter as the "Internal

Government Document Requests."

## ARGUMENT

### THE GOVERNMENT SHOULD BE ORDERED
### TO PRODUCE THE REQUESTED DOCUMENTS

The government's discovery obligations are well-established and straightforward: among

other requirements, it must produce any documents material to the defense. *See* Fed. R. Crim. P.

16(a)(1)(E)(i).  Moreover, under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United*

*States*, 405 U.S. 150 (1972), the government must produce all exculpatory material in its custody

or control, or otherwise known to the government (hereinafter "*Brady* material").  If the

government fails to comply with these requirements, the Court may order the government "to

permit the discovery or inspection; specify its time, place and manner; and prescribe other just

terms and conditions. Fed. R. Crim. P. 16(d)(2).

Because the government declined to produce documents material to the defense as well

as *Brady* material, the Court should compel it to do so. We take each document request in turn.

A.    Conference Center Documents

1.    *The Requested Documents Constitute* Brady *Material and Are Critical to the*
*Defense*

The government charges a corrupt bribery scheme that sought to win U.N. approval of a

permanent center for the southern hemisphere or "South South" nations in Macau.  Implicit in

this charge is the false assumption that Mr. Ng believed illicit payments were necessary to

achieving the goal of establishing such a center. Both common sense and the history of the South

9

South community of nations thoroughly undermine that false assumption. Disclosure of U.N. documents relating to the possibility of a permanent center for the South South nations is critical to demonstrating that Mr. Ng would have had no reason to break the law to achieve his goal.

The South South nations are a collection of 133 countries, including China, primarily located in the southern hemisphere of the globe, including all Latin American, African, Middle-Eastern and many Asian nations. While many of these countries are considered developing nations, they include stable and prosperous ones as well, such as Brazil and China. Because of the challenges that uniquely confront the South South nations, there is a department within the U.N. solely devoted to their issues: the U.N. Office for South South Cooperation or "UNOSSC". A detailed summary of the mission, guidelines, objectives and benefits of the UNOSSC can be found on the U.N.'s official website at http://ssc.undp.org/content/ssc/about/Background.html.

The objectives of the South South nations can be summarized in a single phrase: achieving independence and self-reliance. It is commonly known that the so-called G7 or G8 nations (depending on whether Russia is included or not) exert extraordinary and disproportionate influence over the global economy and policy. The South South nations have no voice in that elite body's deliberations and decisions. Thus, as the website of the UNOSSC illustrates, the overwhelming focus of the South South nations is finding ways to be self-reliant as a community of like-minded nations. The first objective for South South Cooperation is to "foster the self-reliance of developing countries by enhancing their creative capacity to find solutions to their development problems in keeping with their own aspirations, values and special needs." Another objective is to "enable developing countries to achieve a greater degree of participation in international economic activities and to expand international cooperation for development." The UNOSSC also explains that pooling of resources of the South South nations

can: "Strengthen[] the voice and bargaining power of the developing countries in multilateral negotiations," and "[f]oster[] economic, scientific, and technological self-reliance."

With that as background, it becomes clear why the idea of a permanent expo and conference center in one of the South South nations, namely China, would naturally have attracted serious consideration.  We expect that the Conference Center Documents will demonstrate that the South South nations perennially struggled to find a suitable conference center each year ; that, without a permanent center that would be exclusively devoted to the serious issues confronting those nations, the South South agenda would continue to be unfocused and disjointed; that a center in China would be a dramatic game-changer because it would be based in a country that was itself a South South nation, but one with enormous economic resources and credibility on the world stage.

As the government acknowledges, Mr. Ng offered the South South nations a home.  He offered to have his company, SKI Group, finance and build a permanent center in the Macau region of China.  For free.  Such an offer has historical precedent for the U.N.  When the U.N. headquarters was first built, the Rockefeller family donated to the international community priceless real estate for the construction of the U.N., at a cost to the U.N. of $1.  Fact Sheet: History of the United Nations Headquarters, available at

http://www.un.org/wcm/webdav/site/visitors/shared/documents/pdfs/FS_UN%20Headquarters_ History_English_Feb%202013.pdf   The South South nations likely saw in Mr. Ng a modern philanthropist of vast wealth who had a vision that was in keeping with the civic vision of the Rockefellers, but one focused on the unique issues confronting their respective governments and constituent citizens.

We expect U.N. documents will confirm the enthusiasm of the South South delegates as a whole when Mr. Ng's proposal was brought to their attention.  All the U.N. documents that relate to a permanent expo and conference center, its necessity, where it should be located and how it might be financed are thus plainly material to Mr. Ng's defense.  Even if they turn out not to be outright exculpatory, it cannot credibly be argued that he does not need to see them as he formulates his defense against the charge that he sought to bribe an Ambassador to support his pro bono proposal.

2.      *The Documents Are Within the Government's Control*

The government refused to even entertain the defense request for this category of documents, declaring simply that the U.N. is a separate sovereign entity immune from the government's processes.  Of course, that did not deter them from charging a Chinese citizen for allegedly corrupting a U.N. official about a U.N. project.  Knowing full well that there would be both documents and witnesses critical to the case that the defense may never be able to secure through court processes, the government presumably got what it wanted from the U.N. and now refuses to participate in obtaining documents Mr. Ng needs to defend himself.[3]

If it is indeed the case that the documents cannot be obtained from the U.N., we will move to dismiss this misbegotten prosecution, for it would violate the basic tenets of due process.

It should not come to that because the government can easily obtain the documents from the U.N.  As the government knows, the U.N. has publicly and repeatedly declared that it is cooperating fully with the U.S. Attorney's Office.  *See* Daily Press Briefings by the Office of the

---

[3] In stating that the U.N. was a separate sovereign entity, the prosecutors advised us to seek them directly from the U.N.  We did so by letter dated July 29, 2016 addressed to the chief legal officer of the United Nations.  We received no response of any kind.  *See* Park Dec., Ex. D.

Spokesperson for the Secretary-General, October 6, 2015, at *2 (stating "obviously, if we are contacted by the relevant US authorities, we will cooperate with them") available at http://www.un.org/press/en/2015/db151006.doc.htm; Daily Press Briefings by the Office of the Spokesperson for the Secretary-General, April 4, 2016, at *4 (stating "obviously we remain fully committed to working with the . . . with any requests that may come from the US authorities") available at http://www.un.org/press/en/2016/db160404.doc.htm.  There is no reason to believe these expressions of full cooperation were not genuine.  The U.N. values transparency and obviously has a vested reputational interest in ensuring that an accurate accounting of Ambassador Ashe's conduct be revealed.  The cooperation the U.N. pledged is no different than the cooperation public companies routinely provide to prosecutors, giving them access to voluminous and even highly sensitive documents in aid of an investigation or prosecution. Under these circumstances, the government's *Brady* obligations require it to ask the U.N. to turn over the documents necessary for our defense; the prosecutors have clear notice of such documents and unquestionably have practical control over them.  See *Kyles v. Whitley*, 514 U.S. 419 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police"); *Strickler v. Greene*, 527 U.S. 263, 280-281 (1999); *Gonzalez v United States,* No. 12 Civ. 5226 2013 WL 5289793 (S.D.N.Y. Sept 19, 2013) (Civilian Complaint Review Board ("CCRB") records were "'suppressed' for *Brady* purposes," where records in CCRB's possession related to cooperating witness, who was deemed to be an arm of the prosecution team, and where the witness had knowledge of the records).

Indeed, courts have applied the same principle when compelling production under Rule 16.  *See United States v. Kilroy*, 523 F. Supp. 206, 215 (E.D. Wisc. 1981)(company's documents

deemed under control of government where company had been cooperating with and making files available to the government);  *cf. United States v. Stein*, 488 F.Supp.2d 350, 363 (S.D.N.Y. 2007)(where defendant's employer (KPMG) entered into formal deferred prosecution agreement with the government requiring it to cooperate, KPMG documents were within the control of the government for purposes of Rule 16).

The fair administration of justice is at stake.  Federal prosecutors are not only officers of the court, they are expected to ensure that justice is done and not merely that they win their case. *Berger v. United States*, 295 U.S. 78, 88 (1935).   Justice will not be done here if the government does not exercise its option, granted by the U.N., to ask for and obtain documents that will assist in an accurate verdict.

For the foregoing reasons, we respectfully request that the Court direct the government to request prompt production of the Conference Center Documents.

B.   PGA Documents

The second category of U.N. documents sought from the government (and rejected by them, again on the basis that they do not "control" such documents), are those relating to the General Assembly President's custom and practice of receiving private donations.

Mr. Ng cannot be forced to confront charges about corrupt acts of bribery at the U.N. without receiving all relevant documents regarding the U.N.'s customary practices relating to private donations of money.  Such documents are necessary to ensure the jury is not misled into believing that any monetary contribution by a private donor who has a personal interest in making the donation is necessarily engaged in an act of corruption.

That is not the law even in this country where the anti-corruption laws are as detailed and deeply etched in our culture as in any civilized nation.   As the courts have held, any

14

donation to any public figure or office is almost certainly going to involve motivation to advance

some private interest, and such payments are made all the time. *See e.g., United States v. Taylor*,

993 F.2d 382, 385 (4th Cir. 1993) (gifts to an elected official are generally made "because of his

office" or "motivated by the public office involved", and "[a]ll payments to elected officials are

intended to influence their official conduct.").

The point has increased significance in this case because the conduct and expectations of

the many members of the U.N., coming from the far reaches of the globe, are not governed by a

single set of laws or cultural expectations.  Documents relating specifically to the practices and

customs at the PGA are, therefore, of critical importance to the defense and to the jury's

understanding of what constitutes corrupt conduct.

This is not a fishing expedition.  We know that a U.N. Task Force was convened shortly

after the indictment of Ambassador Ashe, expressly to investigate what the practices were at the

PGA.  The results of its examination were made public.  Among other conclusions, the Task

Force found that the PGA was woefully underfunded by the U.N., with a grant of a mere

$326,000 for the entire annual budget of the PGA, an amount that has been static since 1998

(with increases only corresponding with inflation).  *See* Park Dec., Ex. C, at 3.  Not surprisingly,

the Task Force concluded that:

> a.  [Referring to the past ten sessions or years,] "the financial and human
> resources needs of the [PGA] President have been met from voluntary
> contributions, in cash and in-kind, from various donors, including . . .
> foundations and nongovernmental organizations." (Ex. C at 3.)
>
> b.  "the funding arrangements for cash and in-kind contributions from Member
> States and non-United Nations entities are made on an ad hoc basis and at the
> sole discretion of the President." (*Id.*)
>
> c.  "a significant number of in-kind contributions, for which no official records
> are available, are provided directly to the President and the Office by donors."

15

For at least the past ten years, it appears to have been widely accepted practice at the PGA that private donors would help to fund the PGA. There is no reason to believe this was not the way things were done from the very inception of the office of the PGA.  Of course, each of those private parties will have had their personal interest and motivations in contributing to the PGA. As the Fourth Circuit in *Taylor* put it: "[a]ll payments to elected officials are intended to influence their official conduct."  993 F.2d at 385.

This observation is especially important to the instant case because, as the Task Force further found: "there are no formal, agreed common principles of ethical conduct or financial disclosure measures for the President and the personnel of the [PGA] Office, except those serving under United Nations letters of appointment." Ex. C, at 4.

In order to prepare to defend against a vague claim of corrupt intent in the context of the PGA, we must have access to the details underlying private payments to the PGA that the Task Force reviewed and relied upon.  Such documents are expected to demonstrate that Mr. Ng's donations to the PGA were well within the norm of the PGA's historical custom and practice. As such, they constitute *Brady* material.

The government is well aware of the Task Force Report because it included the Report in its production to the defense.  The government evidently believed that its discovery obligations required it to produce the document.  Having made that determination, it should not now be heard to argue that the underlying documents that led to the Task Force conclusions are not material to the defense.  For the reasons described *supra* at 12-14, the documents are within the "control" of the government.  Thus, it should be compelled to obtain them from the U.N. for production to the defense.

16

C.      The Internal Government Documents

There is substantial basis for believing that the government chose to prosecute Mr. Ng because of his efforts to support the South South nations' long-term objectives by providing a permanent center for them in China.  Mr. Ng rose from his utterly impoverished youth to build a real estate empire in Macau.  His record of philanthropy for the poor in China is legendary, and his ambitions for the South South nations are also a matter of public record.  As early as 2010, Mr. Ng helped establish a news agency called South South News, whose primary focus is covering news that affect the South South community of nations.  *See* South South News' website available at http://www.southsouthnews.com/about-us. Mr. Ng single-handedly financed the operations of this news agency, which is located near the U.N.   His ambition to found a permanent expo and conference center for the South South nations is part of his efforts to increase the visibility and self-reliance of the developing nations.  Thus, his activity is protected by the First Amendment.

The Internal Government Documents are necessary to determine whether in fact the government selected him for prosecution because of his protected activities.  If it did, the indictment will have to be dismissed.

1.      *Governing Legal Standard*

It is axiomatic that a prosecution brought for unconstitutional reasons violates the due process clause and will be dismissed even if the defendant is guilty of the crime charged. *See United States v. Al Jibori*, 30 F.3d 22, 25 (2d Cir. 1996).  While federal prosecutors retain "'broad discretion' " to enforce our criminal laws, . . . this discretion is bound by constitutional constraints such as the Due Process Clause of the Fifth Amendment, which prohibits a decision

to prosecute from being based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Id*. (citing and quoting from *Oyler v. Boles,* 368 U.S. 448, 456 (1962)).

Selective prosecution case law often involve claims of disparate treatment based on nationality, but prosecution brought because of one's exercise of his First Amendment right to speech or association also violates the due process clause.  Thus, in *United States v. Falk*, 479 F.2d 616 (7th Cir. 1973), the Seventh Circuit, sitting *en banc*, reversed a conviction of a defendant accused of failing to maintain a selective service registration card, because the district court should have permitted him to pursue his claim of selective prosecution.  Where he established a *prima facie* showing that he was selected to be prosecuted because of his persistent activities as a conscientious objector to the draft, it was error for the district court to deny him the chance to cross-examine the prosecutors with respect to their motivation.   As the Court held:

> There can be no doubt but that the expression of views opposing this country's foreign policy with regard to Vietnam is protected by the First Amendment. *Schacht v. United States*, 398 U. S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970); *Bond v. Floyd*, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966). And, just as discrimination on the basis of religion or race is forbidden by the Constitution, so is discrimination on the basis of the exercise of protected First Amendment activities, whether done as an individual or, as in this case, as a member of a group unpopular with the government.

479 F.2d at 620.

This principle is reiterated in the U.S. Attorney's Manual issued by the Department of Justice:  Section 9.26-260 provides: prosecution is not to be influenced by a person's "political association, activities or beliefs."

Because prosecutors enjoy a presumption of regularity and constitutional behavior, the burden is first upon the defense to establish unconstitutional discriminatory intent through "clear evidence" of such improper intent. *United States v. Armstrong*, 517 U.S. 456, 465 (1996).  But, in order to obtain discovery from the government regarding the government's motivation, the

showing necessary to trigger such government obligations is less stringent.  The courts "require some evidence tending to show the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent.'"  *Id.* at 468.  It must be a "credible showing." *Al Jibori*, 90 F.3d at 25.

There is no magic formula to what will constitute a credible showing, for each case will present unique facts.  But the factors considered by the Seventh Circuit in *Falk* are instructive: (1) whether others who engaged in similar conduct were not prosecuted; (2) whether there appears to be a governmental policy interest that conflicts with the activities and beliefs of the defendant; (3) whether unusually high levels of internal governmental review was required before the prosecution was authorized, and (4) whether there was any unusual timing in the arrest and prosecution.  Affirmative answers to each of the above four factors led the *Falk* Court to conclude that a probing hearing should be held.  479 F.2d at 623.

2.      *There is Evidence of Selective Prosecution Justifying Grant of Discovery*

The "credible showing" standard is easily satisfied here.

We begin with the first question: whether Mr. Ng was singled out, in the sense that similar prosecutions could have been brought but were not.  The answer is clear.  The government has never before prosecuted a foreign national for conspiring with a U.N. diplomat to obtain support for an international pro bono project using money as an inducement.  Our research has shown no prior instance in which the government ever sought waiver of diplomatic immunity so that it could charge a U.N. diplomat in connection with a bribery scheme.  Previous instances in which the government prosecuted U.N. employees involved no charges against any diplomat, or efforts to obtain waivers of immunity for such diplomats.  Instead, the charges were limited to garden variety bribery charges against procurement or other lower level employees

who were steering U.N. resources to the bribing parties. *See e.g.*, *United States v. Sanjaya Bahel*, Case No. 1:06-cr-00918-1-TPG (S.D.N.Y.); *United States v. Kuznetsov*, Case No. 1:05-cr-00819-DAB (S.D.N.Y.); *United States v. Yakovlev*, Case No. 1:05-cr-00819-DAB (S.D.N.Y.).

In contrast, the charges here are premised on the theory that a U.N. diplomat, indeed, the former President of the General Assembly, received money from a foreign citizen who allegedly sought to induce him to support an international conference center in a foreign territory, at no cost to the UN.  The Task Force report described *supra* at 15-16 concludes that, for at least the past ten years, the PGA has routinely received private funds, and frequently, the money went to the president directly.  Ex. C, at 3.  The Fourth Circuit's observation in *Taylor* bears repeating: "[a]ll payments to elected officials are intended to influence their official conduct."  That being so, it is inconceivable that the government could not have made the same kinds of allegations it makes against Mr. Ng and the late Ambassador Ashe against a host of private donors and U.N. representatives in the past ten years.  Yet, not a single such prosecution has been brought.[4]

While the government may well recite reasons why this prosecution of Mr. Ng appears to be one-of-a-kind and intrudes into U.N. diplomatic affairs, they would all ring hollow given the nature of this prosecution and the long-standing practice of General Assembly diplomats relying on private donations to carry out their functions.

The far more natural explanation for the disparate treatment of Mr. Ng and Ambassador Ashe is that the U.S. government would not tolerate the idea of a permanent expo and conference

---

[4] To the extent the government would point to the prosecution of Heidi Park or Sheri Yan as an instance of others who have been charged with Ambassador Ashe, it was the result of the same prosecutorial decision to go forward with the charges.  Indeed, they were all charged in the same conspiracy.  Moreover, it is likely that the government learned of their activities only after they began the investigation into Ambassador Ashe and his dealings with Mr. Ng through Francis Lorenzo.

center for the South South nations in Macau.  Thus, they used criminal prosecution as a tool to stop Mr. Ng from continuing in his efforts to establish such a center.

Which leads to the second *Falk* factor: whether there is any evidence that the government actually disagrees with the protected speech and activities of the defendant.  The answer to this question is clear.  U.S. concerns about China's growing influence over the developing nations are a matter of public record.  The United States sought to deter China efforts to channel more assistance to developing countries through newly created multilateral institutions, such as the Asian Infrastructure Investment Bank (the "AIIB"), in which China has a dominant role.  The United States attempted to pressure its allies from committing to the AIIB, which it views as a competitor to the World Bank.  *See* Under US Pressure, Major Countries Snub China's New Regional Bank, The Diplomat, October 23, 2014, available at

http://thediplomat.com/2014/10/under-us-pressure-major-countries-snub-chinas-new-regional-bank/; Support for China-led development bank grows despite U.S. opposition, The Guardian, March 13, 2015 (reporting that U.S. lobbied Australia and the United Kingdom not to join the Asian Infrastructure Investment Bank "which is designed to provide funds to the Asia-Pacific region, is viewed with suspicion in Washington, where it is seen as a rival to the World Bank and a possible instrument of Chinese soft power in the region") available at

https://www.theguardian.com/world/2015/mar/13/support-china-led-development-bank-grows-despite-us-opposition-australia-uk-new-zealand-asia; 3 European Powers Say They Will Join China-Led Bank, New York Times, March 17, 2015 (noting that Germany, France and Italy "ignor[ed] direct pleas from the Obama administration" when they decided to join the AIIB) available at http://www.nytimes.com/2015/03/18/business/france-germany-and-italy-join-asian-infrastructure-investment-bank.html.  The U.S. has also been concerned about China's

involvement in Africa and Latin America especially with regard to China's decision to champion

the New Development Bank focused on the so-called BRICS and developing countries.  *See*

China, Russia leaders seek South American Inroads, The Daily Mail, July 17, 2014, (quoting

former US state department official noting with regard to the BRICS summit and the China's

involvement in Latin America: "there's undoubtedly a little anxiety about what might be China's

intentions, capabilities and whether they will create problems for the U.S. [in Latin America] . . .

the bottom line is we're seeing a much more assertive, self-confident China");  BRICS Nations

Plan New Bank to Bypass World Bank, IMF, Bloomberg, March 26, 2013, (noting "[t]here's a

shift in power from the traditional to the emerging world. There is a lot of geo-political concern

about this shift in the western world") available at

http://www.bloomberg.com/news/articles/2013-03-25/brics-nations-plan-new-bank-to-bypass-

world-bank-imf.

      In light of these concerns, the idea of a permanent expo and conference center for all of

the South South developing nations in China has to be anathema to U.S. foreign policy.  In *Falk*,

the U.S. government's policies about the draft resistance activities of the defendant were more

explicit, but the State Department's antipathy to Mr. Ng's activities in support for the South

South goals could not be more obvious.  We fully expect that the Internal Government

Documents sought here will swiftly confirm this fact.

      The third *Falk* factor was whether the prosecution required unusually high levels of

governmental authorization. In *Falk*, the Court found it significant that the prosecution of a draft

resistor was authorized by the Department of Justice and not only the local United States

Attorney. 479 F.2d at 622.   Here, we know that the prosecution of this case likely received the

attention and authorization of the highest levels at the Justice Department, intelligence agencies

and the State Department.  Among other things, we know that the State Department requested

that the government of Antigua waive diplomatic immunity for Ambassador Ashe.  That request

was flatly rejected by the Antiguan government.  It is a fair assumption that the U.S. Attorney's

Office coordinated closely with State Department and Justice Department officials before

embarking on a prosecution that would so publicly intrude into the internal affairs of the United

Nations and jail a diplomat from another sovereign territory.

Moreover, the evidence suggesting concerns about foreign relations is abundant.  First,

the government disclosed to the defense a heavily redacted electronic intercept of an individual

who was apparently the target of a FISA eavesdropping warrant.  It appears the government

turned this over because the contents constituted *Brady* material.  Because the document was

covered by a protective order, we can submit this document to the Court for *in camera* review.

For present purposes, the point is simply that the investigation of Mr. Ng has encompassed

international electronic surveillance under FISA.

Second, the Court is now in possession of a collection of materials the government has

deemed "classified information."  Under Section 1 of the Classified Information Procedures Act

("CIPA"): "Classified information", as used in this Act, means any information or material that

has been determined by the United States Government . . . to require protection against

unauthorized disclosure for reasons of national security" and "National security, as used in this

Act, means the national defense and <u>foreign relations</u> of the United States."  (Emphasis added).

The government is so concerned about the sensitive nature of this information implicating

foreign relations, it refuses to permit even attorneys with high level security clearance to review

them under a restrictive protective order.

Third, during the course of Mr. Ng's post-arrest interrogation by the FBI, an inordinate number of the questions focused, not on bribery or false statements in Customs forms (*i.e.,* the crimes which they had or intended to lodge against Mr. Ng), but on the identification of one Qin Fei who sometimes accompanied Mr. Ng.  No less than 46 questions were about Qin Fei or his activities.  On at least two occasions, they asked Mr. Ng whether he was aware that this person was a Chinese government agent, or whether Mr. Ng knew about his contact with Chinese intelligence. *See* Ex. E (draft transcript of post-arrest video-taped interview).

Fourth, the prosecutors in this case have repeatedly drawn a connection between Mr. Ng and the Chinese government.  During his first detention hearing, AUSA Richenthal repeatedly and misleadingly referred to Mr. Ng as a Chinese government official.  They later went so far as to seek a *Curcio* hearing simply because one of Mr. Ng's counsel, Hugh H. Mo, has represented entities affiliated with the Chinese government.

All these circumstances strongly suggest that the prosecution of Mr. Ng is not, and never was, about policing the integrity of U.N. operations.  Instead, they strongly evidence a foreign policy driven agenda to monitor and stop the progress of China's influence over the South South nations, and to silence Mr. Ng's advocacy of the conference center and promotion of South South cooperation.

The final *Falk* factor – timing of prosecution -- only reinforces the conclusion.  The *Falk* Court found it significant that the defendant was not charged with the crime of failing to maintain a draft registration card until long after the conduct and only brought the charges when he claimed conscientious objector status. 479 F.2d at 622-23.

The timing in the arrest of Mr. Ng is even more telling.  The search warrant applications reveal that the government had been watching Mr. Ng for years and presumably they were

24

tracking the progress of the discussions about the Macau conference center with the U.N. Ambassador Ashe's tenure as PGA had expired as of September 2014, and he stepped down as the Antiguan delegate.  And yet, it was not until a year later, when the General Assembly was about to actually consider the conference center proposal, that Mr. Ng was arrested and charged on September 19, 2015.

The arrest followed shortly after an August 2015 High Level Forum conference in Macau that was attended by 40 delegates from the South South nations.  This conference was wholly and publicly underwritten by Mr. Ng's company, the SKI Group.  *See* Ex. F (High Level Forum Brochure indicating SKI sponsorship).  One of the outcomes of this meeting was that the PGA High Level Committee on South-South Cooperation, UNOSSC, and their partners would present to the 70th General Assembly a plan to implement the development of the Macau Conference Center. The 70th General Assembly was scheduled to commence on Oct. 12, 2015.

As noted, Mr. Ng was arrested on September 19, 2015, and, as far as we know, the General Assembly dropped the topic of a Macau Conference Center like a hot potato.  It never appeared on the agenda for the October 12 meeting.  It is, as far as we know, a proposal that never got off the ground.

In short, during the entire time that Mr. Ng was allegedly bribing Ambassador Ashe because of his so-called influence as President of the General Assembly, and throughout Ashe's year-long tenure as PGA, no bribery charges were brought.  Moreover, no charges of making false statements to customs were brought though, during that time, Mr. Ng regularly brought large amounts of cash and regularly declared them to the authorities.  It was only when it appeared that his efforts to achieve his vision for a South South conference center might actually be successful that the arrest was made.

The arrest also coincided with the State Visit by the Chinese President, Xi Jinping, to the United States on September 22, 2015.  During this visit, the Chinese President was scheduled to attend a General Assembly meeting at the United Nations and speak at the Sustainable Development Summit.  And he did deliver this speech.  In it, the Chinese President announced China's donation of $2 billion to achieve post-2015 development goals and $12 billion investment in the least developed states.  He also pledged China's commitment of $1 billion to the United Nations for a 'peace and development fund.' China Pledges $2 Billion to Help Poor States Meet U.N. Goals, Reuters, Sept. 26, 2015 available at http://www.reuters.com/article/us-un-assembly-china-idUSKCN0RQ0HW20150926.  Even assuming the government was not aware that the Chinese President would be making a commitment to support the developing nations with billions of dollars, it cannot have been lost on them that he would be addressing the development summit and likely using the opportunity to increase China's appeal to those delegates.

Mr. Ng was hastily arrested on September 19, 2015 on an obvious placeholder charge of making false declarations to Customs about why he was bringing many hundreds of thousands of dollars in cash into the United States.  The government claimed those reasons were false, but shortly thereafter abandoned those charges because they were patently groundless.  Instead, with Mr. Ng under arrest, they took the time to lodge the bribery charges that are now pending against him.

All indications are that the U.N. as a whole has abandoned any consideration of a permanent conference center in China.   The government's exquisite timing of Mr. Ng's arrest and prosecution was enough to promptly destroy his vision for the South South nations.

Each of the four *Falk* factors strongly indicate that the government sought to prosecute Mr. Ng because of this protected First Amendment activities.  Under these circumstances, we respectfully submit that the defense has made a credible showing sufficient to require the government to produce the Internal Government Documents.

<u>**CONCLUSION**</u>

For all the foregoing reasons, defendant Ng Lap Seng respectfully requests that the Court issue the enclosed proposed order compelling the government to produce the documents described in the order.

Dated: August 11, 2016

PARK JENSEN BENNETT, LLP
40 Wall Street
New York, New York 10005

By:    _/s/Tai H. Park_____
Tai H. Park
Christopher Greer


By:    _/s/Hugh H. Mo_____
Hugh H. Mo
Law Firm of Hugh H. Mo, P.C.
225 Broadway, Suite 2702
New York, NY 10007 -3080

Alexandra A.E. Shapiro
Shapiro Arato LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110


*Attorneys for Defendant Ng Lap Seng*