UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

NG LAP SENG,

              Defendant.

No. 15 Cr. 00706 (VSB)

# NG LAP SENG'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO SUPPRESS

Douglas R. Jensen
Tai H. Park
Christopher Greer
PARK JENSEN BENNETT, LLP
40 Wall Street
New York, New York 10005

Hugh H. Mo
Law Firm of Hugh H. Mo, P.C.
225 Broadway, Suite 2702
New York, NY 10007 -3080

Alexandra A.E. Shapiro
Shapiro Arato LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110

TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................... 1
FACTS ................................................................................................................................ 2
   1.  Mr. Ng's Arrest at Teterboro Airport ................................................................... 2
   2.  The Conference Room at 26 Federal Plaza........................................................... 4
   3.  The Interrogation Room at 26 Federal Plaza ....................................................... 4
       a.  SA Alberts' pre-Interrogation Discussions with the Interpreter ..................... 5
       b.  SA Alberts Mischaracterizes Mr. Ng's Rights ................................................. 6
       c.  Mr. Ng Resists the Agent's Waiver Request .................................................... 7
       d.  SA Alberts' False Promise of Rest .................................................................. 7
       e.  Mr. Ng's Will is Overborne .............................................................................. 9
       f.  Conclusion of the Interrogation ..................................................................... 10
ARGUMENT
POINT I ............................................................................................................................ 11
     ONCE MR. NG INVOKED HIS RIGHT TO COUNSEL ANY FURTHER
     INTERROGATION WAS IMPROPER ............................................................... 11
POINT II
     MR. NG DID NOT MAKE A KNOWING, INTELLIGENT OR
     VOLUNTARY WAIVER OF HIS RIGHTS ........................................................ 12
       A.  The Agents Deceived Mr. Ng About the Nature of his Rights,
           and the Benefits of Speaking to Them ........................................................ 13
       B.  Under the Totality of the Circumstances, Mr. Ng Did not Make
           a Knowing or Voluntary Waiver................................................................. 15
CONCLUSION ................................................................................................................. 17

## TABLE OF AUTHORITIES

**Cases** — Page No.

*Berghuis v. Thompkins,*
  560 U.S. 370, 382 (2010) ......................................................................................... 12
*Colorado v. Connelly,*
  479 U.S. 157, 168–69 (1986) ................................................................................... 13
*Diaz v. Senkowski,*
  76 F.3d 61, 64 (2d Cir. 1996) ................................................................................... 11
*Edwards v. Arizona*,
  451 U.S. 477, 484-85 (1981) .................................................................................... 11
*Hart v. Attorney General of State of Florida*,
  323 F.3d 884, 893 (11th Cir. 2003) .......................................................................... 15
*McNeil v. Wisconsin,*
  501 U.S. 171, 178 (1991) .......................................................................................... 11
*Moran v. Burbine*,
  475 U.S. 412, 421 (1986) .................................................................................... 13, 15
*Oregon v. Elstad,*
  470 U.S. 298, 309 (1985) .......................................................................................... 13
*People v. Musselwhite*,
  17 Cal. 4th 1216 (1998) ............................................................................................. 16
*Ross v. State*,
  45 So. 3d 403 (Fla. 2010) .......................................................................................... 16
*Spano v. New York*,
  360 U.S. 315, 323 (1959) .......................................................................................... 15
*United States v. Anderson*,
  752 F. Supp. 565, 567 (E.D.N.Y. 1990), *aff'd*, 929 F.2d 96 (2d Cir. 1991) .............. 14
*United States v. Anderson,*
  929 F.2d 96, 99 (2d Cir. 1991) .................................................................................. 13
*United States v. Oehne*,
  698 F.3d 119, 122-23 (2d Cir. 2012) ........................................................................ 12
*United States v. Plugh,*
  648 F.3d 118, 127 (2d Cir. 2011) .............................................................................. 13
*United States v. Spencer*,
  995 F.2d 10, 11 (2d Cir. 1993) (*per curiam*) ............................................................ 13
*United States v. Walton*,
  10 F.3d 1024 (3d Cir. 1993) ...................................................................................... 15
*United States v. Wysinger*,
  683 F.3d 784 (7th Cir. 2011) ..................................................................................... 15

Other Authorities

W. White, *Police Trickery in Inducing Confessions,*
  127 U. Pa. L. Rev. 581, 609 (1979)) ......................................................................... 16

Defendant Ng Lap Seng brings this motion to suppress the statements taken from him following his arrest, as well as the fruits of those statements.  In the alternative, he requests that the Court conduct an evidentiary hearing.

## **PRELIMINARY STATEMENT**

Mr. Ng's post arrest statements must be suppressed for at least two reasons.  First, he invoked his right to counsel almost immediately upon his arrest, repeatedly requesting permission to make a phone call so that he could obtain a lawyer.  At that point, the law required the agents to immediately cease their efforts to speak to Mr. Ng, and yet they persisted.  Their failure to honor his constitutional rights requires suppression.

Second, while Mr. Ng ultimately responded to the agents' questions, he never made a knowing or voluntary waiver of his rights.  Faced with Mr. Ng's initial refusal, the agents employed a variety of techniques -- assuring Mr. Ng that their discussion would be an informal "conversation" that would not be used against him, mischaracterizing the nature of the rights he would be giving up, taking advantage of the fact that he had not slept in two days by offering him a false prospect of "rest," and suggesting that their focus was not him, but rather his business partner Qin Fei -- in an effort to change his mind. Ultimately, after Mr. Ng had been in custody for over 3 hours (and without sleep for two days), the agents' efforts bore fruit.

While Mr. Ng never agreed to waive his rights -- and specifically refused to sign the written waiver presented to him by the Agent -- he did begin to answer the agents' questions about Qin Fei.  One question led to another, and before long Mr. Ng had been in the interrogation room answering questions for over two hours.  The recording of that interrogation, however, along with Mr. Ng's Affidavit, establishes that he never made a

knowing or voluntary waiver. Rather, his will was overborne by the agents, and for this reason as well his statements must be suppressed.

## FACTS

The September 19, 2015 custodial interrogation of Mr. Ng took place in three stages: first, at the Teterboro, New Jersey Airport where Mr. Ng was arrested as he sought to board a flight home to Macau; second, at a conference room in the FBI offices at 26 Federal Plaza; and third, in a video interrogation room at 26 Federal Plaza.1 Only the third of these stages was recorded by the FBI.

### 1. Mr. Ng's Arrest at Teterboro Airport

On the morning of September 19, 2015, Mr. Ng had been in the United States for approximately 3 days, attending meetings and dealing with other business matters. He had been awake all night, first gambling at Foxwoods Casino in Connecticut, and then having breakfast with a group of people in New York City. The night before that he had also gotten very little sleep, as a result of jet lag from the long trip to New York from his home in Macau. He arrived at the Teterboro airport that morning sleep-deprived and

---

[1] Defendant bases his description of the facts on (a) the Affidavit of Ng Lap Seng, sworn to September 12, 2016 (the "Affidavit") and (b) the recording of the third and final stage of Mr. Ng's interrogation on September 19, 2016. Defendant will submit to the Court, under cover of a separate letter, a disc containing a copy of that recording. A transcript of the recording, prepared by counsel for defendant, is attached as Exhibit A, and defendant quotes from portions of that transcript in the body of this Memorandum. Note that this transcript has been revised from the version previously provided to the Court in connection with defendant's motion to compel, as that earlier version was an initial rough draft and also did not cover certain portions of the interrogation session. Pursuant to the Court's Order dated September 14, 2016, we are filing the transcript under seal in the first instance, subject to further orders of the court addressing whether it should remain under seal. As stated in defendant's Reply Brief on his Motion to Compel Discovery, this is without prejudice to the defense argument that it is inappropriate to seal or redact any portion of a recording of a post-arrest statement that preceded entry of a protective order.

exhausted, and looking forward to the opportunity to rest on his long flight back home. (Ng Affidavit ¶ 2.)

Upon his arrival at the airport, Mr. Ng was arrested and taken into a separate room with several law enforcement agents. After some time a Chinese interpreter arrived, and Mr. Ng asked the agents multiple times what crime he had committed and why he had been arrested. One of the agents (SA Jason Alberts, Mr. Ng believes) responded that he would find that out later, when he went to see the judge. (Ng Affidavit ¶ 3.)

Mr. Ng said several times that he wanted to make a phone call so that he could get a lawyer. Agent Alberts said that he could make a phone call later, but not at that time. At the moment, Agent Alberts said, Mr. Ng had two options. One was to have a "conversation" with the agents. He gave the impression that that conversation would be an informal one, stating that Mr. Ng could talk about whatever he wanted, could stop at any time, and the agents would not use his statements against him. Mr. Ng's other option, the agent said, was to go see the judge and talk to a lawyer. If he did that, though, he would lose the opportunity to talk with the agents. (Ng Affidavit ¶ 4.)

After Mr. Ng's interaction with the agents at the airport, they put him in a car and drove him to New York City. They told him, Mr. Ng believes with reasonable certainty, that he could use the drive to think about what he wanted to do. Mr. Ng rode in the back seat of the car (alongside the interpreter) with his hands cuffed behind his back, while two agents sat in the front seat. When they arrived in Manhattan, the agents took Mr. Ng to the FBI offices at 26 Federal Plaza. (Ng Affidavit ¶ 5.)

3

### 2. The Conference Room at 26 Federal Plaza

Upon arrival at 26 Federal Plaza, the agents took Mr. Ng to a conference room, where they had a discussion similar to that at the airport. Mr. Ng said again that he wanted to make a telephone call so he could get a lawyer, and Agent Alberts refused the request. The agent informed Mr. Ng that they could take him to see the judge, where he could get a lawyer, but in that case he would lose the opportunity -- his only opportunity -- to cooperate and speak to the agents. The agent stressed again that it would be an informal conversation, and that Mr. Ng could stop whenever he wanted. (Ng Affidavit ¶ 6.)

At some point during the discussion in the conference room, Agent Alberts gave Mr. Ng a written form that he said explained his rights, and asked him to sign it. The form was in English, a language that Mr. Ng does not speak or read, and he declined to sign it. (Ng Affidavit ¶ 7.)

### 3. The Interrogation Room at 26 Federal Plaza

After the discussion in the conference room, the agents took Ng to a smaller interrogation room. That room was installed with a video camera, and from this point forward the agents' interactions with Mr. Ng were recorded. That recording is significant not only because it records Agent Alberts' statements directly to Mr. Ng to persuade him to talk, but also because it records Agent Alberts' interactions with others -- the interpreter, his fellow agent -- and those asides also confirm the absence of a knowing and voluntary waiver by Mr. Ng.

*a. SA Alberts' pre-Interrogation Discussions with the Interpreter*

Even before Agent Alberts advised Mr. Ng of his rights, the agent had a discussion with the interpreter. In that discussion, the interpreter informed Agent Alberts of several significant facts. First, the interpreter said that Mr. Ng          REDACTED

                                                                        (Transcript of Ng Post-Arrest Interview ("Tr."), Exhibit A, at 5.)  Agent Albert responded "yeah," but instead of stopping immediately, continued with his effort to get a statement. (Tr. at 5.)

Second, the interpreter informed Agent Alberts of Mr. Ng's weakened mental condition. Soon after he entered the room, Mr. Ng put his hands near his head and spoke to the interpreter, who turned to the Agent and informed him that          REDACTED

              (Tr. at 1.)  The agent acknowledged this complaint   REDACTED

                                                                                         but again declined to stop the interrogation. (*Id*.) Mr. Ng persisted with his complaint, speaking again to the interpreter, who told the agent:          REDACTED

                                        To this complaint the Agent did not respond. (Tr. at 2.)

Third, when SA Alberts began to look for a Miranda form (saying to his fellow agent                    REDACTED

                         the interpreter offered to get a form in Chinese, rather than the English version that SA Alberts apparently had in mind. The interpreter explained the benefit of having a written form --                REDACTED

                                                                                             (Tr. at 2.)  The discussion moved to a different topic, but moments later the interpreter

5

returned to the subject, again offering         REDACTED        SA Alberts declined this offer, instead choosing to read Mr. Ng his rights orally and in English (albeit translated).  (Tr. at 4.)

      b.  *SA Alberts Mischaracterizes Mr. Ng's Rights*

Agent Alberts began by informing Mr. Ng that he had been arrested under a complaint.  As he had already done multiple times that day, Mr. Ng asked about the basis for his arrest:           REDACTED           (Tr. at 6.)  Consistent with his responses earlier in the day, Agent Alberts again declined to answer.  Instead, he said       REDACTED       but first wanted to cover what he characterized as a "formality," apparently referring to Mr. Ng's *Miranda* rights.  (Tr. at 6-7.)  He acknowledged that Mr. Ng had not wanted to sign a waiver of his rights REDAC but said he would read Mr. Ng his rights "so we can have a conversation."  (Tr. at 7.)

Agent Alberts proceeded to read Mr. Ng his rights from a document on his cellphone, stating again that this was just a "formality."  (Tr. at 7.)  That reading included a generic description of the charges devoid of any substance       REDACTED       and then continued with a lengthy recitation of rights.  That recitation went on for approximately 10 minutes, with Agent Alberts reading a sentence or two from his cellphone, and then waiting for the interpreter to translate.  (Tr. at 7-11.)

Once this lengthy process was completed, Agent Alberts summarized what he had just covered, but did so in an inaccurate and misleading way.  He stated:    REDACTED

6

REDACTED                                        (Tr. at 8.)  Of course, the rights read by Agent Alberts had concerned far more than just Mr. Ng's right to a speedy appearance, yet this summary created the impression that the only thing Mr. Ng would be giving up was his right to a speedy presentment.  When Mr. Ng's interpreter had difficulty understanding the agent's summary          REDACTED                  Agent Alberts repeated the misleading summary.  He stated again that Mr. Ng would be waiving                      REDACTED                                  (Tr. at 8.)

   c. *Mr. Ng Resists the Agent's Waiver Request*

Notwithstanding this misleading summary of his rights, Mr. Ng resisted the request that he waive them.  When Agent Alberts asked whether Mr. Ng was willing to give up his rights              REDACTED                          Mr. Ng did not respond with a yes or no answer.  (Tr. at 9.)   Instead, Mr. Ng responded in a way that made clear he was in no position to go forward with the interrogation:

REDACTED

(Tr. at 9.)  Just after this statement, Agent Alberts' cellphone rang, and he interrupted the interrogation to take the call.  (*Id*.)

   d. *SA Alberts' False Promise of Rest*

Following his cellphone conversation, Agent Alberts returned to his interrogation of Mr. Ng and, in so doing, engaged in another act of deception.  In a bow towards Mr. Ng's fatigued mental condition, Agent Alberts stated that        REDACTED                      (Tr. at 10-11.)  Rather than end the interview, however, he sought

7

to take advantage of Mr. Ng's condition by offering him a false choice. On the one hand, he suggested that if Mr. Ng agreed to the "conversation," it might last    REDACTED

(Tr. at 11.) On the other hand, if Mr. Ng declined the opportunity for the
REDACTED

This choice was misleading, since the promise of "rest" was illusory. To the extent that Mr. Ng agreed to the interrogation, as the Agent knew, he would not thereafter be going to a place where he could "rest." Instead, he would go to a decidedly unrestful destination: the Metropolitan Detention Center. Indeed, Agent Alberts acknowledged this fact in a contemporaneous aside to his fellow agent, stating    REDACTED

(Tr. at 11.) Rather than say that to Mr. Ng, however, Agent Alberts told him they would take him to a holding facility    REDACTED

Not only was the agent's promise of rest illusory, Mr. Ng's comments indicated that he did not understand the other option that Agent Alberts had offered him. Mr. Ng did understand (or at least thought he understood) what Agent Alberts meant by "rest," but with respect to the other option the agent had offered him, Mr. Ng did not have an understanding.    REDACTED    he asked. (Tr. at 11.) Agent Alberts provided an explanation, stating among other things that Mr. Ng would be presented before a judge and the charges against him would be read. In that event,    REDACTED

(*Id.*)

### e. Mr. Ng's Will is Overborne

After offering Mr. Ng this false choice, Agent Alberts again asked Mr. Ng for a decision:                    REDACTED                    (Tr. at 11.)  As he had done previously, though, Mr. Ng did not respond with a yes or no answer. Instead, he responded to Agent Alberts' question with a question of his own: REDACTED

(*Id*.)  Agent Alberts initially declined to answer, saying REDACTED

(*Id*.)  Nevertheless, Mr. Ng persisted, asking again:        REDACTED        (*Id*.)  This time the agent responded, and did so in a way that appears to have been designed to put Mr. Ng at ease.

At that point, the agents had arrested Mr. Ng for making allegedly false statements to US Customs officials about the purposes of the cash (all declared) that he had brought into the country.  But in responding to Mr. Ng's question Agent Alberts said nothing about those charges, or the conduct that had led to them.  Indeed, his response made no reference to Mr. Ng or his own conduct at all.  Instead, the agent said he wanted to talk about a different person altogether: Qin Fei, who the agent identified as REDACTED

(*Id*.)  In so doing, it appears the agent hoped to provide Mr. Ng with reassurance about the requested "conversation," since that conversation would not be focused on Mr. Ng.

Whether motivated by this strategy or not, Agent Alberts' statement had the desired effect, and formed the final link in the chain that overbore Mr. Ng's will.  That chain is best described in Mr. Ng's own words:

> At that point I was exhausted, and desperately needed to get some sleep.  I had not understood much about the rights that the agent

9

> had read to me, but it seemed that all I would be giving up by speaking to the agents was the right to go to court immediately, as opposed to later.  Also, I believed the things the agent had told me about the proposed "conversation," that it would be very informal and would not be used against me.  Finally, while the agents hadn't given me any information about what I supposedly had done to cause my arrest, I took comfort from the fact that they wanted to talk about my business partner Qin Fei, and apparently were not focused on me.

(Ng Affidavit ¶ 13.)  As a result of these considerations, while Mr. Ng never responded directly to Agent Alberts' question whether he wanted to talk, he did begin to answer questions about Qin Fei.[2]

### f. Conclusion of the Interrogation

Once Mr. Ng began to answer questions, the interrogation continued for over two hours.  At the conclusion of the questioning, based on his earlier discussions with Agent Alberts, Mr. Ng asked whether he was free to leave.  He first posed that question to the interpreter: REDACTED (Tr. at 59.)  Although the response was negative, he continued to ask the question three more times (as relayed to the agents by the interpreter): REDACTED (Tr. at 62).

In addition to this repeated request, Mr. Ng. indicated that he was feeling unwell, with the interpreter reporting that REDACTED (Tr. at 59.)  Mr. Ng added tha REDACTED

(Tr. at 59-62.)  As he had earlier in the day, Mr. Ng reiterated his request that he wanted to get a lawyer.  REDACTED the interpreter relayed to

10

the agents. (Tr. at 59.))  In response, the agent said that he was going to take Mr. Ng to court REDACTED but given the time of day (2:30 p.m. on a Saturday) there was almost no prospect of that happening. (Tr. at 61.)

In fact, Mr. Ng was never taken to court that day.  Instead, he was handcuffed and taken to the detention center, where he was kept in solitary confinement for the remainder of Saturday and all day Sunday.  He did not see a judge until Monday, and was never given an opportunity to use a telephone.  (Ng Affidavit ¶ 14.)

## ARGUMENT

## POINT I

### ONCE MR. NG INVOKED HIS RIGHT TO COUNSEL ANY FURTHER INTERROGATION WAS IMPROPER

Once the right to counsel has been invoked, a person must not be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).  In *Edwards*, the Supreme Court held that law enforcement officers must cease questioning of a suspect who clearly asserts his right to have counsel present during custodial interrogation. *Id.* at 482-85; *see also Diaz v. Senkowski*, 76 F.3d 61, 64 (2d Cir. 1996).  For a suspect to invoke his *Miranda* right to counsel, he must at a minimum make "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney."  *Diaz,* 76 F.3d at 64 (*quoting McNeil v. Wisconsin,* 501 U.S. 171, 178 (1991)); *see also United States v. Oehne*, 698 F.3d 119, 122-23 (2d Cir. 2012).

---

[2]    Not until 57:08 did Agent Alberts ask Mr. Ng about the cash he brought into the United States, and then he returned to the subject of Qin Fei.

11

Here, Mr. Ng clearly invoked his right to counsel. Shortly after his arrest, while still at the Teterboro airport, Mr. Ng's affidavit establishes that he repeatedly asked the arresting agents for permission to make a phone call so that he could obtain counsel. Later, at 26 Federal Plaza, the recording of his interrogation confirms that he continued to make those requests. Before a single question was asked, the interpreter informed Agent Alberts that REDACTED and the agent responded "yeah." Any one of these requests should have been the end of it, and the agents should have discontinued further questioning. Instead, Agent Alberts used a variety of techniques to break down Mr. Ng's resistance, until his will was finally overborne. This conduct violated Mr. Ng's constitutional rights, and any statements that resulted from it must be suppressed.

## POINT II

### MR. NG DID NOT MAKE A KNOWING, INTELLIGENT OR VOLUNTARY WAIVER OF HIS RIGHTS

While it is clear that Mr. Ng invoked his right to counsel, it is equally clear that any waiver of his rights was involuntary, and not done knowingly or intelligently. His will was overborne by the agents' deceptive conduct.

A statement made by the accused "during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [*Miranda*] rights when making the statement." *Berghuis v. Thompkins,* 560 U.S. 370, 382 (2010) (internal quotation marks omitted). Courts look to the totality of circumstances surrounding a *Miranda* waiver and any subsequent statements to determine knowledge and voluntariness. *See Oregon v. Elstad,* 470 U.S. 298, 309 (1985). "[K]nowing" means that it must be with "full awareness of the nature

of the right being abandoned and the consequences of the decision to abandon it," and "voluntary" means that it was the "product of a free and deliberate choice rather than intimidation, coercion, or deception." *United States v. Plugh,* 648 F.3d 118, 127 (2d Cir. 2011) (internal quotation marks omitted).  The government bears the burden of proof. *Colorado v. Connelly,* 479 U.S. 157, 168–69 (1986).

"Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal quotation marks omitted).  The totality of the circumstances includes "the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir. 1991).  "The question of waiver must be determined on the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993) (*per curiam*) (internal quotation marks omitted).

### A. The Agents Deceived Mr. Ng About the Nature of his Rights, and the Benefits of Speaking to Them

The agents misled Mr. Ng in at least two respects.  First, the agents mischaracterized the nature of the rights that Mr. Ng would be giving up by speaking to them.  After providing Mr. Ng with a roughly 10-minute recitation of the various rights that he possessed, Agent Alberts then distilled those rights into a single inaccurate summary, stating,                             REDACTED



(Tr. at 8.)  Of course, the rights conferred by a *Miranda* warning concern

13

far more than one's right to a speedy appearance, yet Agent Alberts' summary left the impression that Mr. Ng would only be giving up one thing: the right to be presented to a judge immediately, as opposed to a later time.

Second, Agent Alberts presented Mr. Ng with a false choice: go to court, or speak to them and have the ability to "rest." This choice was misleading because, as Agent Alberts well knew, as soon as any interview was concluded Mr. Ng would be going to the Detention Center, and would have no opportunity to rest. Agent Alberts acknowledged this fact in an aside to his fellow agent, stating REDACTED but continued to tell Mr. Ng that he would be taken to a place REDACTED (Tr. at 10-11.)

In connection with the issue of voluntariness, the *Miranda* Court expressed disapproval of deceptive strategies: "Any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." 384 U.S. at 476. In *United States v. Anderson*, in the Eastern District of New York, the district court suppressed statements where an agent told the defendant that if he asked for a lawyer he would be precluded from future cooperation. The court found that "the D.E.A. Agents here . . . made a mockery of the safeguards provided by *Miranda* and that the *presumption* of coercion had not been overcome". *United States v. Anderson*, 752 F. Supp. 565, 567 (E.D.N.Y. 1990), *aff'd*, 929 F.2d 96 (2d Cir. 1991) (emphasis in original) (citing W. White, *Police Trickery in Inducing Confessions,* 127 U. Pa. L. Rev. 581, 609 (1979)). In affirming the district court, the Second Circuit concluded that "because [the agent's] statements were factually and legally erroneous they effectively undermined the *Miranda* warnings given Anderson

and, in effect, compelled him to talk . . . [T]he district court . . . found, in the alternative, that even if the original *Miranda* warnings were properly administered, the defendant's statements still should be suppressed because they were procured by coercion. *Anderson*, 929 F.2d 96, 98 (2d Cir. 1991).

Other cases have reached a similar result. *See Spano v. New York*, 360 U.S. 315, 323 (1959) ("Petitioner was apparently unaware of John Gay's famous couplet: 'An open foe may prove a curse, but a pretended friend is worse,' and he yielded to his false friend's entreaties."); *United States v. Wysinger*, 683 F.3d 784 (7th Cir. 2011) (suppressing statements where agents gave defendant a false choice between choosing to have a lawyer present either during questioning or before questioning and where agents "used various tactics to confuse [defendant] regarding the start of 'questioning' and diverting him from exercising his rights"); *United States v. Walton*, 10 F.3d 1024 (3d Cir. 1993) (finding statements had been coerced, and suppressing them, where agent made a false promise that he would not use statements against defendant); *Hart v. Attorney General of State of Florida*, 323 F.3d 884, 893 (11th Cir. 2003) (waiver was not knowing or voluntary where prosecutor made statements that contradicted the scripted Miranda warning). These authorities warrant suppression of Mr. Ng's statements.

### B. Under the Totality of the Circumstances, Mr. Ng Did not Make a Knowing or Voluntary Waiver

In determining whether any waiver of rights was knowing and voluntary, courts look to the defendant's level of comprehension, *Moran v. Burbine*, 475 U.S. 412, 421 (1986), as well as "the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials," *Anderson,* 929 F.2d at 99.

Here, the totality of the circumstances points to the involuntariness of any waiver:

15

(1) a Chinese citizen with only six years of formal education (Transcript of July 11, 2016 *Curcio* hearing at 26), Mr. Ng was unfamiliar with the American justice system; (2) he spoke no English; (3) he was sleep-deprived, having not slept in approximately two days, as he repeatedly reminded the agents; (4) even putting aside the misleading summary of his *Miranda* rights, the explanation of those rights was inadequate, with Agent Alberts forgoing the written form suggested by the interpreter to opt instead for a lengthy oral recitation that was confusing at best; (5) the agent's downplaying of the importance of Mr. Ng's rights, calling them a mere "formality" and assuring Mr. Ng that they would only be having an informal "conversation," created the illusion of a non-adversarial relationship.  S*ee Ross v. State*, 45 So. 3d 403 (Fla. 2010) (holding that minimizing and downplaying the significance of the *Miranda* rights is a factor for determining voluntariness of waiver); *People v. Musselwhite*, 17 Cal. 4th 1216 (1998) ("Evidence of police efforts to trivialize the rights accorded suspects by the *Miranda* decision—by 'playing down,' for example, or minimizing their legal significance—may under some circumstances suggest a species of prohibited trickery and weighs against a finding that the suspect's waiver was knowing, informed, and intelligent.").

Consistent with the above, the recording of the interrogation at 26 Federal Plaza reflects multiple instances of confusion.  During the recitation of Mr. Ng's rights itself, the interpreter interrupted several times to interpose questions, in particular following Agent Alberts' inaccurate summary of those rights     REDACTED           . And once the interrogation was concluded, Mr. Ng asked multiple times whether he was free to leave.     REDACTED     (Tr. at 59, 60, 62.)  Viewed in its entirety, the record of the interrogation confirms the absence of a voluntary and knowing waiver.

16

## **CONCLUSION**

For all the foregoing reasons, defendant Ng Lap Seng respectfully requests that the Court suppress all statements taken from him following his arrest, as well as the fruits of those statements. In the alternative, defendant requests that the Court conduct an evidentiary hearing.

Dated: September 19, 2016

                                        PARK JENSEN BENNETT, LLP
                                        40 Wall Street
                                        New York, New York 10005

By:    \_\_/s/ Douglas R. Jensen\_\_
           Douglas R. Jensen
           Tai H. Park
           Christopher Greer

           Hugh H. Mo
           Law Firm of Hugh H. Mo, P.C.
           225 Broadway, Suite 2702
           New York, NY 10007 -3080

           Alexandra A.E. Shapiro
           Shapiro Arato LLP
           500 Fifth Avenue, 40th Floor
           New York, New York 10110