UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

     v.                                15 CR 706 (VSB)

NG LAP SENG,

                         Jury Trial

         Defendant.

------------------------------x

                              New York, N.Y.
                              July 26, 2017
                              9:00 a.m.

Before:

                 HON. VERNON S. BRODERICK,

                             District Judge

                     APPEARANCES

JOON H. KIM,
    Acting United States Attorney for the
    Southern District of New York
BY:  DANIEL RICHENTHAL
    JANIS ECHENBERG
    DOUGLAS ZOLKIND
    Assistant United States Attorneys


DEPARTMENT OF JUSTICE, CRIMINAL DIVISION, FRAUD SECTION
BY:  DAVID A. LAST


PARK JENSEN BENNETT, LLP
    Attorneys for Defendant
BY:  TAI PARK
    DOUGLAS JENSEN

APPEARANCES


SHAPIRO ARATO LLP
     Attorneys for Defendant
BY:  ALEXANDRA A. E. SHAPIRO
     CHRISTOPHER GREER


THE LAW FIRM OF HUGH H. MO, PC
     Attorneys for Defendant
BY:  HUGH HU MO


ALSO PRESENT:  PATSY ONG, Cantonese Interpreter
               NANCY WU, Cantonese Interpreter
               JEAN YAP, Cantonese Interpreter

(Trial resumed; jury not present)

THE COURT:  We are here to complete issues relating to the charge.  I don't know what copies each party is working off of.

MS. SHAPIRO:  Your Honor, we brought the black-lined because we assumed that nobody is going to relitigate issues and that the Court is going to focus on the changes.

MR. ZOLKIND:  That's fine, your Honor.  We have the black-lined version as well.

THE COURT:  Mr. Ng, can you hear the interpreter?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Let's begin.  With regard to some of the global issues, I'm not sure exactly how clear it was.  With regard to the Hoskins request, I rejected that request in connection with the charge.  Also, there was a request for the definition of "bona fide" which I did not include, which occurs at several places.  There were also some additional requests. We'll get to it.  Let's proceed.  Is there a first place that folks have a language issue?

MS. SHAPIRO:  The first one we have is page 19.  It's just a nit.  Right before the heading, at the top of the page, the second line, the line just above the heading, it says "then has not proved."  We think you need to insert "the government" has not proved.

THE COURT:  Page 19?

MS. SHAPIRO:  Page 19 of my black-lined.  It's right above the heading that says "3.  Count One.  First element: Object of the conspiracy."

THE COURT:  It's the underlined portion.  I have "and" comma "you find that the government has not proved."  Is that what you are saying?

MS. SHAPIRO:  Yes.  It's the underlined portion.  It says "then has not."  I think words are missing.  Do you see what I'm referring to?

THE COURT:  I see, yes.  I was looking at the first sentence.

MS. SHAPIRO:  I'm sorry.

THE COURT:  That's right.  The first line, "The government."

MS. SHAPIRO:  The next thing I have wasn't until page 24, conscious avoidance.

THE COURT:  Let me hear from the government.  Anything before 24?

MR. LAST:  No, your Honor.

MS. SHAPIRO:  We appreciate the Court's addition of the language.  I think in deleting some other language a problem has been created.  I have a feeling that the government is going to agree with me, but let me explain it.  I'll hand up the case and a proposed fix, which includes language that's very similar, if not identical, to language that was actually

in the government's requests to charge.

By the way, I should have mentioned this at the outset. Of course, we are continuing to preserve all the objections we previously made.

THE COURT: Yes.

MS. SHAPIRO: There is a bunch of text that is deleted before it says, "There is a difference between knowingly participating," which is the second paragraph. In deleting those as well as the bit at the end about how negligent conduct isn't enough, what's happening is that the instruction no longer complies with the case law, which requires the Court to instruct that the defendant had to know there was a high probability that the fact was true unless he did not actually believe it was true.

There are a bunch of cases that support this, but I think one that is right on point is United States v. Kaiser, which I can hand up -- it was my case -- where the court reversed for plain error a defective instruction. The Second Circuit has repeatedly held that a conscious avoidance charge must communicate two points: (1) that a jury may infer knowledge of the existence of a particular fact, that the defendant is aware of a high probability of its existence (2) unless the defendant actually believes that it does not exist. The court repeatedly emphasized the two elements, citing a prior case, and that the prosecutor should request the "high

probability and actual belief" language, which I think was in their requests to charge.

THE COURT:  I also think some of it would have been dealt with with the two sentences that were deleted.  Let me see if the government agrees with the language.  I understand the issue of the case.

MS. SHAPIRO:  I have handed up two things.  One is a copy of the case with the relevant section highlighted.  The other is a proposed red-line of the Court's instruction that would insert the missing language.

THE COURT:  Let me hear from the government with regard to the language that is being inserted, which is "If you find beyond a reasonable doubt that the defendant was aware that there was a high probability that his co-conspirator's objective was to violate the law as charged in Counts Two, Three, and Four, but that the defendant deliberately avoided confirming this fact, you may treat this deliberate avoidance of positive knowledge as the equivalent of knowledge of the object of the conspiracy.  However, if you find that the defendant actually believed that he and his co-conspirators were acting in a lawful manner, he may not be convicted of the charge in Count One.  Moreover, guilty knowledge may not be established by demonstrating the defendant was merely negligent, foolish, or mistaken."

Let me hear from the government.

MR. RICHENTHAL:  Apologies, your Honor.  I was stuck in a subway car underground that wasn't moving for a very long time.  The only reason I'm standing up is I have dealt with the conscious avoidance instructions in some other cases.

I think as a general principle we would agree with Ms. Shapiro that this language is both acceptable and consistent with Second Circuit case law.  It is also generally consistent with request to charge number 10, pages 18 to 19 of our requests to charge.  However, we do worry that the statement here "objective to violate the law" is rather vague.  We would think it better to have the objective be the charged objective.  So the analogous language on page 19 of our requests to charge is "high probability that its co-conspirator's objective was to pay bribes or illegal gratuities or to violate the Foreign Corrupt Practices Act," tied to this case rather than generically the idea of breaking the law.

MS. SHAPIRO:  Your Honor, that's why we listed the counts.  That is what the Court had done also in the language your Honor had inserted at the end.  We didn't suggest any changes to that.  We were trying to be consistent.  There is nothing wrong with that.  It makes the same point.

THE COURT:  If I make that change, I'll make in it both places.  Mr. Richenthal, what was the language again?

MR. RICHENTHAL:  I agree with Ms. Shapiro about citing counts.  The concern is if you say "high probability that the

co-conspirator's objective was to violate the law," the implicit suggestion is that the defendant has to understand he is violating the law.  That is actually not the law.  He has to understand they intend to engage in actions that the law criminalizes.

Our language, looking at page 19 of our requests to charge, is preferable in this respect.  I don't want to make a mountain out of a molehill.  The language is reasonably similar.  The language on page 19 of our requests to charge, I will start with the word "probability" because I think that is the section we are talking about of that sentence, is probability that his co-conspirator's objective was to pay bribes or illegal gratuities or to violate the Foreign Corrupt Practices Act.

MS. SHAPIRO:  Your Honor, I'm going to object because I think Mr. Richenthal is actually misstating the criminal intent that is required.  In fact, on page 20 of the black-line, in the description of this element, object of the conspiracy, in the third paragraph it says, "The government must prove beyond a reasonable doubt that the defendant knowingly, willfully, and intentionally entered into the conspiracy with a criminal intent, that is, with an awareness of the generally unlawful nature of his acts."  There is no reason to change this because it is true that the defendant had to understand in a general way that the purpose of the

conspiracy was to violate the law.

MR. RICHENTHAL:  Again, I don't want to make a mountain out of a molehill, but there is a distinction in the law that is well-recognized between engaging in conduct that you understand is generally wrongful or generally unlawful and a specific intent to violate the law.  It's a subtle difference, but the law recognizes it.  All we are asking is that the Court's charge recognize it.

MS. SHAPIRO:  Your Honor, again, in conspiracy law there does have to be a specific intent on the part of the defendant.  That's precisely why this language is on page 20.  Mr. Richenthal is just misstating the law.

THE COURT:  Mr. Richenthal, you are not saying that is an incorrect statement of the law, the language that has been inserted here.  Your point is, I take it, that you believe that it is perhaps a clearer statement, the language that you have proposed.

MR. RICHENTHAL:  What I would say is the law is correct on page 20, which is why we are not asking your Honor to change anything on page 20.  I think this language might suggest the law is different from page 20, which it isn't.  I think our language in our request to charge informs the general principle.  The defense doesn't appear to be disputing the general principle, they just want different language here.  That is exactly our concern.

MS. SHAPIRO:  I'm not sure I understand what he is saying is the general principle.  This instruction accurately reflects the law.  What I understood him to be saying initially was that it wasn't tied to this case notwithstanding the fact that it says "as charged" and then identifies the particular counts which are the supposed objects of the conspiracy.  There is nothing incorrect about this instruction.  It's not confusing.  There is no reason to modify the language.

THE COURT:  I'll insert the proposed language of the defense in total, three sentences.

MS. SHAPIRO:  Thank you, your Honor.

THE COURT:  Next page.

MS. SHAPIRO:  The next thing we have is on page 28.

THE COURT:  Anything before 28 for the government?

MR. LAST:  No, your Honor.

THE COURT:  28.

MS. SHAPIRO:  In the middle of the page on the fifth element, consistent with the Court's breaking up the bribery and gratuity separately, I think you need to take out the words "or reward" in the bribery one.

THE COURT:  Yes.  Does the government agree?

MR. LAST:  Yes, your Honor.

THE COURT:  We will take out "or reward" there.  Next page.

MS. SHAPIRO:  On the next page, page 29, right before

the second bribery element heading, I think the insertion of bribery under Count Two is actually not correct because the agent definition applies to both.  It should still say not guilty of Count Two.  Otherwise, there will be confusion when you get to the part in the bribery elements list that refers you back to this because it only says bribery there.

THE COURT:  Up at the top of the page?

MS. SHAPIRO:  Correct.

THE COURT:  Any comment from the government?

MR. LAST:  That's fine, your Honor.

THE COURT:  So we'll take out "bribery under."  Next page.

MS. SHAPIRO:  I have something on 31.

THE COURT:  Does the government have anything before 31?

MR. LAST:  No, your Honor.

MS. SHAPIRO:  In the first paragraph, the sentence starting on the third line, "Thus the government does not have to prove that the agent accepted the bribe offer or that the bribe actually influenced the final decision of the United Nations."  I thought perhaps the word "the" should be changed to "a" because as worded it sort of implies that there was a final decision of the United Nations, which I don't think we have in this case.  It just seemed like it was wrong.

THE COURT:  "The" to "a"?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MS. SHAPIRO:  Yes.

THE COURT:  Does the government have a view with regard to that?

MR. LAST:  No objection, your Honor.

THE COURT:  Okay, we'll change that.  Next.

MS. SHAPIRO:  The next thing I have is on 36.

MR. LAST:  Nothing before that, your Honor.

THE COURT:  Go ahead.

MS. SHAPIRO:  In the last paragraph of the new language, right before the heading "Count Two, 6.  Illegal gratuities" element, where it says that the court has instructed on the definition of official act and that that should apply, we would request that the Court make a similar reference back with respect to donations to that charge in the bribe charge.  Let me explain why.

I think you can't actually have a gratuity connected to a campaign contribution.  As we discussed and has been extensively briefed, under McCormick, because of the First Amendment among other things, you can't have a bribery case relating to a campaign contribution unless there is an explicit quid pro quo.  If you could have a gratuity in connection with such a contribution, that would basically throw that whole principle out the window.

I can give a hypothetical that I think will illustrate why this would be the case.  For example, if I own an oil

company, let's say, and am really happy that President Trump has lifted some environmental regulations or something and I decide to donate to his campaign, it's linked but that couldn't possibly be illegal.

The whole point of McCormick is that a campaign contribution can't be the basis for a bribery prosecution unless there is an explicit quid pro quo. Therefore, by definition, the lower gratuity standard, which doesn't require any quid pro quo, can't apply. It's simply irrelevant in the gratuities context.

If the Court refers back to the donation instruction, it will take care of that issue. Obviously, the government is alleging other types of payments, but the instruction is very specific with respect to the PGA account. We would ask the Court to do that and would submit that if that instruction is not included, there would be a violation of First Amendment.

MR. RICHENTHAL: That is not the law, for multiple reasons. McCormick doesn't apply to section 666. McCormick certainly doesn't apply to payments to a PGA account that doesn't have anything to with a campaign in any way, shape, or form. In this specific case, in an abundance of caution, we have not objected to McCormick type language in the bribery context. We would not object to McCormick type language here.

But it has to be very, very precise. It can't be a general reference to donations. As you know knows, we dispute

that this was a donation.  In any event, the idea that donations is excluded as a matter of law from gratuity is wrong even under McCormick.  It has to be a bona fide donation.  We talked about extensively yesterday.

So as a high-level principle, although this is not the law, we don't object to some instruction or reference provided it is narrow and does not tell the jury you have to exclude from your consideration an alleged donation that we think was anything but.

MS. SHAPIRO:  Your Honor, to be clear, I am not suggesting anything remotely like that.  I am simply suggesting the Court refer back to its own instruction on page 34, which does not in any way, shape, or form suggest that the jury can't consider the PGA account donation.

I think the language your Honor crafted was carefully crafted, and there is no reason that same language wouldn't apply and get this concept across.  We are not suggesting some sort of language that would say you should disregard the PGA donation.  We are suggesting a reference back to language the Court has already carefully considered and applied.

MR. RICHENTHAL:  Here is the problem.  The prior language is about an ex ante alleged donation in return for action taken in the future.  A gratuity is about an ex post alleged donation to reward an action taken in the past.  If your Honor just refers back, the gratuity instruction

essentially is rendered meaningless because you have now told them they have to find an explicit promise up front. Again, we don't have an objection to this concept, but it has to be tied to what a gratuity is, which is action after to reward action before.

THE COURT: What language would you propose?

MR. RICHENTHAL: I would propose nothing.

THE COURT: I understand.

MR. RICHENTHAL: If the defendant wants something, maybe we can confer on how to have language similar to what is on page 34 but in the gratuity context. We didn't know the defense was going to propose this. This wasn't in their answer of last night. I am answering on the fly. We don't have a problem in principle, but we don't think it is the law.

MS. SHAPIRO: Your Honor, I want to be clear. Our position is that you can't have a gratuity if the jury were to find that this was a legitimate donation. There simply isn't a gratuity crime. So there is really nothing for us to confer on. I apologize, your Honor. I don't mean to be difficult. But that's our position. What he is suggesting is fundament- ally inconsistent with our view of the law, what the Constitution requires.

MR. RICHENTHAL: The Constitution has no role here. This is not a campaign donation. In any event, if what the defendant is suggesting, if the jury were to conclude this was

a bona fide donation, the jury could not both reach that conclusion and find that it was a gratuity. We don't agree, but we don't object to that instruction. It has to say bona fide and has to be tied to what we are talking about. If that's all the defense is looking for, I think we can come up with language.

Also, I would say again we do think the jury should be told what "bona fide" means, especially if they are being told that their entire decision with respect to a count turns on that determination.

MS. SHAPIRO: Your Honor, there is no difference in the way this concept applies. It sounds like Mr. Richenthal isn't disagreeing with that. There is no difference between the way this applies to a bribe or a gratuity. The reason I suggested just referring back to the Court's language was because the Court very carefully considered that language and balanced it. We had objected to it and the Court had overruled our objection that we thought it wasn't strong enough.

I'm not sure, but it sounds to me a little bit like Mr. Richenthal is trying to relitigate the content of that instruction. I think the Court rejected in this context the notion that the language wasn't sufficiently balanced that you had to add some concept of bona fide. I just don't understand the argument. It does sound like the government is agreeing that if the jury is instructed on this concept and they find

that the facts are as the defendant argues and not as the government argues, then there can't be either a bribe or a gratuity.

MR. RICHENTHAL: That is not our position on the law and it is not what we are saying. What we are saying is very simple. The instruction from yesterday is about there needing to be an explicit quid pro quo, a specific exchange in the bribery context. That is McCormick, although we don't think it applies. What we are talking now is not about that. By definition, a gratuity occurs after the action. What we are talking about --

MS. SHAPIRO: That is not true, by the way. A gratuity can occur before.

THE COURT: I know in the language we have both. But at least as an initial matter certain of the case law does talk in terms of -- in other words, it can be both, which is the language. I'm not sure how clear it is.

MS. SHAPIRO: Your Honor, the point is if it is before, under either scenario it makes no sense that the standard would be lower in the gratuity context when the reason the standard is higher in the bribery context than an ordinary bribery case that involves a personal benefit to the recipient or something like that, the reason the standard is higher is constitutional concerns. It just makes no sense that you could get around that by charging someone with a gratuity. I think

my hypothetical illustrates the point.

MR. RICHENTHAL: What's left out of the hypothetical I keep saying is the bona fide. If you like what President Trump did and you gave a fake donation, it wasn't intended in any way, shape, or form to be a donation. If it was intended to be a reward to him, then obviously you have committed a crime in the hypothetical. That's why "bona fide" matters.

I think this problem is solved, if I understand it to be a problem at all, if the jury were told something like if you find that a payment was a bona fide campaign donation, then you cannot find this element was met for illegal gratuity, or something like that, excluding that specific payment if it is bona fide from qualifying as a gratuity payment. If that is what the defendant's concern is about, although we don't think that is the law in this context, we don't object to an instruction like this.

MS. SHAPIRO: Your Honor, I'm sorry, but I think Mr. Richenthal is just fundamentally mischaracterizing the law.

THE COURT: I'm going to add, "If you find that a payment was a bona fide campaign contribution" --

MR. RICHENTHAL: I believe the defense prefers the word "campaign donation."

THE COURT: "Campaign donation," sorry. I had actually written "donation." What was the language?

MR. RICHENTHAL: The language we had written, and we

are certainly open for suggestion, "If you find that the payment was a bona fide campaign donation, then you cannot find that that payment was an illegal gratuity."

MS. SHAPIRO:  Your Honor, first of all, "campaign" is nowhere on page 34.  It just seems crazy to have a different kind of instruction when page 34 -- we don't necessarily need to refer back to it, but we need to talk about the donation to the PGA account to put it in the context of this case.  That's what we are talking about.

MR. RICHENTHAL:  We wouldn't object to that.  As I said a minute ago, we can confer on language.  The problem with 34 is that it is literally only talking about payment on day one for action on day two.  Gratuity is an entire theory of criminal liability that is the opposite of that.  If we refer them to page 34, we are essentially rendering practically meaningless the gratuity instruction.  That is our only objection.

If the defendant wants something longer than what I have proposed or something tied to the PGA account, we do not object in principle, we just would want to talk about the language.

THE COURT:  "If you find that the defendant made a bona fide payment to John Ashe through the PGA account, then you cannot find that the payment through the PGA account was a gratuity."

MR. RICHENTHAL: We think that is fine generally, but we think it should be "bona fide donation," not "bona fide payment." It was in fact a payment.

THE COURT: All right. The language that I have is "If you find that the defendant made a bona fide donation to John Ashe through the PGA account, then you cannot find that the donation through the PGA account was a gratuity." Next.

MR. RICHENTHAL: Sorry. We are reacting on the fly. It think it should be "for John Ashe's presidency" or something like that.

MS. SHAPIRO: PGA account is defined.

THE COURT: I was just looking at the language in it.

MR. RICHENTHAL: Then we should just strike "John Ashe" and say "bona fide donation to the PGA account." What I am reacting to is inserting the person into the sentence, which I think confuses the point. The point is if you make a bona fide donation to a campaign, it is excluded. Again we are accepting for purposes of this discussion that that is true; we don't think that is true in this context.

THE COURT: We defined it earlier. I'll take out "John Ashe" and it will be "donation through the PGA account."

MS. SHAPIRO: Can you read the sentence again?

THE COURT: I'll read it again. "If you find that the defendant made a bona fide donation through the PGA account, then you cannot find that the donation through the PGA account

was a gratuity."

MS. SHAPIRO:  I think that's fine.  You probably want to add the word "illegal" before "gratuity" because that is the way the gratuity concept is referred to throughout.

MR. RICHENTHAL:  If this is the language we are using here, simply so the jury doesn't think there is a distinction in general, on page 34 the phrase "to John Ashe" exists but the PGA account is previously defined.  For the same reason, we think your Honor should strike "to John Ashe" on page 34 so essentially the jury understands they are being told the same thing in two different contexts.

MS. SHAPIRO:  We don't have any objection to that.

THE COURT:  So on page 34 I'm going to take out "made a payment."

MR. RICHENTHAL:  I'm sorry, your Honor.  On page 34 it should again be "donations."

THE COURT:  Yes.  Also, it fits.  It's "made a donation through."

MR. RICHENTHAL:  Exactly.

THE COURT:  Then "that the donations were made to the PGA account."

Let's start on page 34 and go through that.  I want to make sure the language is consistent.

"You have heard evidence relating to" -- shall we make that "donations"?

MR. RICHENTHAL: The allegation is just that there is one, the $200,000 payment. It should be you have heard evidence relating to.

THE COURT: A donation?

MR. RICHENTHAL: This should be a payment because, again, we don't think it is a donation. Our view is the first sentence should say "payment" because it is in fact a payment. We just allege it is not a donation. Then the question is what should the jury find. If the jury finds it is a bona fide donation, then the law recognizes that as a different thing.

THE COURT: It should be "however"?

MR. RICHENTHAL: Mr. Zolkind has made a good point. Because you haven't yet told them what they are looking for, contrary to what I said a minute ago, and I apologize, it should say however, if you find the defendant made a payment, it shouldn't say "donation" yet.

THE COURT: Okay.

MR. RICHENTHAL: To put it simply, other than striking "to John Ashe," we are fine with page 34.

THE COURT: So payment at the end of that?

MR. RICHENTHAL: The way the jury is being told this, we don't want the Court to adopt the defendant's view that it is a donation. The other one is the Court is basically saying if you find X, then Y.

MS. SHAPIRO: That's fine, your Honor.

THE COURT:  Okay.  So it's "made a."  We take out "john Ashe."  There.

MR. RICHENTHAL:  The only thing we would say so it is tied to the evidence, the first sentence says "tied to payments."  And I think they are only concerned about one, the $200,000, so it should be singular.

THE COURT:  And singular below, right?  Below meaning the last sentence.

MR. RICHENTHAL:  Yes.

THE COURT:  "Payment" in this paragraph should be "payment," not "payments"?

MR. RICHENTHAL:  I think that's right.  The heading maybe shouldn't be "donations" because that word doesn't appear in the paragraph.  It should be maybe be "payments to the PGA account" or "payment to the PGA account," something like that.

MS. SHAPIRO:  That's fine.

MR. RICHENTHAL:  I recognize PGA is going to be defined after the jury sees that heading, but it's ten seconds later.

THE COURT:  I think that should be fine.

MS. SHAPIRO:  I had one other thing on page 36, but it is more trivial.  In the paragraph right above that or the language right above that, it says "An illegal gratuity may constitute a reward for some future act that the agent will take or for a past act."  We would ask that the word "official"

be inserted before each of those references to "act" in that last sentence of the paragraph, just for consistency so they are not confused, because the previous sentence talks about a reward for an official act.

THE COURT:  I would add "a reward for some future official act" and then later in the sentence "or for a past official act that he has already taken."  All right?

MS. SHAPIRO:  Yes.

THE COURT:  When we split up the bribery and gratuity, is the formulation that we currently have with regard to the different elements -- I think we added certain language.  The sixth element under bribery is value of the transaction. Because of moving the things around, is everybody all right with the formulation we have and how we split up the gratuity and the bribe portions?

MS. SHAPIRO:  It seems fine to us.

MR. LAST:  Likewise, your Honor, it seems fine.

THE COURT:  The payment language, under the bribery we have it under the sixth element but under the gratuity we have it under the fifth element.

MS. SHAPIRO:  I guess that's technically true, although it has a separate heading so it is not clear that it doesn't just apply to the whole charge.  I think it is fine.

THE COURT:  All right.  We'll leave it as is.  Next.

MS. SHAPIRO:  Your Honor, I had a quick question.

Maybe the Court thought about this and then had rejected this. I understand the Court's ruling with regard to the Hoskins issue. We had made a separate argument irrespective of the Hoskins issue that as to these places in Count Three there were several places where the Court had added "or aided and abetted."

We had a separate concern that even if the Court were to reject the Hoskins argument, it didn't seem to us to make sense to have aid and abet within a substantive instruction when there is a general instruction about aiding and abetting.

THE COURT:  I rejected that and kept it in.  Next.

MR. RICHENTHAL:  Let me note on Hoskins, and then I'll step out to gather some papers, your Honor is not instructing the jury that aiding and abetting applies to Count Four.  I think this discussion has been well litigated.  Just for the record, aiding and abetting in the Court's instructions does not apply to Count Four, and we think that is perfectly fine. So this issue does not exist with respect to Count Four.

THE COURT:  All right.  Next.

MS. SHAPIRO:  We didn't have anything until there was a place where, and we didn't have any time to meet and confer, did the Court want to insert some language in the transcript starting on page 66?

THE COURT:  Does the government have anything before 66?  It's actually 63.  Sorry.

MR. LAST:  Nothing before 63, your Honor.

THE COURT:  The issue I have here is I thought it was defense transcripts that were in English that were handed out but I didn't specifically recall.  Part of it was I just wasn't sure what the exact proof was.  That's why I hadn't inserted language in here.  The issue initially, at least partially, is I don't believe the government introduced English transcripts.  That's why I was looking for the parties' suggestion as to what the language should be.

MR. JENSEN:  Your Honor, I started to scribble some language here.  It is not fully formed.  Do you want me to confer?

THE COURT:  Yes.  Put your heads together.  That way we will come up with some language.

MR. JENSEN:  If you have other issues, why don't I confer with one of them.

THE COURT:  All right.  That's 63.  We'll come back to that.  Ms. Shapiro?

MS. SHAPIRO:  The Court had a question.  We appreciate that the Court changed the cooperator witness testimony.  We think this is much more balanced and makes more sense, particularly given the concerns we raised yesterday.  Your Honor had asked whether the second sentence in the new language applies.  I think it is actually not exactly correct as worded.

We had a suggestion that I think would be more

faithful to the precise language of the cooperation agreement, which I think would be "There is evidence that the government agreed not to further prosecute the cooperating witness with respect to certain charges in exchange for his agreement to plead guilty to such charges and to testify if required."  I don't know.  That's a little more accurate.

THE COURT:  He is pleading guilty to the charges.  He is not being absolved of criminal liability with regard to it.  That was my concern.  The language suggested that, and I think under some circumstances that's correct.  There may be certain charges, but my recollection of the cooperation agreement here is there isn't anything where the government agreed not to --

MS. SHAPIRO:  It could refer to the government agreed to bring the witness's cooperation to the attention of the sentencing court if he agreed to plead guilty and testify at this trial and provide substantial assistance.  I don't know.

MR. ZOLKIND:  Your Honor, we have objections to the way that this new section has been drafted.  We think it is not entirely accurate.  I'm looking now at the nonblack-line version because --

THE COURT:  It's easier to read.

MR. ZOLKIND:  Yes.

THE COURT:  What page is that?

MR. ZOLKIND:  It's on page 58 of the clean copy.  It begins by saying, "In this case there has been testimony from a

government witness." We would prefer "a witness called by the government."

THE COURT: "In this case" --

MR. ZOLKIND: "There has been testimony from a witness called by the government." I think as phrased it could suggest that he is an employee of the government.

THE COURT: "Testimony from a witness called by the government."

MR. ZOLKIND: That's a minor point. It then goes on to say there's evidence that the government agreed to dismiss some charges against the witness.

THE COURT: Yes.

MS. SHAPIRO: We understand that is not accurate.

MR. ZOLKIND: I don't think that is accurate.

MS. SHAPIRO: That's what I was talking about. The Court asked if it applied, and I said I didn't think it was accurate as phrased, and we are trying to find a sentence that would be more accurate.

MR. ZOLKIND: I'm not aware of the government agreeing not to prosecute him. He pled guilty to all of the crimes that we were aware of.

THE COURT: Ms. Shapiro I think is acknowledging that. Rather than trying to describe, the agreement is in. I hesitate to, rather than literally pulling language --

MS. SHAPIRO: If you took that sentence out and then

said the government also promised to bring, it sort of doesn't make any sense.  What about something along the lines that there is evidence that the government agreed or promised to bring the witness's cooperation to the attention of the sentencing court, something that at least gets that concept married up with the fact that the point of the agreement is that he is going to plead guilty to some charges and in exchange for his testimony or for his substantial assistance the government is going to bring his cooperation to the attention of the sentencing court.  Otherwise, that other sentence is not linked up to the agreement, which is the whole point.

MR. ZOLKIND:  Your Honor, we would strongly object to any language that suggests that the agreement is based on his agreement to testify at trial.  As the Court knows, that is not what the agreement says.

MS. SHAPIRO:  It says he has to testify if the government asks him to, which is what happened.

MR. ZOLKIND:  Right.  In this case there happened to be a trial and the government did ask him to testify, but it was not an agreement to write a letter in exchange for his testimony, which I think is how it is phrased right now.

MS. SHAPIRO:  The sentence says the government also promised to bring the witness's cooperation to the attention of the sentencing court.  That's accurate.

THE COURT:  I would delete that sentence.  I have used the other language that we had in here.

MS. SHAPIRO:  Your Honor, if there is no explanation of any of this, then the jury doesn't understand what his motive to lie is.  The whole point of this instruction is to tell the jury that a cooperator has a particular motive to lie and that they can still believe him if they choose to, but to warn them of the dangers of cooperator testimony in the same way that the immunity instruction talks about how you have to give that testimony special scrutiny.  If you take out what his incentive is, which is to get a letter to the sentencing judge, you sort of gut the whole point.

THE COURT:  When you say the government has promised to bring the witness's cooperation to the attention of the sentencing court for the court's consideration in connection with the witness's sentencing --

MR. ZOLKIND:  Your Honor, the first sentence also says that it was a witness who pled guilty after entering into the agreement with the government to testify.

MS. SHAPIRO:  It should say "an agreement with the government."

MR. ZOLKIND:  Exactly.

THE COURT:  Yes.

MR. ZOLKIND:  "A cooperation agreement."

THE COURT:  I was going to say, yes, "a cooperation

agreement."  "A cooperation agreement with the government," period.  We will take out that next sentence.  Then the sentence will read, "The government also promised to bring the witness's cooperation to the attention of the sentencing court for the court's consideration in connection with the witness's sentencing."

(Continued on next page)

MS. SHAPIRO:  Okay.

THE COURT:  I guess do we need to add -- the government promised to bring the witness' cooperation --

MS. SHAPIRO:  What about, "In exchange for the witness' cooperation, the government also promised to bring his cooperation to the attention of the sentencing court if he provided substantial assistance"?  Because that's what the agreement says.  The government doesn't promise it unless he provides substantial assistance.

MR. ZOLKIND:  Well, I mean, the defense has used that phrase "substantial assistance" repeatedly in ways that we think are not accurate, and so, I mean, we wouldn't object to the Court explaining that under the terms of the cooperation agreement, the government will write a letter if it determines that the defendant provided substantial assistance in the investigation or prosecution of another individual and that "substantial assistance" is defined to include the witness testifying truthfully, if he's called to testify, and meeting with the government and so on and so forth.

THE COURT:  How about this -- because in essence what you're fighting about is what's in the cooperation agreement.

MS. SHAPIRO:  Yeah, I was going to say that actually.

THE COURT:  So I'm going to add at the end of that sentence, "I refer you to the cooperation agreement."

MS. SHAPIRO:  I think that makes more sense, your

Honor.

THE COURT: Which is in evidence. And that way, we're not struggling over the language and going back and forth on this, because the other concept that is not entirely in here is that the witness has to abide by the terms of the agreement in order to get the letter.

MS. SHAPIRO: Right.

THE COURT: But it's more nuanced than that.

MS. SHAPIRO: I'll be fine if the Court just refers them to the letter for the details of those provisions.

THE COURT: Mr. Zolkind?

MR. ZOLKIND: I think that's fine, your Honor.

We had another comment later in the same section.

THE COURT: Okay.

MR. ZOLKIND: I wasn't here during the conference yesterday, but I'm told that there was discussion about the phrase "obtain his own freedom" and that --

THE COURT: Now, yes, because I think that should be -- that wasn't changed? Oh, obtain -- so it should be to avoid prison or something like that?

MR. ZOLKIND: Yeah, that's good.

THE COURT: Yes. So instead of obtain his own freedom, it's to avoid prison.

MS. SHAPIRO: Right.

THE COURT: Or to avoid a prison term? Or term of

imprisonment?

MS. SHAPIRO:  I think that's fine.

MR. ZOLKIND:  That's fine.

THE COURT:  To avoid a term of imprisonment.  Okay. Yes.  Sorry about that.

MS. SHAPIRO:  Your Honor, I think there was one other -- I'm trying to find it.  There was one other paragraph or a couple sentences that you had taken out that we wanted to ask if you could put back in.  I'm trying to find it.

THE COURT:  For which, for the cooperation?

MS. SHAPIRO:  For the cooperation.  There was something in here about the fact that the cooperator pled guilty, you know, is irrelevant to whether the defendant is guilty, and I think you took that out.

Yeah, here.  It's in the blackline.  It's on my page 66, I guess in the middle of the page, there's some crossed-out language that previously said, "You are instructed that you are to draw no conclusions or inferences of any kind about the guilt of the defendant on trial from the fact that a government witness --" what it says here, "pled guilty to similar charges."  And I think that's gone now from the new instruction, and we think it's important that the jury get that instruction.

THE COURT:  So it would be, "You are instructed that you are to draw no conclusions or inferences of any kind about

the guilt of the defendant on trial from the fact that a witness pled guilty to similar," so it's "similar charges," period, right?

MS. SHAPIRO:  Yes.

MR. ZOLKIND:  We have no objection to that.

THE COURT:  And I would add that, you know, either right before or after, maybe right before, "You have heard reference to what the punishment may be for the cooperating witness"?

MS. SHAPIRO:  All right.

THE COURT:  Or something like that?

MS. SHAPIRO:  Yeah, that was where we were thinking it could go, right after, or right before, either one.

THE COURT:  Maybe right before, since the punishment would come after the guilty plea, so --

Okay.  Is there anything else after 66?

MR. ZOLKIND:  Your Honor, this is a minor point, but we noticed some of the language here is in bold, and we're assuming that it won't be bolded in the final version.

THE COURT:  It will not be.  Although was it in bold in the --

MS. SHAPIRO:  "Motive to lie" should be in bold.  I'm just kidding.

MR. ZOLKIND:  I think it's not in bold.

THE COURT:  In the regular version, yeah.

Okay.  Is there anything after 66 of the markup?

MS. SHAPIRO:  Not from us, your Honor.

MR. ZOLKIND:  Your Honor, we have one other point that --

THE COURT:  Oh, raised in your letter?

MR. ZOLKIND:  Exactly.  The point about the dual motive.  Just to be clear about this -- and we've had detailed discussions with the chief of our appellate group, and our understanding is that this is a very clear statement of the law, that we don't understand the defense to be disagreeing that this is a principle of law.  It was something that the jury was instructed on in both the Silver case and the Skelos case, and it's an instruction of the law that applies really squarely here, especially -- Mr. Park is in the midst of his summation and there's been numerous arguments about how the defendant was motivated by philanthropic intentions, and we think it's very important that the jury understand that if the defendant was partially motivated by noncriminal intentions and partially motivated by criminal intentions, that means the government has met its burden with respect to that element.  And we think the jury will not understand that and will apply the wrong law under the current instructions.

THE COURT:  All right.

MS. SHAPIRO:  Well, your Honor, number one, we think it's very unfair that the government brought this up at 10:00

last night when, first of all, we had a whole discussion about whether an issue could be raised based on the summations and everyone agreed that Rule 30 actually required the Court to make final rulings on the charge.

THE COURT:  I'll hear you on the Rule 30 issue in a moment.  But I think I said that I believed it was a correct statement of the law and that if the jury asked the question, I would instruct them about that language.  So the first question I have for you is:  Do you believe that it's a correct statement of the law?

MS. SHAPIRO:  I don't disagree with that, your Honor, but I was about to say that I thought what we had discussed was that if the jury asked about it, the Court would answer the question, and we have no problem with that.  And what I was concerned about was that it seemed like that's the way it was resolved and then, by the way, you know, we get this note at 10 or whatever it was that makes the whole deal about Mr. Park's summation but completely ignores the fact that the way Ms. Echenberg started her summation was by talking about the government's allegation that Mr. Ng's motive for this was to make all this money by turning Macau into Geneva.  So obviously I'm not suggesting that Mr. Park wouldn't have mentioned any of this without that, but for the government to sort of claim that the basis for relitigating the Court's decision was that is just bogus, and really what they're doing is they're trying to

get around the Rule 30, and, frankly, I feel a little bit sandbagged because --

THE COURT:  Well, look, look, the jury is here.

MS. SHAPIRO:  But the point is --

THE COURT:  The point is, look, I could have given the instruction.  You agree that it's a valid instruction.  I'm not going to now add it back in, but I will tell the jury and I think, as a legal matter -- and again, it's akin to -- not exactly, but -- like a nullification argument, in essence.

MS. SHAPIRO:  Well, no, it's not, your Honor.  Our argument is that he had no corrupt motive, so I don't agree with that, your Honor.  I don't think that's fair.  And the jury could certainly find that his only motive was philanthropic and therefore he had no reason to bribe anyone, and that's the guts of our argument.

THE COURT:  All right.

MS. SHAPIRO:  And so I really don't think that's fair.  I do agree that if the jury concludes that even if he had a philanthropic motive, he had a corrupt motive, you know, and he really was trying to make all this money or whatever and deliberately engaged in this, and it was bribery and he had a corrupt motive and he was consciously doing something that he knew to be wrong, that's a whole different story, but that's for the jury to decide.

So all I'm asking is, we agree, as we did yesterday,

that if the jury asks that question -- and I haven't studied the language that they sent late last night so obviously we just want to take another look at it, obviously, to make sure everyone is in agreement that the language is precisely accurate, but certainly the general concept is accurate.

THE COURT:  Okay.

Yes.  Mr. Zolkind.

MR. ZOLKIND:  I mean, just in terms of Ms. Shapiro's argument this was a late request brought up by the government, I just note that it's been in our requests to charge from the very start.  And so Mr. Park is obviously still in the middle of his summation, so if he wants to address it, he can.

I think I understand the Court's ruling, but just to be clear, the government understands that we can, in our rebuttal summation, argue that even if he was partially motivated by philanthropic or other good intentions, if he was also motivated by criminal intentions, then the jury should find that the government has met its burden on that element.

THE COURT:  I think that's right, and that there's nothing in the charge that says it's an excuse if he was partially motivated by that, or something like that.  Right?

MS. SHAPIRO:  Absolutely.

THE COURT:  Yes.  Okay.

All right.  So we do have all the jurors here.  I'd like to bring them out.

4069

MR. JENSEN:  Your Honor, we have proposed language for that transcript, if you want to hear that now.

THE COURT:  Oh, yes.  If you could.

MR. JENSEN:  It's agreed upon, so we could also do it later.

THE COURT:  Do you want to just hand up whatever you have written?

MR. JENSEN:  There are two ideas.  One would be to move that entire section until after paragraph T.

THE COURT:  I'm sorry?

MR. JENSEN:  You have a paragraph -- paragraph T on page 64 of yesterday's draft is Translations.

THE COURT:  Yes.

MR. JENSEN:  And we think this use of transcripts would fit better after that.

THE COURT:  Okay.

MR. ZOLKIND:  It's actually paragraph R I think in the new version.

THE COURT:  Yes, it is, yeah.

MR. JENSEN:  This would now be paragraph S.  And I can handwrite out the language and give it to you if that --

THE COURT:  If you could, that would be great.  So we're going to take out -- well, actually, it won't, because if we take out use of transcripts, it will still be -- well, do you want to insert it into that paragraph or --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MR. JENSEN:  I would just move the heading, Use of the Transcripts, and the language that I'm going to scribble out for you until after paragraph R in the current charge so that it follows the section on translations.

THE COURT:  Okay.

MR. LAST:  That's fine with the government, your Honor.

We had one other small, small thing just to raise before the jury comes out.

THE COURT:  All right.  So what's the language -- well, if you can hand -- Mr. Jensen --

MR. JENSEN:  I have to write it out.

THE COURT:  Okay.  That would be great.  And just confirm it with the government.

Yes, Mr. Last.

MR. LAST:  Your Honor, the last point was, with respect to the instruction on evidence not admitted for the truth, I know, when we had a number of sidebars on this issue, the Court said it would make reference in the instruction that the jury's going to get a list of the exhibits that were admitted not for truth, so we would just ask, if your Honor just had a sentence noting that:  You will receive a list of exhibits received not for its truth.

THE COURT:  We can add.  What page of the --

MR. LAST:  Page 8, paragraph I.  I'm sorry.  I'm

looking at the redline page, but I think it's the same.

THE COURT:  It is.  It is.  Evidence for the truth.  Okay.

MS. SHAPIRO:  Your Honor, just one other housekeeping matter.  We would just, as we did yesterday, just ask that the Court mark the clean and redlined versions as Court exhibits for the record.

THE COURT:  Yeah.  And I will do that.  You may be seated.  All of the materials that I sent earlier this morning will be marked and we'll make the first set Court Exhibits A and B so the charge and the verdict form, and the material sent last night will be C and D, which is the markup and the clean.

MS. SHAPIRO:  Okay.  Thank you, your Honor.

THE COURT:  All right.

I'll be right back.  We're going to bring the jury out shortly.

(Recess)

(In open court)

THE COURT:  Okay.  We're going to bring the jury out.

(Jury present)

THE COURT:  Okay.  You may be seated.

Ladies and gentlemen, we're going to continue with the defense summation.

Mr. Park, you may proceed.

MR. PARK:  Thank you, your Honor.

Ladies and gentlemen, when we left off yesterday, unfortunately we had only covered the periods from 2009 through 2012. 2013 is an important year, as you know, from the government's allegations. It is when the June 2013 letter is issued by John Ashe to the General Assembly. So I want to get to that.

But before doing that, I want to remind you of what we covered with respect to the March 2012 letter, which was essentially the foundation for the June 2013 letter.

If we can put that up, Umberto.

What we established yesterday, or at least walked through in terms of evidence, is that the 2012 letter, notwithstanding Lorenzo's claims and lies that Mr. Ng was behind and initiated and pushed for that 2012 letter, he has no connection to that letter whatsoever, whereas Lorenzo and his cronies, with Forest Cao at the helm, was all over that letter. All over it. They wanted it. They referenced it. They used it.

Now before we get to the June 2013 letter, let's just back up and talk for a minute about what it means for Mr. Ng, in the 2013 period, to have wanted an official UN document. We do not dispute that Mr. Ng, as of 2013, was engaged, he was engaged on the issue of having a Macau conference center. No question. He was paying for brochures to be prepared, there was research being done. You will get a chance to review that

brochure on your own.  There won't be time in my summation to go over it in detail.  But it is dense with facts, with proposals, with ideas, that are important for the international community.  That's what's being done in 2013.  Mr. Ng is paying for that.

But what is it when Lorenzo says he was pushing for a UN approval document?  A UN approval document really is nothing more, it's nothing more than the UN saying, yes, we're ready, we want to establish a Global South conference center in China, in Macau.  Unless you get that approval indicating that the UN actually wants to go forward, there's no reason for a businessman like Mr. Ng to invest any further funds in it, is there?  Would you?  It's common sense.  Lorenzo keeps talking about this UN document, approval document that Mr. Ng was insisting on and jumping on his back about.  It's about getting the basic thing ready so that he can then decide, am I going to commit the funds really to make this happen or not?  It's that simple.  It's not a crime.  We've got to use common sense.  All he said was, we got to get an approval document.  I got to know whether this is happening or not.

Now what about the specifics of that document?  That's really the question, right?  The government says that he was cheating, he was cutting corners, he wanted to do things that the PLS document, the manual, and Mr. Hannaford said, you can't do it that way, you can't do it this way, you've got to do it

this way.  Mr. Ng has no idea about that.  That's not his job.
That's Lorenzo's job.  That's what he's paying Lorenzo to do is
to know the rules and navigate them properly, to be the
lobbyist that he's supposed to be, to talk to the right people,
and just get it done properly.

Now, you know, Ms. Echenberg during her summation said
something about this massive bureaucracy at the UN and, you
know, and he was trying to cut corners.  There is a massive
bureaucracy at the UN, and you're right.  Maybe it was his
mistake for thinking, as a real estate businessman, he's just
going to make the UN suddenly change and get on the stick and
get something actually done, rather than constantly talking
about it.  Centers of excellence.  The MDGs.  These are ideals.
They're lofty ideals.  Eradicate poverty.  But it's time to get
something done.  It's not a crime for a businessman to say,
let's do this now.  And if there's a failure in regulations, if
there's a failure in the rules, if there were things that were
getting -- corners were getting cut, it's not because of that
guy.  He's working 30 affiliates, a hundred, more than a
hundred subsidiaries of his company in Macau.  He's paying a
guy $20,000 a month to run South-South News, $30,000 a month
through Terra Trading to do what's necessary to get the
foundations laid for this center.  He has a reasonable
expectation that the guy's going to do it and do it right.  And
there's zero evidence in this case that Lorenzo ever said,

Mr. Ng, we can't get this done, there's a massive UN bureaucracy, I have to cut corners, I have to violate rules, I have to do this that's wrong, I have to do that that's wrong. Not a scintilla of evidence to that effect. As far as Mr. Ng's concerned, things are going just fine. This case is about Mr. Ng, what he knew, what he believed, what was in his heart, not about the UN rules, or about whether Lorenzo followed the rules.

So let's talk about what this June 2013 letter amounted to. Lorenzo said, again, that June 2013 letter was because of him and he only worked on it because he was bribed. And he doesn't quite say this, but he implies, certainly the government implies through their allegations through him, that John Ashe was bribed to issue this letter because of him. Lorenzo's suggestion that he was bribed is just a flat-out lie. Flat-out lie. His implication that John Ashe was bribed, it's not evidence, number one. Certainly nothing that you can even put in the same room --

MS. ECHENBERG: Objection.

THE COURT: I'll allow it.

Ladies and gentlemen, this is argument, so I will give you the instructions on the law, and your recollection of the facts is what counts.

Go ahead, Mr. Park.

MR. PARK: It's not even close to being beyond a

reasonable doubt as to what was in John Ashe's mind. Ms. Echenberg can reach inferences all she wants. You've got to look for the evidence. Where is the evidence that John Ashe would not sign that letter or work on that June letter but for a bribe? None.

When you look at this June 2013 letter, Mr. Ng and Jeff, through Jeff Yin, is asking for the reference to SKI Group, his company, so that there can be some assurance on his part that the UN is okay with him sponsoring a conference center. That's not a crime. I want to know they want to do this with me. Common sense, right?

But you know who's messing around with that letter? Yet again, it's Forest Cao and Francis Lorenzo, and now John Ashe. The three of them are messing with that letter. And Mr. Ng has nothing to do with their shenanigans.

Let's go to Defense Exhibit 509.

This is now February of 2013. Lorenzo has convinced Mr. Ng to get on this project for a Macau conference center. But you know that as of early 2013, he and Forest Cao had created a new company called the IOSSC. And so what he does, the first thing he does is Lorenzo reaches out to Yiping Zhou, the head of the UNOSSC division of the UNDP and he says to him, "Hope you're doing well. I need your assistance in sending me again the same letter you sent me before but with the name of IOSSC. Enclose see the letter that you sent me before."

Let's go to the enclosure.

If we can go to the second enclosure, please.

So let's take a look at this letter.  This is in September of 2012.  Yiping Zhou had sent a letter at Forest Cao and Lorenzo's insistence about a culture center.  Remember, this is the culture center.  But here's the thing.  They had had him address it to Francis Lorenzo as president of South-South News.  But now they've opened the IOSSC.

So if we go to the first attachment, what Lorenzo is asking Yiping Zhou to do is do that same letter but now say, Francis Lorenzo, president of IOSSC.  So he's creating another UN-based foundation for himself and Forest Cao to continue to pursue the culture center.  He's not genuinely -- at this point, 2013, Lorenzo is not genuinely working with him, for him, at all.  Is he paying lip service because he's pressuring him?  Absolutely.  But that's not where his mind is.  He is not his co-conspirator in any way, shape, or form.  He is Cao's man.

So that's in February of 2013.  Now if we can go to Defense Exhibit 966.

What's the next thing they're doing?  Now not only do they have IOSSC, they're now creating -- Forest Cao and Lorenzo and now John Ashe, they're creating another company called SS-SCSD.  This is in June 12, 2013.  They're creating a website where John Ashe is going to be chairman of this new group.  And

again, they're using -- this is Stan Bian.  You know who he is.

He's Forest's man at South-South News, getting paid by

South-South News and Mr. Ng, but doing all the work for Forest.

And he says, "Christian, there are three changes need to be

made on the website, immediately if possible."

See, that June 2013 letter is about to come out.

They're laying the foundation for yet another company for

Forest, controlled by Forest.  They've got IOSSC in place,

they're now using SS-SCSD.

And if you go to the attachment of that document,

there's a bio on John Ashe.  Very impressive bio.  And they're

using that bio for purposes of this new Forest Cao-Francis

Lorenzo company.

Now let's go to Government Exhibit 83.  Meena Sur,

friends with Francis Lorenzo.  You'll recall that she was also

the one who helped to work on that brochure later on that year.

And what she does is she sends -- she's working with Francis

Lorenzo on a draft of that June 2013 letter.

Let's go to the attachment.

This is the draft.  And in this draft, the third

paragraph -- if you can blow that up.

"In this regard, I am pleased to inform you that in

response to the recommendation, Sun Kian Ip Group of Macau has

welcomed the initiative and has been appointed to serve," etc.,

etc.  Macau.  The company's name is Sun Kian Ip Group of Macau.

If you go to the actual exhibit, the final version of the June 2013 letter -- can we call that up, Chris?

Government Exhibit 94, right?  Or this is the 9112C version.  Let's blow up the third paragraph.

This is the final version.  Now it says, "In this regard, I'm pleased to inform you that in response to the recommendation, Sun Kian Ip Group of China has welcomed the initiative."  I asked Lorenzo, well, what's that about?  You got drafts, Macau, Macau, you changed that up to China.  And he's like, well, because people wouldn't recognize Macau, they'll recognize China.  This is the United Nations.  This is to the General Assembly.  People in the General Assembly don't know what Macau is?  But that's his explanation.

But what's really going on is you can't understand that change without seeing what they had just done with respect to that SS-SCSD website that they're creating now.  They're getting ready for a conference center in China.  Now SKI is there.  How are they going to do that?  It's SKI.  And that's when we go to Defense Exhibit 1000.

Just a few months after that June so-called official letter is issued by John Ashe, with the assistance of Francis Lorenzo, Ashe writes this letter.  Well, actually Stan Bian is sending it to Lorenzo, and, you know, we've heard that Stan Bian was Forest Cao's assistant.

If we could go to the attachment.

Let's just blow that up.

First line.  The first line of that letter.

No.  I'm sorry.  In that first paragraph, it says, "In a document (A/66/748*) transmitted."  You know what that is a reference to.  That's a reference to the June 2013 official letter.  They're using that letter.  And what he says in the last paragraph is as follows, last sentence:  "Upon due deliberation, the steering committee," meaning the SS-SCSD, "has hereby decided to appoint the Asia-Pacific Finance Center for Sustainable Development under the SS-SCSD to this important undertaking for more effective coordination and implementation."  Why?  Because allegedly, they deemed that the progress has not been satisfactory and a substantial enhancement is required.

This is just a setup, right?  They're paying lip service to Mr. Ng, but Lorenzo, Ashe, Forest, they're just setting this up.  They're continuing to get funding from this guy.  He's actually the only one who's actually still sending any money to South-South News.  So what they're doing is they're setting up SS-SCSD, they're creating a website, Ashe is going to be chairman, they get that June letter under Ashe's auspices, and then just a few months later, they're saying, we're taking over.  We are taking over SS-SCSD.  And it doesn't stop there.  Well, let's stay on that.

Go back to that first line in the document.

So during the trial, on cross-examination, I asked Lorenzo this:  Transcript cite, page 2507 at lines 12 through 21.

"Q.   What's going on here is that this letter is referencing the June 2013 letter to the General Assembly, right?

"A.   That's correct.

"Q.   Specifically, by the document number, right?

"A.   That's correct.

"Q.   And saying that, SS-SCSD is now going to take this over, isn't that a fair statement?

"A.   That's correct, yes.

"Q.   By John Ashe, chairman of SS-SCSD, right?

"A.   That's correct, yes."

There's no question what is going on with this.  That June letter, it's got -- Mr. Ng wanted it, yes.  He wanted his name associated so that he could break ground or at least start investing in this.  But that letter was not driven by him.  It was driven by Cao.  Plainly.

Go to Defense Exhibit 999.

You just saw Ashe's letter in November of 2013 saying, we're taking over, essentially.  Defense Exhibit 999 is in December of 2013, by Vivian Wang.  Below -- if we can blow up that lower section.

Wang emails John Ashe, and if we see at paragraph 2,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

she says, "Please review the letter to AP Financial Center about the expo initiative.  It's going to build and develop this project soon.  But now the other company's name on the document (they don't have funds to do it, it's been two years). I need the letter ASAP."

Ashe, Wang, Cao, Lorenzo.  They've got the letter, the June letter.  They switched it from Macau to China.  They're playing with this letter.  They're referencing it for this new Cao culture center, not by IOSSC.  Now it's by SS-SCSD.  And Vivian Wang is saying, yeah, we got to fix that company reference.  That's a problem for us.  That's what's going on.

This is a conspiracy for sure.  It's got nothing to do with that guy.  It's actually a conspiracy to defraud him. They tell you he's a member of that conspiracy.  It is a flat-out joke.  You can't look at this stuff and still conclude beyond a reasonable doubt that Mr. Ng had any participation in a conspiracy with people like this.

During the course of the cross-examination I took Lorenzo through the other letters.

Let's put up that graphic, Umberto, from 2012, please.

The series of letters that Lorenzo was sending to Li Gang in 2012, that's what that shows, and then during cross-examination, took him through the series of letters he was having, communicating with Cao and Li Gang in 2013.  Just put them up there.  And there's a exhibit reference.  We're

just going through quickly the documents that are in evidence that we walked through with Lorenzo, to illustrate again that his efforts with Li Gang and Forest Cao to create this separate center continues unabated.

Continued unabated, same pattern. Looked to build a center somewhere else in China outside Macau. Letters to Li Gang, the Chinese government official.

Now are Jeff Yin and Mr. Ng at this point talking to Lorenzo about the Macau center? Yes, absolutely. But Lorenzo is busy. Boy, he's busy. He's not busy on Mr. Ng's stuff, at all. They just get this, they put in his company's name, and even that they don't get right. They substitute China for Macau. Because they want to give themselves as much room as possible. But that's what's really going on. That's busyness. That's work.

Conspiracy to defraud. Not a conspiracy that he's involved in to bribe anybody. Lorenzo and Ashe don't need to be bribed, ladies and gentlemen, to put that letter out, because they've got their own thing going with Cao. They want that letter. It's their thing. It's their letter. Yeah, he wants his name somewhere so that he can give some assurance from the UN that it's good, that they approve him. But that letter is not about him. It's about Cao.

Now how do you know that? How do you know that Ashe and Lorenzo didn't need to be bribed by Mr. Ng to issue that

letter? Besides all of this other conspiracy that they're engaged in? You know that because there's actually no payments. There's no payments associated with that June 2013 letter by my client. What do I mean by that?

Let's go to the graph.

This is for the year 2013. I want you to understand what's going on between Lorenzo and Mr. Ng in terms of payments. Because Lorenzo says, I was being bribed, I was being bribed to do this. And remember this theory, the government's theory, their theory, is that Terra Trading was used as a conduit for bribing Lorenzo to work on this June 2013 letter, among other things.

So what happens? February 3, 2013, there's a payment of $60,000 from SKI Group, Mr. Ng -- as you may recall, the wire transfer had his name on this, transparent, open -- from SKI, Mr. Ng, to Terra Trading's account in the DR, through Wells Fargo in the United States.

What's the next thing that happens? Lorenzo sends the signed Terra Trading agreement. Payment's being made because the agreement's about to be signed. Remember that? Mr. Ng wanted a signed agreement. He would not agree to do this without having an ability to enforce his rights against Lorenzo to ensure that he and Terra Trading were doing real work.

So right about the time that Lorenzo sends the signed agreement, Mr. Ng sends $60,000. That covers two months.

January, 30,000, and February, 30,000.

What happens in March? No payment. Ms. Echenberg, during her summation, she put up a draft of that June 2013 letter and she said, you see, there's this February payment, and right after that, there's this draft. Because he starts -- Lorenzo is now working for Ng. That's her theory. The reason why that 60,000 was sent was because the agreement was signed and he's got to put in the two months' worth of contracts that he's required to pay, or he's supposed to pay. But in March, when this draft letter is sent or being worked on by Lorenzo, there's no payment. What happens in April? He gets no payment. What happens in May? No payment. What happens in June, when that June 2013 letter is finally issued by John Ashe? You guessed it, no payment. What about July? Nada. August, nothing. September, nothing. October, nothing. November, nothing. December, nothing. What kind of bribery scheme are we talking about, ladies and gentlemen? We're not really talking about one. They may be, but we're not.

Now that's just Lorenzo. This is proof positive. We don't have the burden of proof, but I got to tell you, that's proof positive that Lorenzo wasn't -- that he had no intent to bribe Lorenzo to work on that letter or to do anything with respect to this Macau conference center. He's contractually obligated to pay this guy $30,000, and he basically says no, not going to pay you. I want to see work. The guy says, well,

what about this June 2013 letter? Isn't that work? Not interested. I'm not going to pay you. He's a businessman. And he's a hard ass. He'll pay him when he thinks that the work is really meaningful. Clearly that June 2013 letter was not meaningful for him. Otherwise he would have paid him, right? Am I right or no? I mean, what else, how else can you explain his decision simply not to pay him other than he just didn't find that all that significant?

John Ashe -- we went over this yesterday. In October 2010, he asked Mr. Ng for support for his PGA. Gets nothing. December 2011, he sends him, through Lorenzo, a plea about his budget and how expensive it is to run the PGA. December 2011. It's a full year since he had that meeting with him. And he's still getting nothing. And after he sends him that letter, December 2011, it says, I'm going to be PGA, dude. I want your support. Mr. Ng doesn't give him anything. 2013, there's no payment. 2012, there's no payment.

The one thing that Lorenzo tells you is that in around the late November, close to December time period, Lorenzo says, oh, yeah, I actually remember some cash that I got from Jeff Yin, because I told Jeff Yin, and Mr. Ng wasn't there, but Jeff Yin went upstairs and I assumed Mr. Ng was there, and he got some cash, brought it down. It was $20,000. I gave $16,000 of that to John Ashe, because Ashe's PGA office was having a reception or something. Now is there any proof of that other

than what's coming out of that guy's mouth?  No.  But let's even assume that that's true.  Is that the bribe for the June 20 -- it's like seven months later.  What's the connection?  What's the official act for which there is a quid pro quo?  There isn't.

Now what do they do?  So they can't dispute that, right?  There's no payments in the entirety of 2013 for Lorenzo, for Ashe, except for this phantom supposed cash payment for a reception for the PGA.  So what do they fall back on?  Well, Anilla Cherian was getting her $2500 a month, wasn't she?  Think about that.  Their theory is that John Ashe was going to be bribed to work on a letter that he wouldn't otherwise have worked on because Lorenzo had put his wife on the payroll at South-South News, that he was paying for without him actually knowing that she's on the payroll.  Because they've utterly failed to prove up his knowledge that she was on the payroll.  But Ashe is going to be bribed for that?  That's their theory?  This is what this federal case is about is a $2500 payment for that June 2013, awesome, important, fantastic, fundamental letter?  Come on.  Come on.

I'm going to get to that, Anilla Cherian.  I've been saying that a couple of times.  I will get to it.  It doesn't hold water.  It's got nothing to do with Mr. Ng.  It's got everything to do with John Ashe and Francis Lorenzo's bromance.

The other thing is, before I leave this letter, I want

H7BCselliS                 Summation - Black                    4088

to say something.  Why -- not only is there no money that he's

giving as a quid pro quo; there's nothing to these letters that

is in any way extraordinary.  There's no -- you would think

that in order to bribe somebody, in an effort to bribe

somebody, to be motivated to bribe somebody, an official, you

would think that the official would need to be somewhat

resistant, not want to do it.

            (Continued on next page)

This letter is about as plain-vanilla as you could possibly imagine. Let's go to examining this a little bit more. Let's go to Exhibit 35. This is a March 2012 letter. This is the foundation for the June 2013 letter. Let's go to the attachment, please. I don't want to spend too much time on this. There is a cover letter and there is an annex.

I went through this with Lorenzo. If you go through this cover letter as well as the annex, there is no language in this document that is not a repeat and a regurgitation of language that appears in many of the important developing cooperation outcome documents: the Nairobi outcome document, there was another outcome document just before this letter in February of 2012. They are all in evidence.

I asked Lorenzo this. Transcript page 2257 at 6-10.
"Q. There was nothing new about that language," meaning all of the language in that letter, "right?
"A. Correct.
"Q. What is new, what is new is the introduction of the Global Business Incubator, correct?
"A. That's correct, yes."

Meaning everything in this letter is just stuff that people in the international community had been talking about: aspirations, ways to cooperate, coordinate. Remember, all this is is a communication to the General Assembly. Botnaru told you that. He was one of the first witnesses by the government.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

It's a nothing.

The one thing that is important and new is this Global Business Incubator. Why is that important? Because this was Francis Lorenzo's thing. He hired a guy named Bruce Niswander from NYU to conceive of this plan to have in different developing nations a business incubator, startups essentially, with tools, ideas, basically a template for how you start --

MS. ECHENBERG: Objection, your Honor.

THE COURT: I'll allow it. Ladies and gentlemen, this is argument. It is your recollection of the evidence that controls. If there is any evidence or testimony that you want to see, you should ask to have it read back. If anything is inconsistent in terms of how the law is described, my instructions carry the day.

Go ahead, Mr. Park.

MR. PARK: I believe that it had been testified to by Mr. Lorenzo, but that's your recollection. In any event, he worked on this with Bruce Niswander and Niswander was a consultant paid by South-South News and Lorenzo was paid by South-South News. This was something they did. You saw exhibits of him, Lorenzo, immediately sending this idea around to a number of other ambassadors and letters of their support saying that's a great idea. This was his.

So this March 2012 letter that he says he had to be bribed to issue, to communicate to the General Assembly about

this new idea, his new idea, the notion that Francis Lorenzo needs to be bribed to self-promote, it's comical. But that's the only new thing in this letter. Everything else is just a redux.

What about the June 2013 letter? Let's bring that back up. What Lorenzo pointed out, because it is plain as day, is that this document, the language, is exactly the same as the March document except for the following. The third paragraph, where they announce that SKI will support this, that's new.

The letter also, in addition to the GBI, Global Business Incubator, references the expo center. Otherwise, substance is all exactly the same. So when you think about did they need to be bribed to issue a communication to the General Assembly about things that everybody has been talking about for years, think about that.

Let's zoom in on the last sentence of that paragraph. Let's talk about how extraordinary this letter must have been, how resistant ambassadors would have been such that they would have to be bribed in order to issue a communication like this. All it says is, "This is one of the first centres in a network of incubator centres in a public private partnership with the support of leading partner South-South News." It's just one of the first.

You heard about centers of excellence. Centers of excellence are all over the Nairobi document and every other

outcome document that is in evidence. Centers of excellence are nothing more than places where developing nations can come together and share information. We talked about that yesterday. All this says is this is going to be one of the first centers. Focusing on what? Global Business Incubator, among other things, Francis's idea.

Ladies and gentlemen, there is nothing in here that would cause anybody, any ambassador who purports to champion developing nations' issues, to think I need to be bribed to issue this. It is a mere communication. It's a big nothing actually.

The significance of it is that it was being used by Cao, Lorenzo to provide the basis and legitimacy for their efforts to create Cao's culture center. There is no question about that. There is also no question that ultimately, ultimately, these documents were used as a reference point for pursuing the Macau conference center. But that wasn't him, it was them. That's why they wanted these letters.

I think Ms. Echenberg was referring to this. I could be wrong. If I was, I apologize in advance. I think the referenced suggestion was that somehow this letter, because it singled out SKI, that violated some UN rule against impartiality or something along those lines. If that's their theory, question: what does that have to do with Mr. Ng? How would he know that? You see this letter, and all it does is

tells the General Assembly this one company is prepared to support this. That's all it says. How would he know or could possibly think that there is something wrong with that?

You saw Mr. Botnaru. He was one of their first witnesses. He was Mr. UN. He helped work on this letter. Lorenzo brought it to him as well as John Ashe. They worked on it. He didn't say there was anything wrong with this. He didn't say, oh, gee, you're singling out a company, you're not allowed to do that.

The expert within the UN that is supposed to be reviewing these documents doesn't point that out, but somehow Mr. Ng is supposed to know about that? It's a total red herring, like everything else. They've got to connect the evidence of knowledge to this man before they point the finger at him. And so much of the evidence in this case has utterly failed to do that. There are more gaps in this case than there is evidence as to Mr. Ng.

Francis Lorenzo told you repeatedly he was bribed. He was bribed? It's puzzling. You don't really know what his and their position really is. What was he bribed? Were the South-South News payments to him bribery? He actually says no. He says, I was being bribed when I had to go to the UN, I felt that was wrong. That means everything else that he was doing as president of South-South news is not a bribe.

Let's stay on this notion of bribery generally. Let's

see how we got there.  One of the things you will hear from the judge's instructions on the law is that the notion of an official act, you can't bribe an official to do something, under law, to do something that is not an official act.  To set up a meeting, that's not bribery.  Even if you pay him to set up the meeting, that's not bribery.  It's got to be an official act.

When you come back to that graphic of what payments were made in 2012 and 2013, those letters they say were the official act.  There is no payments for them.  We have gone through that already.

Lorenzo can say till the cows come home, I kind of felt bad, I felt it was wrong to do this.  Of course, he never told Mr. Ng that he felt there was a breach of any rules for him to approach the UN while he was being paid.  Never told him.  Never said it was improper.

More importantly, he has trouble tying what it is that he is saying he was bribed to do.  When I asked him, what about the $30,000 for Terra Trading that went into the brochures, he said, yeah, that money went into paying for the brochures.  That's not a bribe.  What exactly was the bribe?

Bring the 2012-2013 up, please.  Actually, let's just do the 2013.  Well, sometimes it's not worth it.

The point is this.  You saw in 2013 for that June 2013 letter there are just no payments that can be tied to that

particular official even if it is an official act. In March 2012 no payments that they can associate with that particular so-called official act.

Lorenzo saying that he kind of felt bad about it is not a bribe, is not a foundation of bribery. It takes two to tango in a bribery case. Somebody has to want to bribe you and then you have to want to take it. No evidence indicating, even from Lorenzo, that he said it was wrong for me to work on this while I'm getting paid by you. No actual payments, no quid pro quo, no knowledge.

What amount was actually used for Lorenzo to exercise his official duties? We don't know. They don't know. When Mr. Richenthal stands up, because he will do the rebuttal summation, I want you to have in mind, wait for it, tell me, wait for it, Mr. Richenthal, which of those payments was for him to walk in and do that official act. Wait for it.

Beyond the June 2013 letter, there is a reference to a May 2014 trip that John Ashe made. This was the one that elicited so many photos of Mr. Ng showing the hotel, the residences that were under construction. They consider that an official act, that he would actually go there and do a tour. That's what we are dealing with.

But what was the payment for that one? Where is the quid pro quo? What he is doing is showing people what he is capable of doing if the conference center is actually built.

There is nothing wrong with that. You will actually hear instructions about that.

Where is the bribe? Let's go to Government Exhibit 135. We don't have it? Did I screw up the number again?

There is a document that Ms. Echenberg showed both during their case as well as during her summation in which Mr. Lorenzo and Ashe are talking about Ashe going on this trip and Ashe showing reluctance. There is an exchange where Ashe is a little ticked off. He says, those people, meaning Mr. Ng's people, need to understand I'm not doing this, I'm not asking for this or doing this for myself, I'm doing it for the PGA.

Yet another communication where Ashe, wanting a communication sent to him saying this is for the PGA, this is for official support of the PGA. I told you before and I'll repeat again the task force report by the UN where private support for the PGA is totally normal and not against the rules.

I did screw up the number. 153, not 135. Sorry, Judge.

THE COURT: That's all right.

MR. PARK: This is a communication where Ashe says to Lorenzo, "Again, to avoid any misunderstanding, I am not asking Ng to refund the cost of the tickets or to cover my DSA. I am asking him to make a contribution to the office of the PGA if he requests me to go out of my way to go to Macau to see a

project. He's the one making the request, I'm not asking for a trip."

He goes on about what it takes to run a budget. It's a normal-course exchange by a very busy guy. He's eager, sure, to show off what he can do, and that guy, the PGA, is saying I'm busy and, by the way, he's been telling me that he's going to support my PGA and I haven't seen anything from this guy.

That's not a bribery scheme in the works. This is the exact opposite, ladies and gentlemen. The guy is asking for a little help for his PGA, which is totally legitimate, and he is basically stiffing him, he is saying no, I don't feel like sending you any money. The same guy who produced that June 2013 letter that put SKI Group on it, and Mr. Ng is still not sending him money. This guy has got to get ticked off.

What happens after that? What does Lorenzo tell you he said to Ashe after this? He basically said come on, just go, it can't hurt. That's what Lorenzo says to John Ashe. In other words, no guarantee that he is actually going to do anything for him other than show Ashe what he is capable of doing for this conference center and basically stiffing the guy, saying no, I'm not necessarily going to support your PGA just because you asked or just because you're coming here. This is not a quid pro quo. This is the exact opposite of a quid pro quo.

That's the May 2014 trip that they say was an official

act, for which is there no quid pro quo. In fact, there is an anti-quid pro quo. There is a no, I'm not going to help your PGA.

There is a letter from Yiping Zhou in June of 2014 that Ms. Echenberg flashed up there where Mr. Zhou yet again, not surprisingly -- he sent at least by now, by my count, about six letters of support from December of 2009. Whatever people want, he is on board, because all of these ideas are good for the UNOSSC.

In June he sends another one, 2014. The government says, aha, you see, in June 2014 what else happened was Mr. Ng provided that $200,000 for the PGA. They make this connection just because Yiping Zhou happened to issue this letter. Which said what? Nothing other than, okay, I support. He has been saying this since December 2009, before John Ashe was ever on the scene.

Even Lorenzo didn't make that connection, that somehow there is this quid pro quo between that PGA payment and this Yiping Zhou letter. Even Lorenzo doesn't make that. But they'll make it because that's what they got. They got nothing else.

I remind you that what Lorenzo said about why that $200,000 went to the PGA account is very straightforward. Again, anti-quid pro quo. What he said was Ashe had had this concert or was about to have the concert and he had incurred

tremendous expenses because it was a big PGA concert and there was a backer who was going to finance it. That guy at the last minute pulled out. Ashe was stuck. That was what was communicated to him.

He gave $200,000 to the PGA, not John Ashe, to the PGA to cover those expenses. That's it. And that's their big quid pro quo payment to John Ashe, who has been begging him to show some love for years. He showed him some love, but only when the guy was like really stuck and in trouble. That's it. That Yiping Zhou letter doesn't do anything to advance the ball for them.

Pro bono agreement, they rely on this as an official act. This is December 2014. What's happened at this point? Forest Cao has passed away that summer. In this little scheme of theirs -- Cao, Ashe, Lorenzo -- their main guy was no longer around. So Lorenzo actually starts to do some work for Mr. Ng, actually does a little bit of work to advance, to lobby, to connect, to set up meetings, all things that he had been expecting Lorenzo to do all along.

But that pro bono agreement of December 2014, Lorenzo's got nothing to do with it. Ashe has nothing to do with it. Mr. Ng had established personal contact with Yiping Zhou. They can speak to each other in Chinese. This is the first time that Mr. Ng actually engages himself. He doesn't need to bribe anybody. There is not even a whisper of a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

suggestion that Yiping Zhou was acting improperly. That pro bono agreement was not related to Lorenzo's activity or Ashe's activity for which there is some purported quid pro quo.

In fact, Lorenzo told you on cross-examination he actually was surprised when he heard about that agreement, and he was a little upset. Maybe he was hurt: oh, you didn't include me. What kind of a bribery scheme are we talking about? How can they possibly say that that December agreement is an official act for which there was a quid pro quo? How could they say that? What are the funds that were tied to that when their own witness says I was actually surprised to learn that?

Wait for Mr. Richenthal to explain to you what money, what quid pro quo, what funds went to pay for that pro bono agreement that his own cooperator did not know about.

Let me take a minute to talk about this notion that Mr. Ng should have somehow known that Lorenzo was going to exercise his official duties. Are you kidding me? This guy, he had his half desk reassigned to somebody else. His ambassador, even as early as December 2009 was sending a letter to the foreign ministry saying --

MS. ECHENBERG: Objection.

THE COURT: Again, ladies and gentlemen, it is up to you to determine what the facts are and whether facts are in evidence regarding the arguments being made by counsel, and

obviously take my instructions on the law.

You may continue.

MR. PARK:  You can send back a note asking for that document or that testimony.  Send back that one and see if I made that up.

Early 2010 Lorenzo gets a letter from the foreign ministry of the DR saying he has been suspended for 30 days.  Oh, yeah, but that didn't really go into effect, blah-blah-blah, blah-blah-blah.  Here is the point.  He was persona non grata there.  They took his half desk away.

They delisted him, removed him from the public Blue Book.  They list the others, he's gone.  Why?  Because the ambassadors decided not to.  Not just the first guy, who caused that initial suspension, but the second ambassador too.  For four years he was off that list.

Then, he told you, again on cross-examination, that he was actually going to be honorary president for South-South News.  Why?  Because he wasn't sure that he could be an alternate representative and have a full title as president.  What happens?  The Blue Book comes out in the middle of 2010 and he's delisted.  What happens?  He's suddenly president.

To be very clear, we are not saying that as a technical matter he was actually not an alternate permanent representative.  That's not the point.  The point is this guy had no real presence as a true ambassador, and he did not

expect him to act as a real ambassador. He signed his name as president constantly of South-South News. He did not identify himself in his signage as an alternate permanent representative. To the extent that he did, he left things totally ambivalent and ambiguous.

What he wanted was the president of an NGO to do what a president of an NGO can do. Do you think those guys don't have access to UN members? They do. That's what a public private enterprise is about. It's like Lorenzo wants you to think because I was able to talk to Botnaru, I had to have been an alternate permanent representative. That's nonsense.

Let's take a look at Defense Exhibit 100. This is an email between Lorenzo and Jason Liu, real name Zhenyu Liu. This is May 2010. The hardcopy version of that 2010 version of the Blue Book hadn't come out. Look at the signage at the bottom: Francis Lorenzo ambassador permanent representative of the Dominican Republic. He has his own DR number there.

That's the last time you will see that signage in any document in this case. Why? We don't really know. He says he can't recall. He says, I don't remember how I became president, I think Forest told me I could be president. I don't know the answer either. But you can well, well imagine that this is not a coincidence, that he is off the Blue Book and now, shortly after that, he is full president, not ambassador permanent representative.

The main fact that I want you to key on, ladies and gentlemen, is this. There is no evidence, none, that Lorenzo told anyone that he could not be paid by South-South News or be paid through Terra Trading. There is no evidence he ever communicated that to anyone. In fact, on cross-examination he actually said, he acknowledged, that he didn't tell even Forest Cao that he couldn't be paid. That's transcript cite 2001 at 11 to 2011 at 15.

Let me recap here about this notion of Lorenzo being bribed. Lorenzo testified on cross-examination that in fact not everything he got paid from South-South News was a bribe. He admitted that on cross.

Number two, what he said was only those payments that cause him to go to the UN, whatever that means, he felt bad about, he felt it was wrong. Those are the Terra Trading payments.

Number three, he didn't tell Mr. Ng this. Did not tell Mr. Ng this.

What he was doing was he was acting as a lobbyist throughout: setting up meetings, facilitating things, using his contacts. He never said to Mr. Ng, I have to go to the UN, whatever that means, I have to exercise my official duties. No evidence he ever communicated that to Yin, anybody, or that it was wrong to be paid for that. Or what exactly the payments were in this case that correspond to an official act. You have

more zeros and question marks and zeros and gaps than evidence tied to my client's knowledge of any impropriety in paying Mr. Lorenzo at any time.

I want to pull up 1501 and go through this chart with you. This is the chart that within minutes of Mr. Lorenzo's direct examination they put up to show all of the allegedly illicit payments to Mr. Lorenzo. They focused on the December 2010 time period.

Mr. Lorenzo's own testimony tells you that those aren't bribes. There is nobody talking about him going to the UN. There is no reference to the conference center or Mr. Ng telling him to go to the UN. Not only that, as the judge will tell you, the date of the alleged indictment in this case begins in 2011. According to them, the conspiracy begins in 2011, but they've got no problem putting all of that money up for 2010. All of that should be stricken. Let's strike those. That's 2010.

Now let's go to 2011. You saw that graphic that showed nothing going on with respect to a conference center that Mr. Ng was involved in. That's all South-South News payments. That should be stricken. This is based on Lorenzo and what he said on cross-examination. What he said was that the stuff that caused him to go to the UN for Mr. Ng was what he felt guilty about, and what he was talking about was the Terra Trading funds.

2012. We showed you a graphic. That's when this March 2012 letter came out. Cao and Lorenzo and Ashe's fingerprints all over it. Mr. Ng had nothing to do with that letter. So all of 2012 go out by the testimony of their own witness.

2013, let's go to that. Terra Trading. Mr. Ng is sending money to Terra Trading. Terra Trading in February of 2013 gets $60,000. That's the second line. I just talked to you about that. It had no bearing, no connection to that June 2013 letter. And all the other payments in 2013, it's all South-South News payments.

By their own witness, all of that is not a bribe. It's got nothing to do with the conference center because Lorenzo told you that by 2013 they had decided to divide up the role of South-South News from the role of Terra Trading, where Terra Trading would be the one advancing the ball on the Macau conference center. So why is all of that money from South-South News still up there? I don't know. When Mr. Richenthal gets up, let's wait to see if he's got an answer for those. Wait for it.

Strike that entire year. It's mostly South-South News, ladies and gentlemen. By their own theory, in 2013 South-South News's got nothing to do with the conference center.

Let's go to 2014. There are Terra Trading payments in

March, there are two in March, there is one in May, one in September. The rest is all South-South News. As to those Terra Trading payments, again, what is the connection between that and some official act? Has there been any connection made? Has there been any evidence, any document saying Mr. Ng, I need to do this official act, I need some money? None. All of 2014 goes out.

Let's go to 2015. Virtually all of that, except for one line, is South-South News. How did they put up a chart like this and suggest that it's all bribery? It flies in the face of their own theories that Terra Trading was the only company related to the Macau conference center. How does that work?

What qualifies as bribe money at the end of the day? Nothing. Nothing on that chart. When you actually scrutinize what the facts are, what the theory is, when you realize that their theory is that the conspiracy began in 2011 and they still throw up 2010, it tells you what you are dealing with here.

We can take that down.

So why did he come in here and say I was bribed over and over again on direct examination by Mr. Zolkind? What happened that caused him to do that? Oh, I felt bad, I knew it was wrong, I told the government that even before my first plea. But there is no evidence of that. He doesn't remember

when that was.

Let's go through the sequence.  Let's put up Government Exhibit 1401.  This is extraordinary, ladies and gentlemen, when you look at this document.  This is his first cooperation agreement, his first plea.  What you know is that he pleaded guilty to tax evasion as well as facilitating bribes to John Ashe, not to receiving bribes for himself.  You heard him say what the process is before he entered into this cooperation agreement.

The government sits down with him right across the table and says tell me every bad thing, criminal thing, you have done, and if you lie, we are done, we prosecute you.  That's how it works.  He said, yeah, I told them everything, I told them all the facts, I told them about my money that I got from him, what I did with the money, I told them about Terra Trading, I answered everything.

He even says, I told them it was wrong.  Well, that was a lie.  He never told them that that was wrong.  He never did.  What he did, though, he did tell them about all the things he actually did do and they chose not to charge him with accepting bribes.  Why not?

The money that they put up on that chart well exceeds a million dollars for five years.  The money that Ashe is alleged to have been bribed with, even assuming Anilla Cherian, there is no more than $300,000.  It's a pittance compared to

the money that Lorenzo received.  How is it possible that they do not tell him to plead guilty to receiving bribes in March of 2016?

I'll tell you why.  Because nobody, nobody, ladies and gentlemen, thought he actually was an official acting with official acts --

MS. ECHENBERG:  Objection, your Honor.

MR. PARK:  -- such that he needed to be bribed.

MS. ECHENBERG:  Objection.

THE COURT:  Ladies and gentlemen, again, my instructions will carry the day on the law.  We are in summations, which are arguments of counsel.  What counsel believes the evidence will show.  It's your recollection of the facts that carry the day.

Go ahead, Mr. Park.

MR. PARK:  When Mr. Richenthal stands up for his rebuttal, wait for it.  Wait for that explanation, if it comes. If he says it's just a distraction, what Mr. Park said, don't accept it.  It's not a distraction.  It's as important and fundamental to this trial as anything that you heard that guy talk about.  How is it possible for him to have confessed to everything he did and both he and the government conclude we're not going to have a charge for bribery.

MS. ECHENBERG:  Objection.  Objection.

THE COURT:  Again, ladies and gentlemen, the issue is

what the evidence is here in the case and my instructions.

MR. PARK: Let's advance the story to two weeks ago when he testifies. In this courtroom, when he used the word "bribe" so often during his direct examination, it was like he was a wound-up toy: bribe, bribe, bribe, Mr. Ng, Mr. Ng, Mr. Ng bribed me. And they put up that 1501.

What happened between March 2016 and that extra-ordinary testimony? They had him plead guilty to receiving bribes in April of 2017, a whole year later. What's going on in April of 2017? He told you. He was getting ready, he was preparing to testify in this trial against my client. Suddenly, oh, I forgot, I was bribed too, let's add that. Literally extraordinary. Yet in none of the notes that he referred to --

MS. ECHENBERG: Objection.

THE COURT: Ladies and gentlemen --

MR. PARK: I'll withdraw it.

THE COURT: And that will be stricken. Ladies and gentlemen, disregard Mr. Park's last comment. Go ahead.

MR. PARK: He cannot point to the a single instance where he actually told the agents or the government that what he did was wrong. Ladies and gentlemen, it is actually because he didn't believe what he was doing was wrong when he received these funds, at least not as to that. That is the only explanation.

Does he get up there and plead guilty to it? Yes. He's stuck. What's he going to do? You have to evaluate the truthfulness of his testimony when he claims that he was somehow bribed. And it doesn't work.

There is a reason why they didn't charge him with bribery in March of 2016. It stares at you right in the face. It's because he was not guilty of bribery, of receiving bribes.

Now let's talk about the infamous trip, vacation trip, to New Orleans that cost $9,200 and the $2500 income to Anilla Cherian from South-South News when she is on their payroll. A vast majority of the case was spent on these payments. They may not be trivial to us, but let's face it, ladies and gentlemen, to a guy like that, a $9500 family vacation, how is that ever going to register on his radar? Why would it? $2500 monthly sums for a consultant at South-South News that's got lots and lots of employees? How is that going to register? Why would he care about this?

But that's what their case reduces to at the end of the day. So let's examine that. You cannot understand those payments without understanding what was going on between John Ashe and Francis Lorenzo. They knew each other before 2011, when Anilla Cherian starts getting her pay.

Recall what Lorenzo said. Transcript cite at 2515 at 25 to 2516 at 6.

"Q. You can put that away now. Does seeing that refresh your

recollection that you told agents in February of 2016 that you considered access to John Ashe to be good for you as well?

"A. Yes.

"Q. The reason for that was because he was a leader within the United Nations, right?

"A. That's correct, yes."

Then what does he tell you?  He told you he set up travel arrangements for John Ashe.  He had connections to Sammy Sosa, so he got Sammy Sosa to travel to Antigua on some promotional thing for John Ashe.  We already talked about this Antiguan consulate general bribery scheme that he said he never thought was maybe wrong or illegal, that $400,000 for a consul general position.  That's him and Ashe working together.

Let's put up Defense Exhibit 973.  This is a letter to Citibank.  Ashe wants some letter of authorization or something, some support from Lorenzo.  Lorenzo writes this letter.  Let's go to the attachment.  Blow it up, please. Lorenzo signs as executive president of IOSSC, although it is on SS-SCSD letterhead.  He's got so much stuff going on he can't keep himself straight.

What he does here is he says Ashe is currently chairman of SS-SCSD, a position he has held since 2012.  That was a lie.  There was no SS-SCSD in 2012, and Lorenzo told you that was a lie.  This is a statement to the bank.  This is bank fraud.

Take that down, please.  Go to the second paragraph. Sorry, go to the third paragraph.

"As chairman, Dr. Ashe currently receives a monthly compensation of $20,000."  Where did he get that from?  I don't remember.  It's just a lie.  This is what he is doing for John Ashe.

Why is he doing it?  Let's go to Defense Exhibit 3005 can we go to page 23, please.  This is Lorenzo cutting a check from IOSSC for John Ashe for $10,000.  This is April 2013, just before they are working on that June 2013 letter.  Remember that?

Let's go to Defense Exhibit 3007.  Blow that up, please.  You scratch my back, I'll scratch your back.  The office of the president of the General Assembly, John Ashe, sends Lorenzo's brother Domingo $33,000.  It says in the lower left-hand corner "advisory services of September 2013."  That's made up.  Domingo did no advisory services for the PGA.  There was no basis for that.  You scratch my back, I'll scratch your back.  That's the relationship these guys have.

Later, when John Ashe became president of the General Assembly, guess what: Lorenzo becomes special adviser to the PGA, further extending his exalted position in the international community.  None of this has anything to do with that guy.  It has everything to do with those two people.

When you consider all this and then you think about

that $9,000 trip to NOLA that Lorenzo got Wang to approve, and they say somehow you should tie that back to Mr. Ng, what can I say?  Really?  Really?  How do you tie it back to him?

Let's go to Defense Exhibit 909.  It's difficult that I have to spend time talking about this thing.  It's $9,000.  But that is the reality of what this case is about, these trivialities in a massive five-year bribery scheme.  What's going on here, what's happening is John Ashe is telling Lorenzo, dude, I can't go to that trip, I've got a family vacation lined up at the end of April.  That's what Ashe is telling Lorenzo.  What happens?  Lorenzo pushes him: I really need you to be there, and your vacation, it will be to NOLA, South-South News will take care of it.  So Ashe ends up going.

What does Ashe have to do?  He actually has to schlep all the way from New York to Hong Kong, Macau, whenever during that trip, and then hustle on back to make his family vacation.  This is not pleasant.  Lorenzo does say we are going to pay for your vacation.  Do you think Mr. Ng cares in the least about something like this?  What is the evidence he knew about this?  Lorenzo's testimony.  I'll get to that in a minute.

Let's talk about documentary evidence tying back to Mr. Ng.  Let's go to Government Exhibit 422B-TX.  This is a document that Ms. Echenberg used during her summation, basically flashed it up there, spent maybe 15 seconds on it.  Let's really look at it.  Can we go to the line that has that

reference to the $9,000, please. You've got to scroll down this financial statement. You've got to keep going on and on.

This was a document that Vivian Wang sent to Andy Leung in 2011. This is a document that they would want you to use to infer that Mr. Ng knew about this trip. If that is not the inference they want you to draw, why even show it? Why spend any time on it? They want you to infer from this document that Mr. Ng may well have know about this trip.

Have we finally reached that? Let's go to that $9,000. Ms. Echenberg flashed this up, but let's really blow that up. Take a close look, ladies and gentlemen, the old-fashioned way. Do you see where it says Travel Ease, there is a reference to $9,670. That's the NOLA trip, 4/8/2011. It doesn't say NOLA. It doesn't say family vacation for John Ashe. It's just one of hundreds of entries. What are you supposed to do with that? Why is Ms. Echenberg showing that to you?

Take that down.

Lorenzo says, oh, but definitely Ng knew about it. You know why Ng knew about it? Because I saw John Ashe go to Mr. Ng in Macau or Hong Kong, wherever it was, and say thank you for that family vacation that I am about to take, because it hadn't been taken yet. Thank you, I appreciate that. Family vacation. Except that a year before he took the stand he told the government, he told you he remembered telling the

government, I said thank you on behalf of John Ashe.  Didn't mention family vacation.  But that's what I meant.

Less than a year later, a year ago, in another meeting with the government, he says, I did see John Ashe thank Mr. Ng.  Didn't mention family vacation, but that's what I understood John Ashe to be getting at.  Then he takes the stand.

We're getting farther and farther away from April 2011.  Somehow his testimony is getting more and more incriminating against Mr. Ng about this trivial NOLA trip, and he has the temerity to get up there and say, I now remember John Ashe went up to him and said thank you for that family vacation.  How does that work?  How does the brain work that way?  The farther away you go, the clearer your recollection is of a meeting that's being done through a translator in April of 2011?  He lied to you.

(Continued on next page)

MR. PARK: Why is he lying? Because he's facing a lot of time in jail, ladies and gentlemen. This is as serious for him as anything he has ever confronted in his life. His motivation to lie to you is unbelievably strong. That's why he'll actually get up there and try to improve his testimony to incriminate my client about this trivial trip. And he'll be confronted by notes and recollections and interviews that he had with these people that's inconsistent with what he says, and he'll still tell you that's the truth. Do you feel the desperation of this guy? Whether you do or not, there's no way you can rely on this guy to conclude beyond a reasonable doubt what was in my client's heart and mind. There's just no way.

Oh, let's go to Government Exhibit 10.

This is the one document that Mr. Lorenzo said, well, I, after my recollection, I did see a document and that improved my recollection. Okay. Let's take a look at this document to see whether there's anything in here that would cause him to improve his recollection in such a peculiar fashion.

What this document says is, John Ashe says, "Please thank Ng again." Mr. Ng and South-South News had sponsored the trip for all of those delegates to go there in April of 2011. There's nothing in here about a family vacation. It's Ashe thanking him, for supporting this organization, for supporting the trip. There's nothing in there about a family vacation.

But suddenly Lorenzo will suggest to you -- not only suggest, he will swear under oath to you that that document helped to refresh his recollection such that he remembers Mr. Ashe thanking Mr. Ng personally for a family vacation.  He lied to you.

Anilla Cherian.  Transcript cite at 2530 at 15 to 20:

"Q.  Now do you recall telling the government on April 14, 2016, over a year ago, that the reason why Cherian was hired by SSN was because she had expertise to help out South-South News and because it would make John Ashe happy?  Do you remember telling the government that?

"A.  Yes."

Right after that he struggles and he starts to back away.  So I got to go at him again.  Transcript cite, 2533 at 21 to 2534 at 1:

"Q.  Does looking at that refresh your recollection that on April 14, 2016, you told the government that when SSN hired Cherian, you understood two things -- one, that she had expertise to help out South-South News; and secondly, her employment would make John Ashe happy?

"A.  Yes."

That's what he told the agents, as to why he hired South-South News, as to why Vivian Wang approved, why he hired Cherian, and why Vivian Wang would approve that.

And it's logical.  I mean, you can't look at her

résumé and not think that an organization like South-South News might not benefit from somebody like that. She's a climate change expert specializing in the developing nations. She's the wife of John Ashe. You don't think they talk about climate change and those issues? Hiring her for those reasons makes sense. I don't dispute that she didn't show up and that she was a no-show job. I don't know. But I don't dispute that. But the point that he wants to make to you is that, oh, no, no, no, no, no. It was nothing about her expertise. Never. It was all phony. You got to confront him with something he said a year ago in order for him to finally fess up. That's how this works with him, to finally realize, yeah, I can't really help the government that much on this one, 'cause I said something else a year ago.

Transcript cite, 2530 at 12 to 14.

"Q. Keeping John Ashe happy is good for you too, right?

"A. Yes."

How do you know that he or anybody else told Mr. NG about Cherian? Because he says so. He recalls a meeting in January of 2014. This guy's recollection is incredible. He recalls this meeting -- no documents that would corroborate that he had this conversation -- where he says, I told Jeff Yin and Mr. Ng that she's just John Ashe's wife. I, you know -- she didn't do anything. That's what he says he told them.

In what universe do you think somebody like Francis Lorenzo would have such a blatant, blunt discussion with Jeff Yin or Mr. Ng?  You know Francis Lorenzo.  He'll always look for the easy path out.  And there's an easy path here.  She's an expert.  You think he didn't say to Jeff Yin, we got her on payroll but she's fine, she's a real expert in this stuff?  Do you think he didn't say that?  Why wouldn't he say that?  It's right there.  They've got her résumé.  She's writing a fricking book on the subject.

Government spent a lot of time showing you a lot of financial statements that are being sent where Anilla Cherian's name is in there, it's embedded in there, and next to it, it says, Antiguan wife, or stuff like that.  And their suggestion to you is that this guy, who runs a hundred thirty associated companies, a real estate empire, in Macau, is going to bother looking at that stuff.  Wendy Zhu told you that that notion is ridiculous.  She said that in 2009 she had this one conversation, he told her, I want a one-pager.  Of course he would want a one-pager.  He doesn't need to go into the details of what's going on.  He doesn't need to know about a consultant when's getting paid $2500 a month.  Are you kidding me?  He wants a one-pager.  What would make you think that when Andy Leung was his assistant -- oh, he and did a great job, right?  During his tenure, Vivian Wang stole close to a million dollars of gambling, right out from under this guy's nose.  Andy Leung,

boy, he's some crack assistant. What would make you think that Mr. Ng would suddenly want something different from Andy Leung, or even Jeff Yin? Jeff Yin is now a CPA. I mean, that guy, he can dig in. And he did dig in. He will dig in. He could trust him. He may not even need a one-pager from Jeff Yin.

So all of those financial data that was like embedded in line 159 -- I memorized that, I think it's line 159, her name, and her title, sometimes it's consultant, sometimes it's wife -- that somehow that got on his radar. This is what they are reaching for, because this is all they got.

Let's just put up Government Exhibit 908ATX, page 12.

This is one of the documents the government got in, shareholder profile. Company structure chart.

"Mr. Ng Lap Seng's Macau Sun Kian Ip Group is a real estate company with strong capabilities in Macau. It owns over 30 wholly-owned subsidiaries, approximately 100 affiliates and joint ventures."

You can take that down.

Do you think he wanted a one-pager? I mean, do you think he had any interest in line 159? Government Exhibit 49. Again, I'm spending time on this, but I got to address this. This is what they're relying on. Government Exhibit 49 is a business plan that, at Mr. Ng's request, Lorenzo prepared and showed in that meeting in Zhuhai where he's begging him to keep South-South News open. And if we go to the business plan and

go to the org chart, Cherian's name does not show up.  Now why is that?

Ms. Echenberg, during her summation, she said something that even Lorenzo didn't say.  She said, well, this is -- what was the -- she said, this chart only shows people who are actually working at South-South News.  Wait a second.  This is a business plan that's supposed to show Mr. Ng how the money is going to be used.  He actually wants to know if there is somebody who's not working but getting paid, right?  That explanation, which just kind of came out on the fly, doesn't work.  Lorenzo kept her name off.  He said it was Mildred's fault.  Oh, it was a mistake.  He kept her name off.  Isn't that obvious?  'Cause he didn't want Mr. Ng in this meeting, where he's talking about efficiencies and controls, and trying to convince this guy to continue to fund South-South News.  He didn't want him to know that he's got John Ashe, his buddy's wife, on the payroll for a no-show job.  That's all.

Let's go to Government Exhibit 1635A.

Ms. Echenberg said, these -- and she wasn't showing this document.  She showed a lot of other Chinese language summary documents where Anilla Cherian is listed there and the translation says Antiguan wife or something like that.  Well, this is a Chinese document.  And actually, the only entry that's not in Chinese is Anilla Cherian.  It says Antigua wife in English.  Everybody knows Mr. Ng can't read.  So if their

theory -- am I making a big deal out of this?  No.  But if their theory is that these documents are in Chinese so that Mr. Ng can actually review them natively and realize that Anilla Cherian is on the payroll, well, what do you do with this, where everything is in Chinese except for Anilla Cherian?

Am I asking you to rely on this?  Of course not.  But I'm also suggesting, how do you rely on their arguments about Chinese documents and just ignore this at the same time?  How does that work?  This is their proof beyond a reasonable doubt.

Jeff Yin.  Let me just pause to say very briefly about Jeff Yin -- the government wants you to accept that everything Jeff Yin was told or knew is attributable directly to Mr. Ng.  Real life doesn't work that way.  There's stuff that my wife knows, I don't know, and we're close.  There's no special relationship between Jeff Yin and Mr. Ng such that they can make such an audacious request of you.  There's no such relationship in the world where you can actually assume beyond a reasonable doubt that he had knowledge because his assistant had knowledge.  Reject it, I ask you.  That is not the basis for finding knowledge beyond a reasonable doubt, and knowledge is a critical element here.

Now Wendy Zhu, you remember her testimony just on this point.  Zhu told you that on the few occasions when she bypassed him, because she wasn't getting the right answers from Jeff Yin, he told her, no, deal with Jeff.  That's what she

testified to. And again, it's logical. You can easily see that happening. He's busy. He doesn't want to deal with Wendy Zhu on her financial issues at South South News. That's why he's hired Jeff, so that he can delegate this stuff. And he trusts Jeff to do a good job. So just deal with him. It's a short passage, but so significant in giving you a window, right, into how this guy operates. But they want you to infer that all knowledge in Jeff Yin's mind can be attributed to him. That's just wrong. It's not right. It's not just.

I talked about this a little bit before, the irregularities, the infractions, the cutting corners. They talked about the global compact between SKI and the UNOSSC and how that wasn't taken care of, the SKI Group Foundation didn't have their taxes paid -- I'm sorry -- the tax exempt status taken care of in the way it was supposed to. That was from IRS revenue employee Ms. Ball. They had Hannaford say, well, in order to have a true public/private partnership, such-and-such must happen. We're not talking about public/private partnership with a capital P. Nobody talked about that. The MDG goal public/private partnerships doesn't talk about this formal sense of what the UNDP had determined needs to be public/private partnership. It's the idea. That's why their letters to Mr. Ng references public/private partnerships. The point here is that all of these rules and irregularities that they spent some time asking you to focus on through these

witnesses who, frankly, are completely irrelevant to this case, is that none of that transfers back to this guy, because that's not his job. His job is to have people like Lorenzo take care of these things. Ms. Ball was asked: Well, whose job is it to file for the tax exempt application? She said: I would think the president, officers. Well, you know who the president was? That was Francis Lorenzo. It's an obvious thing. He's here. It's a Delaware company. Just do your job. Is there any testimony that he said, no, no, no, no, no, no, don't do that? In fact, to the contrary. That SKI Group Foundation -- something else came out of Lorenzo's testimony that was very interesting. When they signed a new lease for a new apartment in Manhattan, that Lorenzo said he was going to live in, part of it, his idea, what he wanted, was for the foundation to have a location where they could hold events. Lorenzo said that. So they said, well, you know, it only took in a hundred dollars. Well, it was a new foundation that was getting set up. Doesn't mean that there was something nefarious or somehow he's like looking to do something that was somehow wrongful. He had plans for this foundation. They were going to have events. He was actually signing a lease so that they could do that.

I ask you to keep your eye on the ball as to what's in Mr. Ng's mind and heart. And to the extent that there are things like this, like these irregularities, send out a note

that says: Where is the evidence that Mr. Ng was aware of that regulation and aware it was not being complied with? And I guarantee you the judge will respond with a note or a direction back to you that the parties have confirmed there is no such evidence. But send out the note anyways.

Legal elements. I've spent virtually all my time -- and I am incredibly grateful to you, I am -- on my summation about what's in his mind and in his heart, because the element of criminal intent, willfulness, corrupt intent, is the key issue in this case. If you conclude that there is no evidence beyond a reasonable doubt that my client acted with that intent, that willful intent or corrupt intent, it's over. But if you conclude that they have proven beyond a reasonable doubt that critical element, there are others that you must go through and find beyond a reasonable doubt before you can return a verdict.

So let me just go through some of them. Ms. Echenberg put them up on a chart. For every count there's at least four separate elements. In order to return a verdict of guilty, you must find beyond a reasonable doubt as to each and every one of those independent elements.

I'm just going to talk about a couple that are independent of the issue of corrupt intent. I'm here to tell you, they have utterly failed on the element of intent. Utterly. They haven't even gotten off the ground when they

march in with Francis Lorenzo as their key witness. But the other elements include -- one of the issues that you'll be instructed about is whether there are -- that some of these payments were bona fide salary, wages, fees, or other compensation, in the usual course of business, because such things under the law are not bribes.

Agent. Was Lorenzo and Ashe an agent of the United Nations? Not an agent of Antigua or DR but of the United Nations. We do not concede, we do not concede that they were agents of the United Nations. Even if Lorenzo was a full-fledged ambassador or deputy ambassador, we submit to you he was an agent of the DR and not the United Nations.

Official act has to involve a decision or action that must involve a formal exercise of power, a formal exercise of power. It also must be specific and focused on something that is pending or by law or rule be brought before an agent. We do not concede that there was any official act proven in this case. Those letters, communications, do not qualify.

We submit to you: Donations, like the payments to the PGA account, have a special status, in our view. For payments to Ashe for his PGA work to count as a bribe, the government has to show, beyond a reasonable doubt, that Mr. Ng made that payment in return for an explicit promise or undertaking from John Ashe to perform a specific official act. They don't even come close. Mr. Ng is too busy ignoring John Ashe's entreaties

for support.

The FCPA, separate charge. One of the many elements, many elements, but the one that I want to just focus on for a minute is that they have to show that the purpose of the payment was to obtain or retain, obtain or retain a business. And there is abundant evidence in this case that this was ultimately going to be a pro bono project. So before you can satisfy that element, they've got to prove beyond a reasonable doubt. And here, they don't have a financial projection that there's going to be a business of any significance at the end of the day in terms of profit.

Conspiracy. The government has to prove beyond a reasonable doubt that Mr. Ng knowingly agreed with others to violate the bribery, FCPA, and money laundering laws. He has to agree to take part in a conspiracy with an awareness of the generally unlawful nature of those acts. They don't even come close. Those guys were so busy ripping my client off, and for them to walk in and say he's part of their conspiracy, how does that work? How much money do you have to lose? How much betrayal do you have to show in order to realize, this conspiracy count doesn't work, we shouldn't bring it?

I will shortly cede the field to Mr. Richenthal. Reluctantly. They've got the burden of proof and therefore he gets the last word.

Ladies and gentlemen, I've always felt that the one

flaw in our jury --

MS. ECHENBERG:  Objection.

THE COURT:  Sustained.

MR. PARK:  I'm sorry.  To what?

THE COURT:  I.

MR. PARK:  One thing in the trial system that is a deficiency is that there's no interaction between the jurors and the lawyers.  It's like a lecture.  We don't get to hear what your questions are, what troubles you, what concerns you.  But you can do that through notes.  When you deliberate, if there is something that troubles you or concerns you about something that I've said or something that the government's said, please send a note.  We want to engage.  That's the only way to communicate.  Because otherwise, you're just a kind of a blank slate to us.  We try to read body language.

MS. ECHENBERG:  Objection.

THE COURT:  Again.

MR. PARK:  So the one thing that I'm going to ask is that you use your ability to send notes to engage, if there are serious issues and questions.

Again, when Mr. Richenthal finishes, I won't be able to respond to what he said.  So I ask you to do a couple of things when he provides his rebuttal summation.  See if he says anything that you had not heard before in this trial, that is surprising, and ask yourself, why is this coming up now?  See

if he says something that requires a transcript citation or an exhibit citation or whether he just seems to be talking without reference to a specific piece of evidence. And I ask you to take your notes and ask for proof of that statement later.

To the extent he says that all of my comments about Lorenzo are a distraction, the way that Ms. Echenberg argued, ask yourselves during deliberation, how is it a distraction, for us to assess how we can trust his information with respect to a man who is accused and as to whom we need to find beyond any reasonable doubt as to all elements before we can return a verdict of guilty? How is that a distraction? How is that not core to your job as jurors in applying your common sense, native knowledge, to render a fair and true verdict? It is not a distraction. There's nothing more important, ladies and gentlemen, than Lorenzo's credibility.

Mr. Richenthal may say that to the extent Lorenzo is a liar and a fraudster and a criminal, the government didn't pick him, Mr. Ng picked him. He may make that argument. And that argument doesn't work here, because Mr. Ng saw this guy on a stage, many stages. You saw how he can perform. Mr. Ng is in Macau. He did not have the ability linguistically, trainingwise, to cross-examine him, or to scrutinize him in the way that the government did, the judge did, and that I did. Not even close. Mr. Ng did not pick that, what you saw up there. He picked somebody who appeared to be committed to the

development goals, somebody who was smooth, who knew a lot of people, who knew a lot of things about the United Nations, and who actually performed and put on South-South News.  You saw just a clipping of that.  That's what Mr. Ng saw.  He did not pick the character that you actually saw him reveal to be on cross-examination.

Mr. Richenthal may say that the way you know Lorenzo told the truth is because he could have done a much better job in damning Mr. Ng if he wanted to and that's how you know he's telling the truth, because he sometimes held back.  Well, that doesn't work, because a calculating liar makes a bet each and every time he tells a lie -- what are the risks and benefits? What are the chances I will be caught in this lie if I go this far?  He knows that they've gotten interviews of him for days and days and days.  There's a binder sitting in front of him and boxes --

MS. ECHENBERG:  Objection.

THE COURT:  Sustained.

MR. PARK:  There's -- Park is catching him in lies that he told, inconsistencies that he told before, so when they argue to you, if they do, that he held back, think about one thing, whether he held back because he was being truthful or he held back because he didn't want to go that far.  I submit to you, Mr. Lorenzo does not know truth from falsity.  He only knows what he thinks will help him get out from under an

incredibly lengthy prison sentence. That's all he knows.

Mr. Richenthal may say that I'm trying to have it both ways. The defense wants for you guys to actually adopt some of what he said and otherwise reject other lies that we didn't like. That argument may come up. And here's what I say to that if that comes up. Mr. Lorenzo can be pinned down sometimes. The issue -- there's virtually nothing on direct examination we're asking you to accept from this guy. He makes these sweeping claims about bribery and wrongfulness and Mr. Ng's level of control, sweeping. But when he is confronted with documents, with prior statements, with logic, sometimes he will come out with things that are factual. I'm not suggesting he's truthful. But he is capable of admitting to facts that stare at him in the face. I'm not trying to have it both ways. Not for a second.

And finally, the one thing that I ask you to keep in mind, see if Mr. Richenthal tries to shift the burden to us. We do not have a burden. Everything that we have said has been said for you to evaluate their burden of proof to see if there is an alternative that makes better sense. It is for them to overcome. When I stood before you four weeks ago, I said that the presumption of innocence that protects our client never leaves. And I told you that I believed that when the evidence is in that --

THE COURT: Okay. Go ahead.

MR. PARK:  I told you that when the evidence is in, that presumption will stand untouched.  I submit to you that is where we are.  His presumption remains untouched.  I ask you to return a verdict of not guilty on each and every count.

Thank you.

THE COURT:  Okay.  Thank you, Mr. Park.

Ladies and gentlemen, I was going to say we're going to take a break.  What I'd like you to do, ladies and gentlemen, is, I was planning on having a ten-minute break, coming back, and then having the rebuttal, and then you can have the lunch break, but if you're really hungry now, we could do the lunch break.  But I would want to actually finish the summations.  That would be my preference.  People are shaking their heads up and down.  If you want, the lunch is back there.  Obviously, I won't mind if you're still chewing when you come out if you want to take a snack.  But please leave your pads.  You don't have the case yet.  And you won't have the case until after I charge you.

So we're going to take a ten-minute break, we're going to come back at 12:43 and then press until we're done with the rebuttal summation.  Okay?  And then we're going to do the lunch break.  Thank you.

(Jury not present)

THE COURT:  You may be seated.

Is there anything we need to take up?

MS. ECHENBERG:  Yes, your Honor.  There's a lot in that summation that was unusual and objectionable, and I don't typically object during another's summation, but there was quite a bit, and your Honor sustained some of it.  And two of those issues, I just want to raise.

It's not an issue in this case what the prosecutorial decision was.  We've had a lot of litigation about that.  And I think given what the defense argued, it would be appropriate to instruct the jury on that, or at minimum, that Mr. Richenthal be able to address that in his rebuttal, that it is not the jury's concern what the prosecutors were thinking.  They can certainly evaluate what Mr. Lorenzo said about his cooperation. So I just wanted to flag that beforehand.

THE COURT:  Mr. Richenthal can address that.  Again, it's with regard to -- again, the issue is what is in Mr. Lorenzo's mind.

MS. ECHENBERG:  And the second point, your Honor, with regard to --

THE COURT:  Obviously, Mr. Park, I'll hear from you if you have a comment about this.

MR. PARK:  No, that's fine, Judge.

THE COURT:  All right.

MS. ECHENBERG:  With regard to notes -- and this is why I objected, or I may have objected.  I objected so many times, I was trying to temper it.  But Mr. Park made a point

earlier, he talked about notes twice, but the first time he talked about it, what he essentially said to the jury was, send us a note of whether the government has proved their case. I mean, it was so broad. And so I think your Honor has some instructions about notes, but I think they may need to be -- they should be even more specific, that the jury's job is to decide whether the elements have been met. If they want to ask for a specific piece of testimony or they want a specific instruction on the law, that's one thing, but the idea that they would send back a note that says, show us all of the evidence on X point, (a) that's not a note that we would be capable of responding to or capable of responding to in a reasonable amount of time; and (b) that's not the use of notes. The use of notes is for them to ask for specific things on specific issues. And so again, your instructions talk about specificity, but I think that is worth emphasizing, given that Mr. Park has left the jury with the idea that they can engage in a general conversation with us about the proof, and that's, as your Honor knows, not how the process works and not feasible.

MR. PARK: Judge, I would like to address that. I don't think I said anything even remotely like that. What I said was, if -- what I was addressing was specific connection of a specific issue, where's the proof of that connection. That's entirely a proper note for the jury to send back. So

that's the only -- I never said how they proved something, how they proved something beyond a reasonable doubt. And if I, you know -- I don't remember saying that. That would be a silly thing to say, frankly. But they are entitled to know. They are entitled to know, if they're trying to figure out, okay, well, that particular rule, how does that bear on this issue? What's the evidence? Did we miss that? They're entitled to ask that question.

THE COURT: I mean, look, I think the issue with regard to notes is, it's the questions that come up in the jurors' mind after they've reviewed the evidence and they've considered what the law is. And I think the instructions deal with this, but at the end of the day, the argument that you were making -- and I'll take it as argument -- and what you were directing them to ask about doesn't necessarily mean that because the government didn't put evidence in that they haven't met their burden. Having said that, I understand it's argument, and if I need to, and they start asking questions -- well, if I need to supplement the instruction if they start asking questions that I deem that they don't understand what the process is, I'll hear the parties with regard to what I should say.

Yes.

MS. ECHENBERG: Your Honor, I think the issue is that -- and we're trying to find the citation. It wasn't the

second time he talked about it, which we've found, and more recently, and maybe the court reporters can help us find any time the word "note" came up, because we're not going to have, you know, a transcript before you instruct the jury, but I think the problem is that if they ask, if they send a note that is consistent with what Mr. Park suggested they do and we're not able to respond to it, the implication was, you can't find him guilty. And the broadness of the note that he proposed is a note that, if we were able to answer, it could take days, because we'd have to compile together all the different -- I mean, it would be like a closing argument again. So unless Mr. Park would be amenable to us sending back our PowerPoint presentation from the closing argument, it sets the government up in a very difficult situation.

THE COURT: But the note is addressed to both parties, right? And so to the extent that I'm going to respond to them, it's going to be a response on behalf of, yes, me, but after consultation with the parties, not one side or the other. And it may be that you just need to be more specific.

MS. ECHENBERG: Understood, your Honor. But just to put an even finer point on it, what Mr. Park said is, you'll see, they won't -- the answer will be there's nothing, there's no answer, and from that you can conclude that he's not guilty.

THE COURT: Yes. I mean, look, I think -- and again, I'll go back to what the general instruction is for them.

Their responsibility is to review the evidence, all of the evidence, and to make credibility determinations with regard to the witnesses and to apply the law as I instruct them. And again, we're somewhat speaking in a vacuum, but if I need to remind them of that and emphasize that, I will do that and, if need be, point out specific parts of the charge that, after consulting with the parties, that I deem relevant to their consideration based upon whatever note they send.

Okay. Is there anything else that we need to deal with? You're free to obviously search the summation if there's a specific item you want to point me to.

MS. ECHENBERG: Unfortunately we just don't have search capability with LiveNote so we have to just sort of scroll through. But we'll consult with the court reporters. Perhaps there's another way to do it.

THE COURT: Okay. All right. So we're just going to take five minutes and then we're going to come back, because it's already 11:41. All right?

(Recess)

(In open court; jury not present)

THE COURT: I'd like to have the parties' attention. I'd like to bring the jury out in a moment, but with regard to the portion of the transcript that my deputy clerk just provided, what I suggest is, review it over the lunch break. Discuss it with each other. And if there's an application for

some additional statement with regard to when I reach the note

portion of my instruction, I'll hear whether -- I'd like,

obviously, there to be some kind of agreement with regard to

it, but I'll hear from the parties after the rebuttal.  Or I'll

come back early after the lunch break.

MS. ECHENBERG:  Thank you, your Honor.

THE COURT:  Okay.  All right.  As soon as Ms. Williams

comes back, will we be ready to bring the jury out?

MR. RICHENTHAL:  Would your Honor like me to start

here or back --

THE COURT:  Doesn't matter.  If you want a running

start, so to speak, that's fine.

MR. RICHENTHAL:  I wasn't planning on running here,

but sure.

THE COURT:  Yes.  And I take it your technology is all

set up and ready to go?  Okay.

MR. RICHENTHAL:  Gosh, I hope so.

THE COURT:  All right.  Ms. Williams?

(Jury present)

THE COURT:  Okay.  You may be seated.

Ladies and gentlemen, we're about to have the

government's rebuttal summation.

Mr. Richenthal.

MR. RICHENTHAL:  Thank you, your Honor.

Couple of hours into the second day of Mr. Park's

summation, he said something like, at the end of the day, all my client did is just say: Let's do this thing. Let's get a center. Isn't that a great idea? Now if you've learned anything in the past month, that's not what the defendant said, right? You know that. You've seen the emails. What the defendant said is: I'll pay you. You do this thing. That's why we're here.

Now Mr. Park made a lot of arguments, spoke for nearly five hours. I'm not going to do that. He spoke with passion, sometimes outrage. He's an extremely good lawyer. He's a committed advocate for his client. And that's exactly how it should be. I want to make something very clear. Just because something's said, just because something's said loudly, just because something is said with anger, doesn't mean it happened, doesn't mean it's in evidence. What speaks in this courtroom, it's lawyers, but what we say is not evidence. So when lawyers raise their voice, don't listen to the tone; listen to the substance. Are they asking you to focus on what they're telling you, or are they asking you to focus on the evidence? Because in this case, as you've learned over the past month, the evidence is clear.

Now I said Mr. Park spoke for approximately five hours. I'm not going to do that. But if you noticed, over two days, he skipped around from 2009 to 2015 to 2013, oh, wait, I got to talk about 2010, 2011. Jumped around, all over the

place, even in the same year. As you noticed, sometimes you saw an email in January and then December and then March. After listening to him, you're probably thinking, this is all really complicated. Maybe it's too complicated. It isn't.

This is GX 912C. You've seen this a lot. Mr. Park spoke about this a lot. This is the official UN document, right? June 2013, the one that names the defendant's company. Now this was signed by John Ashe. This was circulated to the entire United Nations General Assembly. That's every member state in the United Nations. This happened. You don't need to wade through testimony or listen to lawyers. This happened.

Now this names the defendant's company, Sun Kian Ip Group. It says it in black and white. Is that Forest Cao's company? No. That's the defendant's company. It also names the defendant's project, the permanent expo and meeting center. Is that Forest Cao's project? No. Now Mr. Park suggested, well, maybe it's Forest Cao's project because it says Sun Kian Ip Group of China and it's actually Sun Kian Ip Group of Macau. First of all, look at 1351 and 1352. Those are exhibit numbers. That's the website for Sun Kian Ip Group. That's the website for Windsor Arch, which also names Sun Kian Ip Group. Doesn't say the company is Sun Kian Ip Group of Macau. In fact you know, because Agent Chan told you, Sun Kian Ip Group has a Hong Kong location. It also has a project in North America. You saw that on the website. I guess you can say Sun Kian Ip

H7e1n54                                   opening - the People

Group of North America.  So what's the actual name of the company?  Sun Kian Ip Group.  Why does it say China?  Because the UN operates based on member countries.  And even, by the way, if it should have said Macau, does that make it Forest Cao's project, Forest Cao's company?  No.  That's the defendant's company.

(Continued on next page)

That benefited only one man, the chairman, the defendant, and only one family, the defendant's family.  And you know why.  Because for months the defendant, with the help of Jeff Yin, pressured and paid Ambassador Lorenzo to get that, to put in "Sun Kian Ip Group."  You saw the emails literally talking about putting in the name of the company.  How did Forest Cao do that?  He didn't.  This wasn't for Forest Cao. Some of those emails include GX-65, if you want to take a closer look.

Now, Mr. Park said repeatedly -- he said it towards the end, he said it in his opening, he said it today -- you have to look into the defendant's mind, the defendant's heart. The defendant is on trial.  You do need to figure out what he was thinking.  But the emails and documents in this case show you what he was thinking.  You don't have to guess.  This isn't magic.  You have evidence.

You know among other things this.  GX-50, January 2013.  Ms. Rao, can you blow that up.  Right after that meeting in Zhuhai you heard about.  Yin says to Lorenzo, "Ng's top priority right now is the South-South convention center project.  He would like to assure you that all of the details in the discussion during Christmas would be satisfied."  What are those details?  You know it's the $30,000 payment.

Your Honor, I think a juror's screen went out.

THE COURT:  Are the screens in the back row working?

That's fine, you can move.  I'm sure Ms. Williams will remind you of your number.  Thank you for letting us know.

You may proceed, Mr. Richenthal.

MR. RICHENTHAL:  Thank you, your Honor.

Let me back up briefly because you guys may not have been able to the screen.

What I was saying is Mr. Park keeps saying you have to look into his client's heart and mind.  But this isn't a magic test.  You have evidence, contemporaneous evidence, meaning evidence that happened as the crime was being dismissed, that tells you what the defendant is thinking and what he wants.  This is just one example.  January 2013 GX-50.

Right after the meeting in Zhuhai you have heard about, the defendant's trusted assistant Jeff Yin emails Lorenzo it's top priority right now is the South-South convention center project.  There is no dispute what that means.  "Ng would like to assure you that all the details in the discussion during Christmas will be satisfied."  What does that mean?  That's the $30,000 a month.  You know that.  That's January 2013.

Next month, GX-58, what happens?  Excuse me.  Later that same month, what happens?  He emails Lorenzo again: "The urgent matter as of now is Mr. Ng has given you a deadline of obtaining approval for the convention center project."  No dispute what that is referring to.  We all know what is about

to happen. I'm showing the things in order.

How does Lorenzo respond? This is important. Again, you don't have to trust Lorenzo. I'm not talking about his testimony. I'm talking about what he said. How does he respond? "I am waiting for the transfer to speed the process." His money. He's telling Jeff Yin, I'll get you approval from the UN, but show me the money first. Not after, first.

You know what happens next. A few days later, February 2013, GX-1501, there's the money. $60,000, not 30. This document is really important to the defendant. $60,000 comes in straight to Terra Trading.

Mr. Park said you should wait for the moment when I point to a bribe. There are a lot of bribes, but okay, here's a moment. You want approval from the UN, I want to get paid. Then he got paid. That alone is bribery. But the story continues.

What happens next? March 2013, the next month, this is within weeks, Lorenzo begins talking with a UN official about revising the document exactly the way the defendant wants, to name his company not Cao's company, the defendant's company.

GX-86. A few months later, Lorenzo sends Mr. Botnaru, a UN official, a top UN official in fact covering the General Assembly, revisions to the document that name the defendant's company. A few weeks later, early June, the document's done.

Ng wants official action, Lorenzo wants money. Ng pays him his money, he gets his official action. It's very simple when you tell the story in order, not when you jump around.

Side note. Mr. Park referred to Meena Sur, one of the people involved in discussions about what this document should look like as Lorenzo's friend. Did you see anything in this trial that suggested that Meena Sur was Lorenzo's buddy? Meena Sur was an official of the United Nations. Is it a surprise Lorenzo spoke with someone at the United Nations to get something from the United Nations? Is Mr. Botnaru his friend too? Mr. Lorenzo was acting as an ambassador. There is no question that that's what he was doing.

Remember, this document benefits no one and nothing other than the defendant, his company, and, by extension, his family.

I have showed you already some emails that show you that the defendant wanted this document. But you don't have to rely on those alone. Telling the story in order shows you what happened. What happens after the defendant gets this document? He uses it everywhere.

GX-968, show first page. You saw that a lot in this trial. Page 9, please. There's the document. That's not a Forest Cao brochure. That's the defendant's brochure. He's shopping this project all over the place, and this document is critical to him. That's why he paid for it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Of course, that's not all he did. He talked about it. I'm not talking about Forest Cao because Forest Cao didn't do this. GX-955, found with Jeff Yin. Pull this up. A letter from the defendant to Francis Lorenzo talking about the document, talking about appointing him as representative to go forward with this project. Jeff Yin had that document. That's where that was found. You know that from stipulation S-4.

Let me pause no one second. This might strike you as frankly a little strange document. Francis Lorenzo and the defendant had known each other for years. In fact, Lorenzo works for the defendant. Why is the defendant sending him a formal letter? Strange, right? But you know the answer. Because the defendant can't let anyone know the truth.

What Ambassador Lorenzo is doing at the UN is for the defendant, but the defendant can't let anyone know that. Lorenzo has to pretend he's been requested formally by a citizen with an interest to do this. So he gets an official letter. It's just a sham. This is utterly unnecessary unless the defendant himself understands this has to look like something very different from what it actually is.

I already mentioned the defendant cared about the document. I mentioned the defendant used this document. I also showed you the defendant clearly paid for the document.

Mr. Park suggested that doesn't make any sense. He threw up a chart. Remember this one? Mr. Park said, look the

first payment, it's in February; look at the letter, it's in June; where is the bribery?  But I showed you the emails about what actually happened.  The payment's in February.  Lorenzo springs into action after saying I'll do this if you give me the payment, if you send the wire.  So he springs into action within weeks.  It takes a few months because the UN's slow, and the letter comes in June.  That email isn't on Mr. Park's chart.

But there is plenty of other stuff that isn't either because the story doesn't end there.  You know the defendant wanted more than just this letter.  You know he was going to pay for more than just this letter.  He also wanted this, GX-142, a letter from the South-South unit, a document naming his company.

You know that Yiping Zhou was sending it to Francis Lorenzo.  Why is Yiping Zhou sending it to Francis Lorenzo?  It's for the defendant, remember?  Because Francis Lorenzo is working for the defendant.  Yiping Zhou knows that, so he sends it to Francis Lorenzo.

But of course that still is not all the defendant wanted.  He wanted Ashe's trip, GX-1154, GX-1146, and he got it.  Once Lorenzo delivered on that, what happened?  You know what I'm going to say.  Lorenzo got paid, a lot, because now he's delivered a lot.

Mr. Park said he was paid in February 2013 and then

sort of nothing happened. A heck of a lot happened. Do you know what the defendant paid Francis Lorenzo in 2014? Remember that trip? $110,000. Not 30. 110. The defendant is a sophisticated businessman. He is, as Mr. Park told you, a hard-ass. You don't get paid unless you deliver. Lorenzo delivered the president of the General Assembly, so he got paid. He got paid big.

Pause for a second. This is extra pay. Also not on Mr. Park's chart is the $20,000 Lorenzo is getting every single month in 2013. This is extra. Why is he getting extra? Because he's done extra. He's gotten his stuff from the UN. That is why we are here.

Mr. Park said that's not what happened, Lorenzo wasn't working for the defendant in 2013, or he was only working for the defendant at South-South News. There is no way to understand these emails and accept that assertion. That is not possible. How is it you can talk about I want X, the person back says pay me, the person gets paid, they give you X, and the person wasn't working for you? Was that an accident? Are these emails fake? That happened.

Mr. Park also said, well, that's sort of okay because people have been talking for years about this project so Lorenzo didn't need to be bribed. Two points on that. One, what the heck does that mean, Lorenzo didn't need to be bribed? He was bribed. What does it mean he didn't need to be bribed?

He was bribed.

I expect you are going to hear from Judge Broderick -- and whenever I mention the law, you should listen to him, not to me -- but I expect you are going to hear from Judge Broderick it does not matter what the person you are paying does after you pay him.  In fact, an offer to pay him is enough.

Is there any question Lorenzo was offered money to take action at the United Nations?  No.  There's literally no question that is what happened.  That is enough.  Need to be bribed doesn't make sense and it's irrelevant.

But it is also false.  What would Francis Lorenzo, an ambassador from the Caribbean, and John Ashe, an ambassador from the Caribbean, want to have a conference center a 16-hour flight away, a ferry ride to Macau, and then a drive when they are from the Caribbean and they represent poor countries in the Caribbean?  How does that help the Caribbean?

They might have wanted a center, by the way.  There is no evidence of that, by the way.  John Ashe's website doesn't mention it; you know that from Agent Chan.  Okay, but they might have wanted a center.  On the other side of the world?  Why?  Frances Fuller never even heard John Ashe talk about this.  Use your common sense.  They wanted a center because the defendant was going to pay for a center.

Remember, the center is also surrounded by luxury

hotels and apartments and marinas. Even if you want to assume John Ashe and Francis Lorenzo thought the idea of a center was the greatest thing ever and they also thought it is a really good idea to put it on the entire other side of the world, not even a city you directly fly to -- remember, they had to fly to Hong Kong first -- even if you want to assume those two things, did they want it surrounded by luxury apartments? How in heaven's name does that help the people they represent? It doesn't. That was okay with them because they were getting paid, but it doesn't.

Now I want to show you something else. I could sit down now and you could convict the defendant of every single count. I'll sit down soon. Not yet. But I could sit down now and you could convict the defendant of every count. And I haven't talked about Francis Lorenzo other than what is in the emails, and I haven't shown you more than, I don't know, 1 percent of what you have seen. Let me show you a few percentage points more, then I'll sit down.

GX-31. You guys remember this. This is Jeff Yin late 2013. "Please give Ng an update on the status of your work. He is extremely unsatisfied with the progression. The wife will be on halt until further progress is made." Pause here. This is 2013, not on Mr. Park's chart.

You know what he is talking about. Is there any question what Mr. Lorenzo is working on for the defendant in

2013?  The conference center project.  He's being threatened to not be paid unless he keeps getting more from the UN.

Of course, the story doesn't stop there either.  You know the monthly payments continue.  You know, by the way, Ashe's wife is already being paid for her no-show job at this point.  You know at this point the defendant has already promised financial support to John Ashe.  That's already happened.  And the story keeps going.

I said Francis Lorenzo was delivering at the UN.  That's not really disputable, is it.  What was the defendant paying him for?  Documents, official documents from the United Nations, multiple official documents from the United Nations, at least two of which have that official logo on the upper right.

They are searchable and findable on what it is called -- it's been a long trial.  What is it called?  The official document system, ODS.  You saw the exhibit.  That's where that document lives.  That is an official document circulated to hundreds of countries.  And the defendant paid for it.

Mr. Park suggests, well, maybe he paid for it, maybe he wanted it, but he sure didn't know it required action by the United Nations.  Ladies and gentlemen, that document is available in all the UN's official languages.  You heard that from multiple witnesses.  It's on the UN's official website.

Jeff Yin downloaded it in every official language and kept it. You saw that through Agent Chan, stipulation S-4. It says United Nations again in every language including Chinese.

The defendant was paying an ambassador at the United Nations to get it for him. The defendant is a sophisticated and incredibly successful, wildly successful international businessman. Do you seriously believe he thought Lorenzo could get this other than in an official way? Would he sneak it into the website?

I'm not making light of the facts in this case. They are incredibly serious. But ask yourself how in heaven's name did the defendant believe he could get this other than paying an ambassador to act as an ambassador. Let me be very clear. There is no question the defendant knew he was an ambassador. Remember 1804, the defense exhibit, Mr. Ng standing next to him. This is Mr. Ng's picture for South-South News when the banner at the bottom of the screen says Ambassador Francis Lorenzo? That's in 2011, years earlier.

Mr. Park showed you a document where he said he was president, and Mr. Park suggested well maybe he wasn't an ambassador. That document is before he starts getting paid. There is no question the defendant understood he is an ambassador, there is no question he was an ambassador, and there is no question he was being paid to act as an ambassador. The defendant literally went to presentations -- they are in

evidence, 1806, 1809 -- in which Ambassador Francis Lorenzo as Ambassador Francis Lorenzo spoke, and then the defendant paid him repeatedly to get things from the UN.  It's simple.

I said a few minutes ago that I haven't mentioned Francis Lorenzo yet, and I haven't, other than what is in the documents.  You could convict the defendant on every count in this case alone if Lorenzo had never testified and if you saw nothing else but emails and bank records and official documents of the UN.

You decide the facts, not me.  There is no way to understand what I have shown you except the defendant is guilty.  There is no story you can tell that makes any sense unless the defendant is guilty.

I'm going to show you two quick slides that Ms. Echenberg showed you just so you understand this is truly just a snippet.  You saw these in her opening.  Remember what I showed you earlier, in order.  People live things forward. They don't live things bouncing around the years.

This is not what I showed you.  This is a different story in order.  November 2013 NG's is not satisfied.  January 2014 Zhou sends a revised letter confirming that UNOSSC supports the center.  Pause there.  By the way, the GX numbers are there.  You can look at them.

Does this support the center?  No.  It supports the center to be developed by the defendant's company.  Couple of

months later, Ashe visits Macau in his capacity as president. You know it's official by the way. Officer Lawrence told you he only goes on official trips. He went on this trip. He also saw the banner that is in the photograph. In March $110,000.

Go to the next slide. This is a different part of the story. Remember, this went on for years. These are just pieces. The GX numbers are there. May 2014 Lorenzo tells Yin Lorenzo is working with Ashe to get the things the defendant needs. June 2014 Ng wires $200,000 for the PGA account. June 13, 2014, Zhou sends a letter confirming that the pro bono agreement will be ready soon.

But that's not all it says. Look at it. It talks about the Sun Kian Ip Group. This is all linked up. This isn't just like letters of support for some idea in the sky. It's the defendant's idea, also the PGA account. It's true that's what the account says, but the records are in evidence. You know what you are going to see? It's John Ashe's account. He opened it.

The report Mr. Park keeps referring to as the task force report actually talks about you are supposed to give your donations to the United Nations president of the General Assembly for a trust fund. This wasn't given to a trust fund. Again, if you tell the story in order the way we live life, it is crystal clear.

Mr. Park, by the way, also referred to the expo center

as if it was a center of excellence.  That's not what any of the documents say.  But okay, let's assume it's a center of excellence.  So what?  Seriously.  If the defendant was bribing UN ambassadors to get a conference center and actually he was bribing them to get a center of excellence, is he not guilty of bribing them?

If someone was bribing a state legislator for a state hospital to be owned in Queens but it turned out the story changed and actually he wants it opened in the Bronx, is he not guilty of bribing him?  It's absolutely the permanent conference center, every document says that.  But let's just assume it says center of excellence.  It's still bribing for those documents.

I said that you don't need Francis Lorenzo to convict the defendant of every count.  But Francis Lorenzo told you a lot about this case.  I'm going to spend a couple of minutes more telling you more that you don't need him for, although this would be enough.

How do you know the defendant didn't just pay Francis Lorenzo to get these documents and think it was perfectly legal?  Mr. Park raised that a lot.  Maybe Mr. Park is right, the defendant didn't know?  Wrong.  How do you know the defendant knew?  Again, ignore Francis Lorenzo from what I am about to tell you.  How do you know?  Terra Trading, the documents.

Mr. Park asked you, he did it yesterday, he said it again today, Terra Trading is an attempt by the defendant to enforce his rights against Francis Lorenzo.  Francis Lorenzo allegedly couldn't do a damn thing for the defendant, so he wants to enforce his rights against him so he enters into a contract with him.  That's wrong.  It's not wrong because I say so.  What I say does not matter.  It is wrong because the evidence shows you it's wrong.

First, Lorenzo is an employee of the defendant.  If the defendant thought he was doing a bad job, he could fire him.  He could execute a contract with him at South-South News.  He could give him a bonus if he got certain work done at South-South News.  This is a sophisticated businessman.  These are not unique or special ideas.  He could have done any of those things.  He could have Jeff Yin, his trusted assistant, request an accounting background, do it for him.  He didn't do any of them.

He did a separate contract with an offshore company that Francis Lorenzo doesn't have an interest in.  GX-914.  This is 2013.  Firstly, this contract is not with Francis Lorenzo.  I'm going to say that again.  This is not with Francis Lorenzo.  A sophisticated international businessman wants to lock down Francis Lorenzo by executing a contract with -- someone else?  That doesn't make any sense.

What also doesn't make sense?  Look at the duties.

Ms. Rao can you go down to duties and compensation. The duty is one sentence along: representative of Sun Kian Ip Group. By the way, it doesn't say Sun Kian Ip Group of Macau. But okay, representative of Sun Kian Ip Group. That's the duty. That's it. You can read this whole document. It's in evidence. That is it.

The defendant, if you want Mr. Park's story to make sense, wants to lock down Francis Lorenzo, wants Francis Lorenzo to execute exactly what the defendant wants. He is trying to control him, Mr. Park used that word, but he executed a contract with someone else? Where the entire duty is just you represent me? A sophisticated international businessman did this? That alone tells you that this contract is a sham.

But that's not all you know. You know from Agent Chan that Jeff Yin asked exactly zero questions ever about the work of Terra Trading. Jeff Yin with his accounting background trusted Jeff Yin, hired by the defendant to make sure things run as they should, asked zero about what Terra Trading did, ever. Why? Because no one cared what Terra Trading did. This was a sham.

Finally, if you weren't convinced yet, looked page 2 of this document. Look at the upper left. Remember, this is supposed to be a legally enforceable contract. It spells Sun Kian Ip Group wrong. It literally spells the name of the company wrong. Sophisticated international businessman

executes a contract with the wrong man, the contract contains essentially no duties of any kind, his assistant trusted to work with Francis Lorenzo asks him zero questions about what the company ever does, and the company actually has its own name spelled wrong. The contract is just a piece of paper. It's not what is happening and it is sure as heck not what the defendant was thinking. Remember, the defendant actually signed this. You don't have to guess.

Now let's assume that that was a mistake, everything I said about this contract, people are human, the defendant is busy. Look at the contract the following year. Remember, it's two years in a row. GX-918. It's the same thing. It's with the wrong guy. It has no explanation of duties. The company's name is spelled wrong. And Jeff Yin still asks nothing.

That didn't happen twice by accident. And remember the second contract is 2014. According to Mr. Park, Francis Lorenzo and the defendant were done before that, right? Defendant didn't want anything from him after that. But he signed the second contract --

MR. PARK: Objection. Mischaracterization.

THE COURT: Ladies and gentlemen, as I have mentioned to you and as you know, it's your recollection of the evidence. We are now engaged in argument. Remember, it's your recollection that controls. Go ahead, Mr. Richenthal.

MR. RICHENTHAL: He signs a second contract with the

wrong man and all those other errors in a year in which he allegedly no longer has any interest in controlling what Francis Lorenzo does.  I don't think I need to say more about those contracts.  They are shams.  They are shams just like GX-955, the letter pretending that Francis Lorenzo was acting for a concerned citizen and not for the man paying him.

Everything in this case looks like this.  It's one story.  The defendant paid ambassadors to get things from the UN because it would help him.  It's just that simple.

I haven't mentioned a single thing Lorenzo said yet, but I'm going to do that.  But again, if Lorenzo had never testified, you could convict the defendant alone an every count.  Now let's talk, briefly, about Francis Lorenzo.

Mr. Park asked you to throw him out.  He says he's a rat, he is a wind-up doll.  In some sense it's pretty silly for lawyers to talk about whether someone is telling the truth because you were here and it is up to you to decide whether he was telling the truth.

You saw him.  You saw how he asked questions.  You saw him admit lots of bad things he has done.  You saw him admit dreams he had for South-South Cooperation that he threw away for bribes.  But you actually don't have to trust what he says. No one is asking you to trust him.  You know what he says is true because it fits everything else you have seen.

I'm going to give you two examples.  One, the Terra

Trading contract. He told you about them. Lo and behold, that's exactly what they are. You may think Francis Lorenzo knows about them, but wait a second. They are sitting in a folder that Jeff Yin has marked "Lorenzo wires" that Jeff Yin has when he is arrested. Francis Lorenzo didn't sign the stipulation S-4 that says that.

How could Francis Lorenzo know where Jeff Yin had saved those documents and yet Jeff Yin saved them under a folder called Lorenzo wires? What Francis Lorenzo tells you happened and what the documents say happened are the same.

That does not make Francis Lorenzo a good person. That does not mean you should trust everything he says. You should be sickened by how he abused his power, lied to a friend, lied to a bank, viewed money as more important than his duties to the United Nations and his country.

Mr. Park is right, I am going to say Mr. Ng chose Francis Lorenzo, because he did, and it is clear why. If you pay Francis Lorenzo, he will do what you want. If you pay him in 2013, he will spring into action and get you a document from the UN. The defendant knew that because it happened and he kept paying him and he kept getting more from the UN. That is what happened. You don't have to like Francis Lorenzo to know when he tells you what happened, it's because it happened.

Mr. Park also said that you should watch me to say he wants it both ways. Well, I am going to say that. You know

why I'm going to say that?  Because it's true.  Mr. Park anticipated some weaknesses in his own argument.  He is an extremely good lawyer.  Mr. Park does want it both ways.  And not just on cross.

Francis Lorenzo told you on direct about the payment of the PGA account.  He thought it was for an event or might be for an event.  He told you that Luis Guerra's signature is a forgery.  He told you he was deeply, absolutely, sincerely in his heart committed to the MDGs.  He told you South-South News did good work.  All on direct.  He told you when the discussion happened about the $20,000 in cash the defendant wasn't there.

On direct those are things he told you that don't help our case, but he told you them because he was doing his honest best to tell you what he remembered happened.  Mr. Park says ignore all of that because he had tax charges against him so he had to sort of plead to bribery.  Again, I have shown you he admitted bribery, so it's not theoretical.

Also, if you pull up Government Exhibit 1402, it's in evidence, you will see that the tax shelter that Mr. Park is talking about had a statutory action of eight years.  That is the maximum he could ever go to prison for those crimes.  He pled to 70 years more of crimes.  Now, Francis Lorenzo may not strike you as the smartest man, the most honest man.  Do you think that he literally decided that because he could go to prison for 8 years he should admit extensive bribery exposing

him to 70 years more in prison?  Would anyone do that?

MR. PARK:  Objection.

THE COURT:  I'll allow it.

MR. PARK:  Objection to the legal.

THE COURT:  As I mentioned, ladies and gentlemen, you are going to take the instructions on the law from me and the facts are in your province.  I'll give you some pretty detailed instructions after lunch.  Go ahead, Mr. Richenthal.

MR. RICHENTHAL:  Mr. Park also suggested that somehow Francis Lorenzo didn't receive bribes even though he admitted receiving bribes because the government didn't charge him originally with receiving bribes.

First of all, the government is not on trial.  Whether you think the government should have made different decisions or decisions at a different time is utterly irrelevant.  You have no context to judge this.  You don't know what is even remotely involved in that.  I'm not saying that out of disrespect, but you just don't know.  There is nothing in the case about that.

Here is what you do know.  In March 2016, when Francis Lorenzo pled, he pled to agreeing to pay bribes and paying the bribes to John Ashe.  Whose bribes?  These documents are in evidence.  Whose bribes?  The defendant's bribes.  If you take Mr. Park seriously, you should convict the defendant because Francis Lorenzo pled to paying bribes to John Ashe on behalf of

the defendant.

MR. PARK:  Objection.

MR. RICHENTHAL:  But you shouldn't do that.

THE COURT:  Again, ladies and gentlemen, for you to make the connection between the law and the facts, I'll give you the law, you can deal with the facts.

MR. RICHENTHAL:  You shouldn't do that.  Why?  Because the mere fact that Francis Lorenzo pled guilty does not make the defendant guilty.  We have a burden, Mr. Park is absolutely right.  The defendant has none.  It would be wrong and unfair and in violation of your oath to convict the defendant because someone else pled guilty.

But it would also be wrong and unfair and in violation of your oath to acquit the defendant because you don't like Francis Lorenzo or you think he should have pled guilty to more or you think he should have pled guilty to more at a different time.  What you are going to be charged to do later today is look at the evidence in this case and decide that that man committed the crimes he is charged with.  That is your job.

I'm still on Lorenzo, but I'm going to switch in a moment.  Mr. Park said he is just a lobbyist.  I don't think I need to say much about that.  Imagine if the defendant were charged with bribing a U.S. congressman to get a bill passed through Congress and he said, no, no, that first congressman, he was just lobbying, he wasn't being a congressman.  Okay, so

it happened in the halls of Congress and I actually got the law, but you, it was just lobbying.  Kind of silly.

It's no different for the UN.  You know that.  By the way, you also know from common experience that lobbyists have disclosure requirements.

MR. PARK:  Objection.

THE COURT:  Again, ladies and gentlemen, it's what the evidence is in the case and my instructions on the law.

MR. PARK:  I move to strike.  Facts not received in evidence, your Honor.

THE COURT:  Mr. Park.  The comment about the "you know" is stricken.  Go ahead.

MR. RICHENTHAL:  Did Francis Lorenzo ever tell anyone at the UN, by the way, I'm getting tens of thousands of dollars offshore to advocate for this project on the other side of the world?  Do you have any question what would have happened if he had told Ion Botnaru that?  Do you think Ion Botnaru would have let that document be revised?  That's not speculation.  You saw what he talks about.  There is a process for this.  Of course, Lorenzo couldn't talk about it because he was being bribed.

I'm going to step away from Francis Lorenzo.

Mr. Park tells you this is all public private partner-ship, not the fancy UN version he says but nevertheless a public private partnership.  That's nonsense.  A public private partnership is paying the ambassador's wife for a no-show job

for years who lives in New York?  A public private partnership is paying an employee offshore to help him avoid taxes while he does work for you and doesn't tell anyone the real reason?  That's a partnership?  I guess it's a form of partnership.  It's a criminal partnership.  It's not a public private partnership.

And you know the defendant knew all this was going on.  For instance, Anilla Cherian, I'm not going to spend a lot of time on this, Mr. Park showed you an email in English.  That's true, there is an email in English.  There are also a number in Chinese, several of which are not line 159.  One of which you saw through Chan is a payroll tab, just a tab, 10 to 15 employees at most, and it says Anilla Cherian, the Antiguan ambassador's wife.  But I expect you to hear from Judge Broderick that it wouldn't matter even if the defendant never saw that because the defendant is responsible for the acts of his co-conspirators.

MR. PARK:  Objection.

THE COURT:  I'll allow it.

MR. RICHENTHAL:  I expect you are to hear from the Judge Broderick that the defendant is responsible for the acts of his co-conspirators.  Whenever I reference the law, it is what Judge Broderick says, not me.  But I expect you will hear that.

There is no question Jeff Yin was the defendant's

agent and the defendant's co-conspirator. You could have never heard from Simon Hannaford, you could have never seen a task force report, and you would still know a public private partnership is not paying a guy's wife to do nothing.

MR. PARK: Your Honor, I object and ask you to strike that comment.

THE COURT: I'll allow it. Objection overruled.

MR. RICHENTHAL: What matters is what the defendant thinks, not what you think. To be more precise, what matters is what you decide he was thinking.

How do you know he wasn't thinking, incorrectly, that this was in fact a public private partnership? Multiple reasons. First, he went to events and ceremonies, some of which he sponsored, about the MDG's, public private partnerships, poverty. You literally saw him in a video. You can watch the videos yourself.

Do you think that anyone in those speeches, including Ambassador Lorenzo, said you will solve poverty by paying the president of the General Assembly's wife to do nothing? Do you think that anyone in those meetings said you will solve poverty by paying ambassadors tens of thousands of dollars a month? You know that's what no one said. You can watch the videos yourself.

The defendant understood what the MDGs are. The defendant understood what public private partnerships are. But

he chose to do something a different way because the right way would not have advanced what he wanted.

Task force report, same thing. You should read it. It's in evidence. You are not going to see anything about public private partnerships paying ambassadors personally for your for-profit company.

What the task force does say, what Mr. Park spent a minute or so on yesterday, is that the office of the president of the General Assembly, PGA, can accept outside funds. Of course. So can the congressman in my example. No one disputes the PGA is allowed to accept outside funds. You should not convict the defendant for thinking otherwise. But that you are allowed to accept outside funds doesn't mean you can accept them in return for official action. That's when this goes from a donation to bribery.

Now I'm speaking of money, so let me go to the chart briefly, 1501. Mr. Park spent a lot of time on this chart. He said, among other things, you should conclude the defendant did not pay bribes because the amount of money on this chart is essentially meaningless to him. That is insulting. It is not meaningless to John Ashe and Francis Lorenzo and Anilla Cherian, and that's what matters. It may be meaningless to the defendant. He paid them just enough to get what he wanted.

And you know that the defendant is actually a man who controls his money closely. That's why he put Jeff Yin in.

That's why he cut the monthly funding of South-South News from 300,000 to 200,000. That's why Jeff Yin got all those detailed reports. The defendant knew exactly where his money was going. It may be that he thought, well, it's nice I don't have to bribe them more. That doesn't mean he didn't bribe them. A no-show job at $2,500 a month is $30,000 a year. $30,000 a year for doing nothing is pretty good.

This is the same reason the defendant paid John Ashe the $200,000 in June 2014. Mr. Park said to you, how can he possibly, he being the defendant, how can he possibly have bribed John Ashe if he waited years to actually give him anything? First of all he was already paying his wife for a no-show job. The answer you can see in the emails. John Ashe keeps asking for money, the defendant keeps promising him money, but John Ashe keeps helping him anyway.

The defendant is a businessman. This is business. John Ashe came to Macau. He hadn't been paid. He required no more than reimbursement for a New Orleans trip. That is a good deal. But when the defendant needed action from the South-South unit from Yiping Zhou that wasn't coming, remember these letters, he wants his own company named and it wasn't coming.

Finally, he pays John Ashe. And what does he get in less than two weeks? GX-977. This letter, this is not just another letter. You know that because the defendant really wants it. A random letter would seem something that he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

wouldn't care about.

You also know about it because it names his company. This comes within days of that payment to John Ashe. What does it say at the top? The defendant's company. What does it say in the next paragraph? Let's blow it up. Support of president of the General Assembly. This is business. The defendant needed this. It was worth $200,000.

Now go back to the chart for one second, 1501. Mr. Park said you should challenge me to identify every penny of a bribe. Okay. Starting October 2010, where the defendant talked about wanting official action from the United Nations, everything after that you could conclude is a bribe.

I want to be very clear it's impossible to unwind every penny of every payment because Lorenzo told you, honestly, on direct, I also did some stuff that wasn't bribery, I did some stuff that wasn't at the UN, in fact in the early years I did a lot for South-South News. So it is impossible to look at it and say, well, a thousand dollars is a bribe and $5,000 wasn't but the next month it switched. But you are not going to be asked to do that.

When you see Judge Broderick's instructions, you are not going to be asked to break down to the penny what the bribe was. You are not even going to be asked to determine the amount of the bribe. You are just going to be asked to determine if the defendant offered even a single bribe. He

absolutely did that.  Red Xs do not tell you he didn't do that.

What else in this case tells you not just that the defendant paid ambassadors, not just that he knew he was paying them, not just that he got official action from the UN, but that he knew it was wrong?  I have given you some examples:  Terra Trading, 955, the letter from Lorenzo pretending they are having an arm's length relationship.  Frankly, the mere fact that he is paying him offshore when he has all these bank accounts we have seen is itself really strange.

What else?  The payments to John Ashe is listed as lending or lend.  Is there any evidence that was a loan?  People don't do things like this if they think it is perfectly fine.

Mr. Park says, well, the defendant was misunderstood, he just was engaged in philanthropy.  So let's talk just for a moment about the defendant's alleged philanthropy.  Mr. Park told you, I think he said this yesterday, he told you the defendant promised $5 million a year for three years to the UN.  That's GX-958.  But he didn't talk to you about what the document actually says.

If you look at the bottom, it talks about the uses of that money.  Ms. Rao, could you go to the next page, Roman numeral V, page 2.  "The implementation by the Sun Kian Ip Group" -- by the way, it still didn't say Sun Kian Ip Group of Macau -- "of the permanent expo and meeting center referred to

in GA document A/66/748." His donation was going back to his own project. This is Roman V. There are Roman numerals I through IV, so part of it is going elsewhere.

But this was not philanthropy in any sense of the word. If you give money that you are going to get back for the project you want, for your for-profit company, it might be a smart business move, but it is not philanthropy. It is certainly not only philanthropy.

I want to pause there for one second because you are not going to have to find, nowhere in the instructions will you see, that the defendant cared not at all about South-South Cooperation. No one is telling you that. You don't have to find that. You are not going to find, and nothing in the instructions is going to say, you must conclude that 100 percent of every dollar he paid and 100 percent of everything he did was to line his pockets. People are complicated. You don't have to decide that.

What you are to have to decide is when he paid money, did he do it in ways and with intentions that the law recognizes as criminal. In other words, was one of his intentions to pay ambassadors to get stuff from the UN? Of course. That's all you have to find.

MR. PARK: Objection.

THE COURT: Again, ladies and gentlemen, I'll instruct you on the law.

MR. RICHENTHAL:  Finally, if the defendant were really interested in philanthropy, why would his foundation have $64 in the bank account.  Why would it never apply for tax exempt status?  And why would he actually not use it?

What the heck do I mean by that?  Mr. Park told you he gave $1.5 million to UNDP.  Look at GX-964, the document that did that.  Look at the bottom third.  Ms. Rao, can you blow that up.  It isn't from his foundation.  It's from his company.  Why would a company do this?  Because this is a business expense.  Remember what I just showed you.  The money is essentially going right back to them.  This isn't philanthropy, or at least it isn't just philanthropy.

Mr. Park also referenced instructions that we expect you will hear for the Foreign Corrupt Practices Act, or the FCPA.  He said, I expect you will hear that the defendant has to act to direct business to someone.  Yes.  To himself, to his company.

Look at 908F, that multiminute video.  The conference center, very small piece.  The luxury condos, the hotels, the shopping mall, very big piece.  In fact, if you go to approximately five minutes and five seconds in, do you know what you will see if you pause?  The International Cultural Avenue, where is really just a shopping mall if you look at it.  The stores are Dior.  There are other stores too.  The defendant may well have thought this was good for the world.

It is certainly not all he thought, it is certainly not all he sought, and that's enough.

It talked about several things, but I'm now on this idea of this project. 908F. Mr. Park asked you time and again to believe this was not the defendant's idea. That is nonsense. There is no evidence it was anyone else's idea. There is no evidence it benefited anyone else.

There is no evidence John Ashe and Francis Lorenzo cared about a shopping mall in Macau. There is no evidence it would have benefited them. Is there any evidence they had stock ownership or some other financial incentive in Sun Kian Ip Group? The defendant's family did. The Francis Lorenzo or John Ashe? Of course not.

Again, you don't need to rely on Lorenzo or for that matter common sense for these points because you can just look at the documents. GX-153, email from John Ashe to Francis Lorenzo. How does John Ashe describe the project in Macau? Mr. Park wants you to believe this is John Ashe's idea. This is 2014. This is years after the alleged time when Francis Lorenzo and other people told the defendant about it. "Visit Macau to see his project," the defendant's project.

Again, Francis Lorenzo supported it, John Ashe supported it because they were promised money and given money. There is no question they supported it. The question is why. Again, maybe they thought part of it was a good idea. Maybe

they thought the convention center part was a good idea.  That doesn't mean they didn't take bribes to advance the entire idea.  It certainly doesn't mean they didn't take bribes to advance the idea as being developed by a particular for-profit company.

Imagine you think the entire project is wonderful, the whole thing.  Why would you care about a single for-profit company on the other side of the world?  You wouldn't.  You might not be against it, but you wouldn't be for it.  Unfortunately for Francis Lorenzo, who put money in front of duty, he will be for it if you agree to pay him.

Final point on this.  Officer Lawrence, who Mr. Park referred to as a security guard, he told you about John Ashe's trip to Macau, the official PGA trip.  He told you that the defendant went on and on about the conference center he wanted to build.  This is page 3520 of the transcript.  Did Officer Lawrence say the defendant asked Ashe what Ashe thought about the project?  No.  He said Ashe didn't even seem interested.  You know why.  Ashe didn't care about the project.  He cared about financial support.  He wanted money.

Finally, Forest Cao, the boogie man in this trial.  Mr. Park talked endlessly about Forest Cao.  I have already demonstrated Forest Cao has basically nothing to do with why the defendant is guilty.  But let's assume Forest Cao did everything Mr. Park said he did, everything.  Let's go back to

the example I gave you a few minutes ago.

Imagine the defendant is bribing a U.S. senator to get a bill through Congress.  Now imagine the senator on the side is getting money from someone else.  That someone else thinks the bill's a really good idea too.

Would you say that the bribery didn't happen?  Would you say that the defendant charged with bribing the senator should be acquitted because someone else actually thought the bill was also a good idea or someone else saw it and said I'm going to get on that?  Does that make any sense?  The UN is no different.

By the way, the fact that there was a potentially competing center -- I say potentially because the documents actually suggest they are very different, different cities. But okay.  The fact that there is a potentially competing center, does that mean the defendant didn't pay bribes?  No. That means the defendant had an increased incentive to get out in front of this, to put his own companies's name in it, to get South-South unit support for his own company.

Why is it in 2013 to 2014 he cares so deeply about his company being named?  Because he is trying to get his project approved.  That part of the reason he wanted to do that is he feared someone else might get there first does not make him innocent.  It just means he had yet another reason to do what he did.

H7CQ1N15                     Rebuttal - Richenthal                    4176

What Forest Cao did or didn't do has nothing to do with this case.

By the way, what Vivian Wang did or didn't do has nothing to do with this case. It is far from clear that all that money was gambling. You saw the cross-examination on that. Again, assume every penny was gambling. The defendant didn't bribe Francis Lorenzo because Vivian Wang liked to gamble using a bank account that Francis Lorenzo had no access to.

Even if Francis Lorenzo knew Vivian Wang was doing that, how does that mean he didn't get bribes? How do you explain the emails and documents I showed you? Those things happened, years later by the way, those things happened. That Vivian Wang years earlier like to gamble, what does that have to do with what I showed you? Nothing. Nothing.

At the end of the day, if Mr. Park is to be believed --

MR. PARK: Objection.

THE COURT: Again, the lawyers are making arguments. The facts are your purview and the law is mine.

MR. RICHENTHAL: Let's be clear. When I say if Mr. Park is to be believed, I am not remotely suggesting he has a burden to do anything. I'm responding to what he said. I'm entitled to do that. Here is my response.

If Mr. Park is to be believed, the defendant was

incredibly unlucky.  He founded a media organization for the best of intentions.  He did it with his friend and business partner Forest Cao, but Forest Cao stole his money.  Forest Cao's wife Vivian Wang also stole his money.  The person the defendant hired to run his company, Francis Lorenzo, also stole his money.

When the defendant noticed what was going on, he broke up with Cao but he kept Lorenzo and Wang, so he only noticed a part.  They continued to steal from him.  The defendant put a new assistant in, Jeff Yin, with an accounting background who spoke English.  Still, unfortunately, this kept happening.  That assistant was either incompetent or was actually himself hiding things from the defendant.

So the defendant tried a new tack.  He tried to execute a contract with Lorenzo.  Finally, let's do it the right way.  But the contract, as I told you, was a mess and didn't work.  And the defendant was even unluckier because while all of this was happening, John Ashe's wife, who the defendant apparently thought was a real employee, wasn't.  She never showed up, but she keeps taking money from the company.

The defense insisted he's not just not noticing what's going on, he's actually threatening to stop paying Lorenzo for taking official action at the United Nations.  You have seen those emails.  He is threatening an ambassador he will cease paying them if he doesn't keep getting stuff from the UN.

Essentially, in other words, he is bribing the ambassador or threatening to stop bribing him.

But in this version of the story the defendant doesn't know that, all of this is happening and he has no idea.  He is an incredibly unlucky man in this version of the story.  But oddly, he is also an incredibly lucky man because all of these people that, remember, in this version he is has not directed to do anything are also working for him.  Francis Lorenzo is working his butt off at the UN for the Sun Kian Ip Group, not for Forest Cao.

(Continued on next page)

MR. RICHENTHAL:  He's getting him document after document from the UN.  Not for Forest Cao.  He's working so hard that in 2015, as you heard, the South-South unit held an event for the expo promoting the defendant's idea.  So the defendant is both the unluckiest man in the world and the luckiest man in the world, all at the same time, for years.  Is that what happened?  Do you accept that story?  Because that is the only way for what you've seen to make sense.

Except one other way:  He's not the unluckiest man in the world, or the luckiest man in the world.  He's just a man.  And what happened is simpler, and it's sadder.  An incredibly successful and wealthy man wanted more success and more wealth.  He wanted it as soon as he could, and he wanted it no matter what.  So he used his wealth to cheat.  He wanted a leg up against a potential competing center.  He was willing to pay bribes for what he wanted.  He had the money to pay bribes, he had the willingness to pay bribes, so he paid bribes, repeatedly.  That wasn't an accident; it was a choice.  It was a repeated choice.  There's nothing to celebrate in that.  But that is what the evidence shows you happened.  For making that choice, he's guilty.

THE COURT:  Okay.  Thank you, Mr. Richenthal.

All right.  Ladies and gentlemen, we're going to take our lunch break now.  You don't have the case yet so you cannot talk about the case.  We're going to come back in an hour, at

3:00, and I'll do the jury charge.

As I mentioned, it's going to be quite long.  We're going to have copies for you.  We're actually making the copies now.  So if it takes a little bit longer than 3, we'll let you know that it's delayed because we're making the copies.

Do not discuss the case, you can leave your pads on your chair, and we'll see you in an hour.  Thank you.

(Jury not present)

THE COURT:  Okay.  You may be seated.

Is there anything that we need to take up at this stage?

MR. PARK:  Your Honor, I do have a couple of motions to strike Mr. Richenthal's comments during his rebuttal.  I don't know whether you want to do this now or after lunch or how would you like to --

THE COURT:  Why don't we do it now.

MR. PARK:  Okay.  So he made reference to the basketball court.  That's not --

MR. RICHENTHAL:  I did not make reference to the basketball court.

MR. PARK:  He absolutely did, absolutely did.  So that should be stricken.  That's all I'm asking for.  If I'm wrong and he didn't, then there's nothing to strike.  But he did.

THE COURT:  Well, I don't remember that, but I'm also not sure exactly what was said with regard to that.  I mean,

but --

MR. PARK:  There's no place in this -- they had their witness come back in and withdraw the reference to the basketball court and clarify.  There's no reason for the prosecutor on his rebuttal summation to bring that issue back up.

THE COURT:  Again --

MR. PARK:  If I misheard, I apologize in advance.

THE COURT:  No, no.

MR. PARK:  But I wrote it down.

THE COURT:  That's okay.  I mean, if you're able to search for that portion of the transcript.  So if you could during the lunch break do a search for that -- I don't remember hearing that, but -- and then I'll take that up after lunch.

MR. PARK:  Very good, Judge.

The other comment was -- he said this twice.  He assumed a fact definitely not in evidence, and if I'm wrong about this, again -- but when he suggested to this jury that Mr. Ng was aware of this competing center and caused him to accelerate his efforts -- and he made that comment twice -- I don't know that that's in the record.  And if Mr. Richenthal wants to proffer where that came from, I'm happy to consider that, but if he does not have a basis for it, I believe it should be stricken.  It's highly prejudicial.

THE COURT:  Okay.

MR. RICHENTHAL: Two responses: First, that's an argument from the evidence. But second, there actually is evidence that Mr. Ng was concerned that he needed to essentially move faster and get his company named because he became at least potentially aware of the competing center. I don't have the GX number in front of me. We could supply it to the Court. But even if there is no such GX, this is an inference, this is an argument from the evidence. Mr. Park made many, many arguments that I think we could say aren't in the evidence, but he's an advocate. He's drawing assumptions from the evidence, or asking the jury to do it. I'm asking the jury to do the same thing.

THE COURT: And I think I clearly --

MR. PARK: Your Honor, just to be clear, they had their -- their cooperator made very clear that he was instructed by Forest Cao not to mention, not to let Mr. Ng know about this competing center. So I'm fine if they want to find some record, but for them to argue that that's an inference that they can invite the jury to make, that's just pure speculation, Judge, and it's highly prejudicial.

MR. RICHENTHAL: Since lawyers' arguments aren't evidence, it's hard to imagine how it's prejudicial, but just to be clear --

THE COURT: In particular, just to be clear, I've repeatedly, in both summations, directed the jury that the

facts are their province and the law is mine.  And I'm going to do so again in the charge, repeatedly, that that is the case.  And again, if you want to point out specifics, that's fine, but based upon the instructions I'm going to give them, I'm not going to strike that portion of the summation.

MR. PARK:  Understood.  We object.  We think this is of a different kind, Judge.  It's very much a shift.

MR. RICHENTHAL:  Your Honor, for the sake of the record --

THE COURT:  Wait.  With regard to that, I mean, again, when you say very much a shift, I will instruct the jury but Mr. Richenthal also said during his summation about where the burden rests, and it's going to be clear to the jury.

MR. PARK:  Right.  I didn't mean that, Judge.  The shift is a shift in a theory that hasn't been mentioned in this case before about Mr. Ng's motivations, and it's just a classic rebuttal, pulling the rug under the defense counsel's legs, with respect to an issue that they well know we spent a good amount of time talking about in an effort to degrade the evidence of a single conspiracy.  And for them to just, on rebuttal, say, well, actually, he was aware of it and he accelerated his efforts as a result, that's a shift.  And I don't mean burden shifting, Judge.  I think it's important.  It's highly prejudicial.  I've got no basis, no ability or opportunity to correct it.

MR. RICHENTHAL: Your Honor --

THE COURT: Go ahead, Mr. Richenthal.

MR. RICHENTHAL: I just want to make a point here. We're talking rebuttal. What that was directed to -- and the parties can read the transcript, as can the Court -- was rebutting an argument of Mr. Park that the evidence, or alleged evidence that Mr. Cao had a competing center is evidence of innocence. The point I was making -- I don't have the exact words in front of me -- was, if that occurred, it's evidence of additional motivation to commit the crime. That is very different from saying, he did the crime for this reason. But in any event, the law is very clear, rebuttal in particular is responsive to a defense argument. It is not itself evidence. An assertion of an argument cannot possibly be prejudicial. I personally at least twice told the jury it's our burden. I don't see how this can possibly be something the jury can remotely be prejudiced by.

But in addition, Mr. Zolkind is prepared, if your Honor would like to hear it, to be more precise about where we say this inference lies in the record, although again, it would be acceptable as argument alone, responsive to the defense's argument.

THE COURT: Okay. All right. Briefly, Mr. Zolkind.

MR. ZOLKIND: Your Honor, the only thing I was going to mention is just that there was testimony by Mr. Lorenzo and

then documentary evidence corroborating it where Mr. Lorenzo pointed out, or testified, that in 2015, after the original letter of support from the South-South unit was obtained, which was early 2014, that in 2015, the defendant requested a revised letter that made clear that Sun Kian Ip Group was -- and I think this is how Mr. Lorenzo put it -- that Sun Kian Ip Group was the only one that was going to be appointed for the center, and then there's documents where Mr. Lorenzo writes a letter with language to that effect, and then he gets the revised letter of support from Yiping Zhou, with language to that effect.  So again, I think it's a very fair inference to argue from those documents and from that testimony that by 2015, what the defendant wanted was not just a letter.  He'd already gotten a letter saying that they supported Sun Kian Ip Group, but he wanted a letter saying Sun Kian Ip Group was the only one, and from that evidence, it's fair to argue that he wanted to make sure that if there were other competing centers, that he was going to be the one that had the UN's support and endorsement.

THE COURT:  Okay.

MR. PARK:  Judge, to be clear, we're talking 2015.  By that time Mr. Ng was dealing directly with Mr. Zhou.  What Mr. Richenthal was talking about was accelerating during 2013 and 2014, and that's improper.

THE COURT:  Well, here's the issue, though.  I mean,

the argument that I think the defense is making with regard to Mr. Yin is that he was brought in to basically tighten the reins. And again, I'm not saying it's a strong inference or an inference that wins the day. I think an inference can be made that he's tightening the reins because he wasn't getting results, and that he became aware that there was other noise out there. And again, this is the inference. And you may not agree with it, and it may not be the strongest of inferences, but -- and again, I have not reviewed the evidence at all and --

MR. PARK: Judge, I'm just telling you, in my experience, this is a game changer, seriously. It literally is. For them to be introduced with this at the last, really, on rebuttal, I mean, Jeff Yin was brought on for financial controls because of what was going on with Vivian Wang and Forest Cao. It had nothing to do --

THE COURT: But again, that's your argument.

MR. PARK: I know, Judge, but where is the argument that he was aware of a competing center?

THE COURT: And again, I'm not at all saying what the weight of it is, but I think it could be viewed that, yes, he was brought on for financial controls. There's no direct testimony that that was part of the falling-out between -- at least I don't recall it -- between Mr. Cao and Mr. Ng. In other words, that it was because there was this -- and look,

4187

you know what, I'm not here to argue.  I'm just saying that I heard your objection and I'm overruling the objection.  You've made your record.

And were there any others?

MR. PARK:  No.  No, your Honor.

THE COURT:  All right.  We'll come back at 3.  Thank you.

(Luncheon recess)

AFTERNOON SESSION

3:12 p.m.

(In open court; jury not present)

THE COURT:  Do the parties have sufficient copies of the charge?

ALL COUNSEL:  Yes, your Honor.

THE COURT:  Yes, Mr. Park.

MR. PARK:  Your Honor, for the record, just on the basis of the arguments we made already with respect to the reference in the rebuttal summation to the competing center, we would move for a mistrial.

THE COURT:  Okay.  All right.

Mr. Richenthal.

MR. RICHENTHAL:  I think the Court has all it needs. This was argument.  The jury was told repeatedly it was an argument.  It's an argument that is grounded in inferences the jury could draw.  In any event, it was responsive to an argument of the defense.  That straight comment, even if not grounded in the evidence, is not sufficiently prejudicial to warrant a mistrial; indeed, it's not prejudicial at all.

THE COURT:  And as I mentioned prior to the motion, there could be inferences that could be drawn, but putting that aside, I repeatedly instructed the jury, both in connection with the defense summation but also the government's summation, about what the jury's responsibility was and what it will be

and what they're going to be held to.  I did that in my opening remarks.  I'm going to do it again now.  So I am going to deny the motion for mistrial.

Okay.

MR. PARK:  Thank you, your Honor.

MR. RICHENTHAL:  Before we begin, I handed your Honor's law clerk a several-page document of proposed transcript corrections.

THE COURT:  Yes.

MR. RICHENTHAL:  So what this is is, we emailed the defense a couple nights ago a list -- it will turn out to just be a partial list -- both sides are still reviewing.  I just reviewed it with Mr. Greer.  He told me that there are two proposed entries on page 2 that they either might not agree with or we may just have miscited them.  So I physically struck those two, I showed it to Mr. Greer, and I've now handed it to your Honor's law clerk, so unless the Court wants to proceed differently, I think we would jointly request that those corrections be made, with leave for both parties to obviously ask for more if we think it's appropriate.

THE COURT:  Okay.  Mr. Park.

MR. PARK:  That's fine, Judge.

THE COURT:  All right.  So would the parties like me to mark this as a Court exhibit?

MS. SHAPIRO:  Yes, your Honor.

THE COURT: Okay. So I think we're up to E, Court Exhibit E. Ms. Shapiro, Mr. Park, Mr. Mo, I have not included the most -- I think my law clerk may have sent you the -- so I can add those at some point, but we'll make this Court Exhibit E.

Ms. Williams? This is going to be Court Exhibit E.

MR. RICHENTHAL: And I don't know if it would be helpful for the reporters if we emailed a copy so they could sort of copy and paste. If it is, we're happy to send it directly to the reporters. With respect to those two lines, we would just remove them.

THE COURT: Yeah. I don't know what the process is, but they may go back and they may look at their notes and then -- because in the end, it's their -- but whatever the process, you can email them if you like.

MR. RICHENTHAL: We'll wait for instructions from them with whatever we think is easiest to make sure it's accurate and complete.

(Discussion off the record)

THE COURT: Mr. Richenthal, my deputy tells me that it's probably better if you send a short letter saying "Attached is," with a list of the transcript issues. We'll take care of the charge. We'll issue an order basically indicating that we're going to have those. So those will be A through D. Once you file the letter, it can be docketed so it

4191

will be part of the record.

MR. RICHENTHAL:  That's fine.  We can take care of that pretty promptly.  Again, I need to remove those two entries so it will be a version without -- I'm sorry.

THE COURT:  You can just file them on ECF.  You don't have to email them to chambers.

MR. RICHENTHAL:  That's fine.  I was just saying I would remove the two entries we physically struck, so we can send a quick letter, and that makes good sense to us.

THE COURT:  All right.  Is there anything else we need to deal with before I begin the charge?

MR. RICHENTHAL:  Not from the government, your Honor.

THE COURT:  I anticipate it being about two hours. Mr. Park, Ms. Shapiro?

MR. PARK:  Not from us, your Honor.

THE COURT:  I anticipate it being about two hours, give or take.  I may, depending upon if the jury -- I'll tell them that I want to get through it all, but if they need to use the facilities, they should just raise their hand, we'll take a quick break, and obviously I'll give them the admonition about not speaking about the case because they don't have it yet. But I think we should be able to make it through.  And I intend to go through the whole charge.

MR. RICHENTHAL:  I'm sorry, your Honor.  Two other things with respect to exhibits.  We've been conferring with

the defense about the best way to get the jury the electronic evidence. I think both sides think it would be nice to get the jury the electronic evidence, and so what we're trying to do is get a clean laptop that both sides would review and the sides would essentially have DVDs of their respective videos. We have a couple of native documents, Excel documents, and the jury would get those. I think there's a good chance that process won't be complete today, and if the Court wants to tell the jury it will be made available to them tomorrow or something like that, but the parties I think are in agreement that that's a good way to proceed.

THE COURT: All right. That's fine. I think I've let them know that there may be some they don't receive initially, but if you want me to say that we're going to make efforts to get them just about everything but that may not be completed until tomorrow, just remind me when I call you to sidebar if I haven't said it. Let me just go to the back here.

So I'm just going to add some something where we say, "You're about to go into the jury room and begin your deliberations. I will send most of the exhibits into the jury room with you, and we will try and get you the balance tomorrow. However, if during your deliberations," and then I'll continue after that.

MR. RICHENTHAL: That's fine, your Honor. And on a related note that I think is actually covered by the

instruction your Honor just proposed, both sides realize that some of the stipulations in this case in evidence refer to exhibits that are not in evidence. That's innocuous, to the extent that it's just a number. It's arguably not innocuous if there's a description of the item, so we've agreed that what we'll do is redact those portions of the stipulation, and so the jury will just know there was something else, and that's okay. Your Honor has already given them an instruction about redactions. I don't think another one needs to be given. But that's a process that we're undertaking this afternoon, and so actually the jury will also not have certain stipulations --

THE COURT: Okay.

MR. RICHENTHAL: -- in particular S-4, until that process is complete.

THE COURT: Okay. And I think that makes sense, because they were admitted in evidence, so I think redacting them rather than altering them I think makes sense, and I think it's covered by what we have, but we should try and get those to them tomorrow. I think, as we have been doing, they won't sit past 6 because the jurors need to get home and tend to personal matters. So as I mentioned, I think it's going to take about two hours for me to read through this. So that will take us to about 5:30 or so. And we'll see where we end. And once we're at sidebar, I may inquire what -- I mean, my druthers would be to have them get started at least with the

4194

preliminaries, you know, picking a foreperson and the like and get themselves acclimated as to how they want to proceed, and even if it's just for half an hour, but that's my preference.

Can we bring the jury in?

MR. RICHENTHAL:  Yes, your Honor.  And just, the jury does deliberate on Fridays, correct, for planning purposes?

THE COURT:  Yes, but as I mentioned, unfortunately, because -- I should have explicitly said that, you know, other than deliberations, we'd be sitting Monday through Thursday, and one of the jurors, you know, scheduled a trip for Friday. I don't know whether she's going to try and alter her plans. And it's one of the jurors, not an alternate.  So I don't know whether she's going to try and alter her plans or not.  And that's me talking.  We haven't broached that subject with her or not.  But since she's been sitting here the whole time -- I'm sorry.

So we're going to lose her, it sounds like.

All right.  Can I bring the jury out?  Lose her for Friday, I mean.  So she'll be here --

MR. RICHENTHAL:  Meaning they won't be deliberating? The Court doesn't need to dismiss her.

THE COURT:  I guess that's what I'm going to have to do.  Let me hear from the parties about that, because at the end of the day, I could ask -- I think it was Judge Patterson who did this in a case with me, where he actually kept the

alternates around, but I think in this circumstance, I don't want the jury to feel pressured that they have to somehow come to a verdict tomorrow because they're going to lose somebody. So I would be inclined to, when I excuse the -- well, that I would excuse her, and again, it's Juror No. 12.

MR. RICHENTHAL:  The other possibility, which I assume the Court is disinclined to do, in light of where we are in the calendar, is just have the jury deliberate -- not have the jury deliberate on Friday and just have the jury continue, if it is continuing, on Monday.  We just worry that we're getting tight on numbers; that's all.

THE COURT:  Well, and we have problems next week with jurors having things scheduled, so -- but let me hear from the defense.

MR. PARK:  Judge, just so it's clear, we're talking about Juror 12?

THE COURT:  It's Ms. Valoy, right?

MR. PARK:  That's 11.

THE DEPUTY CLERK:  Oh, she's 11 now.  Sorry.

THE COURT:  Because the alternative would be -- I mean, I guess I would, you know, keep them, but they'd have to begin deliberations again on Friday.  So my preference is that she be excused because, in part, I don't want the jury to feel at all pressured that they have to do something tomorrow, and I also don't want to have a situation where we're bringing the

alternate in after, which is the way the process typically would work, to start deliberations anew.

MR. RICHENTHAL:  I think our preference is to try to not lose a juror if we can avoid it, and therefore, I take it what that means is, if they're still going, that, you know, the Court basically tells them that's fine but you can just keep going on Monday, but if the Court's saying Monday automatically means we lose more, then I --

THE COURT:  Yes, that's what I'm saying.  That's what I'm saying, that early next week we lose people.

MR. RICHENTHAL:  I mean, could the Court keep the alternates on?  I know that's possible.

THE COURT:  You mean keep them here?

MR. RICHENTHAL:  I don't know that they need to physically be here.  They could essentially not be released.

THE COURT:  Well, that's what I typically would do anyway.  In other words, I would say there's a potential that they'll be called back in so they're not to discuss the case until such time as they hear from us, and if they're called back in, the jury would have to begin deliberations anew.

MR. PARK:  Judge, I guess the other option -- and I don't know if this is an option -- is to inquire of Ms. Valoy whether there's really no option for her but to go away.  I mean, it is jury service and clearly an inconvenience, but I just don't know whether it's a flight that she's arranged or

4197

something else.  I mean, we would hate to -- I agree with Mr. Richenthal, losing yet another juror at this point just because she can't sit on Friday seems extreme.

THE COURT:  Although I do think the problem is that, you know, come Monday, I think there are others who have travel plans, and this is what I alluded to when there was the discussion the other day about not breaking up the summations and the like.  I think that early next week, if not Monday, we lose two others, which brings us down to 11.

MR. PARK:  Well, see, it would not be unusual for a trial of this length to go more than two days in deliberations, so I don't know what to say about that, Judge, because, I mean, essentially what we're saying is, we can only allot two more days of deliberations.

THE COURT:  Well, I mean, look, I can inquire.  This was an issue --

MR. PARK:  I understand, Judge.  I mean, I totally understand.  I don't know what the solution is, but, I mean, other than perhaps, you know, as Mr. Richenthal suggests, just figuring out a way to keep the other three alternates actively -- oh, we only have two.

THE COURT:  Two, yes.  And that's part of the issue.

MS. ECHENBERG:  Would it be worth just -- can we just have a few more facts, like what the dates are and who they are?  Are we talking about the alternates that we lose next

week or is it people who are in the 12?

THE DEPUTY CLERK:  So Mr. Zivitz, his apparent last day, which he's Juror No. 6, is going to be Friday.  He has a flight heading out on vacation.  He can't serve after Friday.

MS. ECHENBERG:  Friday.  Okay.  This coming Friday.

THE DEPUTY CLERK:  Yes.  Ms. Clark has vacation plans next week, and Mr. Middleton, who's Juror No. 1, has vacation plans next week.

MS. ECHENBERG:  And when next week?

THE DEPUTY CLERK:  They didn't indicate, but they were just saying that next week they can't.

MR. RICHENTHAL:  I don't think this necessarily solves the problem, but I assume the Court -- and again, we don't want to pressure the jury either -- to basically tell the jury, look, you can start earlier and end later if you like.  In other words, leave it to them without a directive one way or the other.  Maybe they'll say no.

THE COURT:  And I would also suggest, quite frankly, sitting on the weekend.

MR. RICHENTHAL:  If they're willing, we don't have an objection to that.  Again, we don't want to pressure them one way or the other, but if they're willing, that's fine with us.

THE DEPUTY CLERK:  They are willing to stay as late to get it done, but the other issue is that there's a juror that has child care issues, and then there's another juror who's

4199

saying she has to travel far home.

THE COURT:  Okay.  So I mean, look, this is what I would propose, because I'm not sure that it necessarily makes sense to, in essence, lose a day for Ms. Valoy, you know, because it's a full day of deliberations.  And it sounds like Mr. Zivitz and perhaps -- Ms. Williams, do you know, was there another juror who -- I know they have travel plans next week, but we don't know exactly when, is that right?

THE DEPUTY CLERK:  I think someone said that maybe it was the 2nd or 1st or something.  I have to double-check with them because they all kind of --

THE COURT:  Yes, if you could inquire and say also that I'm considering actually allowing them to sit on the weekend to conclude deliberations.

MR. RICHENTHAL:  One other thought.  And I'm just thinking out loud.  I wonder if the juror who your Honor is planning to dismiss so that we don't lose Friday can essentially become an alternate, like not actually be fully released, so if actually they need to start anew deliberating, and indeed they would have to start anew, she would be part of the pool who could be part of the anew.  That strikes me as at least potentially an issue that could arise next week.

THE COURT:  I've never encountered this situation before.  I mean, she is obviously a full-fledged juror.  But the fact that she is going to be missing for a day, you know,

4200

and the alternates would move down, in other words, put her in seat, whatever it is, 13 or 14 and have her on standby to be an alternate.

Let me hear from the defense on that.

I understand the dilemma.

MR. PARK: It's not perfect, but Judge, I think it's a solution.

THE COURT: Yes. And what I may do is -- obviously Ms. Williams is going to -- I may have some comments for them concerning timing and deliberations from here on out, and again, I'm not saying what's going to happen. Obviously we're going to deliberate on Friday.

MR. RICHENTHAL: And I assume your Honor would give sort of standard instructions to anyone who is not fully released to not talk about the case, etc., so there are a pool from which we can select people if we need. I assume the defense wants something about not checking the internet. We wouldn't object to that.

THE COURT: No, it would be as if they're still on the jury; however, not deliberating. What I typically tell the alternates is, please don't discuss the case, the same rules with regard to the internet and otherwise and looking up information applies, and communicating with family members and the like still applies. So that if deliberations go longer and we lose some jurors, we're going to call them back so that we

can continue the deliberations using the alternates, and I will include Ms. Valoy in that group.

MR. PARK:  So Judge, are you contemplating then telling her to move to the back today before they begin deliberating or would this be only if, at the end of tomorrow, they're still deliberating?

THE COURT:  No.  I think -- and again, I'm willing to hear from the parties -- my intention would be to, in part -- because if we wait, then we're starting deliberations again all over on Friday.

MR. PARK:  Right.

THE COURT:  And so there's no other way to avoid that, I think.  And so my inclination would be to dismiss her, dismiss her today, you know, and ask the alternates to move down and explain that we want to maximize the time that the jury has with the case and that Ms. Valoy will be treated as an alternate as the -- I guess she would be Alternate No. 13 or 14, I guess.  14.

Yes, go ahead.

MR. PARK:  Judge, we've conferred, and I think that makes sense, given her schedule, to -- I guess that would mean Mr. Greene comes down and Ms. Valoy goes up?

THE COURT:  And I can do that at any point.  If the parties want me to do that at the beginning, before the charge, I can do that, or wait until after the charge.

MR. PARK:  I think it makes sense to do it before the charge, just so he's more focused and --

THE COURT:  Yes.

MR. RICHENTHAL:  We have no objection, or, frankly, even a position as to when he moves.

THE COURT:  Okay.  All right.  So just so that I -- Ms. Williams.

So what I'm going to do is, Ms. Valoy is going to become Juror No. 13, Alternate Juror No. 13, or should actually technically, I guess -- and I'll hear from the parties, but should we just shift Mr. Lucas down to 13 and Ms. Valoy -- no? Oh, in other words, I can just swap out 11 for 13.

MR. PARK:  That's what we think makes sense.

MR. RICHENTHAL:  The parties just conferred.  We agreed they should just swap.

THE COURT:  All right.  I'll do that.  And at least as far as I know, I've never had this situation happen, so we're in uncharted territory, so --

Okay.  Can we bring the jury out?

MR. RICHENTHAL:  Yes, your Honor.

MR. PARK:  Yes, your Honor.

THE COURT:  So what I intend to say, is, in light of scheduling, I'm going to ask Ms. Valoy to take Seat No. 13 and Mr. Greene to take Seat No. 11.

So they're going to line up that way and I'll just

confirm it on the record.

(Jury present)

THE COURT:  Okay.  You may be seated.

So ladies and gentlemen, this is just to confirm, in light of various scheduling issues -- and I've discussed this with the parties -- Ms. Valoy will take Seat No. 13 and Mr. Greene will take Seat No. 11.  The purpose of that is, I understand that Ms. Valoy has certain plans on Friday that would preclude her from being able to sit on Friday, but we also don't want to lose one of our number, because what I'm going to ask at the conclusion -- and the alternates need to be here until I finish the charge -- is that the alternates remain available, and by that I mean, until you hear from us, Ms. Williams specifically, you're not to discuss the case, not to do internet research, not to -- basically you're going to treat it as if you're still a juror.  You're just not coming to court.  Because it may be that things happen, someone -- if the deliberations continue on into next week, you know, it may be that we'll call you up, and what would happen at that point is the alternate would come in, but the jury would have to begin deliberations anew.  And I'm not saying that this is something that's going to happen.  We're just preparing, planning for the worst, I guess.  And that's the reason why we're taking these steps at this stage.  And I'll give the instruction to the alternates again at the conclusion.  So the alternates will be

Ms. Valoy and Mr. Tammam, okay?

All right.  We're going to begin reading the jury charge.  It's going to be quite long.  Does everybody have a copy of the charge?  It's up to you.  If you follow along, it might be helpful if you do.  I apologize in advance.  I have to pause occasionally perhaps to take a drink of water or something, since it's going to be quite lengthy.  All right?

General Instructions.

Introductory Remarks.

Members of the jury, you have now heard all of the evidence in the case as well as the final arguments of the parties.  It is clear to me that you have paid careful attention to the evidence, and I am confident that you will act together with fairness and with impartiality to reach a just verdict in the case.

Now it is time for me to instruct you as to the law that governs the case.  There are three parts to these instructions.  First, I'm going to give you some general instructions about your role and about how you are to go about deciding the facts of the case.  These instructions really would apply to just about any trial.  Second, I will give you some specific instructions about the legal rules that apply to this particular case.  Third, I will give you some final instructions about procedure you will follow in discussing the case and reaching a verdict.

Listening to these instructions may not be easy. It is important, however, that you listen carefully and concentrate. I ask you for patient cooperation and attention. You will notice that I am reading these instructions from a prepared text. It would be more lively, no doubt, if I just improvised. But it's important that I not do that. The law is made up of words, and those words are very carefully chosen. So when I tell you the law, it's critical that I use exactly the right words.

Each of you have a copy of the jury charge, and you can read along or just listen. It is your choice. You will each take your copy of the charge with you into the jury room to consult. So do not worry if you miss a word or two. But for now, listen carefully and try to concentrate on what I am saying.

Role of the Court.

My duty at this point is to instruct you as to the law. It is your duty to accept these instructions of the law and to apply them to the facts as you determine them. With respect to legal matters, you must take the law as I give it to you. If any attorney has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow. You must not substitute your own notions or opinions of what the law is or ought to be.

C. Role of the Jury.

As members of the jury, you are the sole and exclusive judges of the facts.  You pass judgment upon the evidence.  You determine the credibility of the witnesses.  You resolve such conflicts as there may be in the testimony.  You draw whatever reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence.

Do not conclude from any of my questions, any of my rulings on objections, or anything else I have done during this trial that I have any view as to the credibility of the witnesses or how you should decide the case.

It is your sworn duty, and you have taken an oath as jurors, to determine the facts.  Any opinion I might have regarding the facts is of absolutely no consequence.

D.  Role of Counsel.

It is the duty of the attorneys to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible.  It is my job to rule on those objections.  Therefore, why an objection was made or why I ruled on it the way I did is not your business.  You should draw no inference from the fact that an attorney objects to any evidence.  Nor should you draw any inference from the fact that I might have sustained or overruled an objection.

The personalities and the conduct of counsel in the courtroom are not in any way at issue.  If you formed reactions

of any kind to any of the lawyers in the case, favorable or unfavorable, those reactions should not enter into your deliberations. Similarly, whether you approved or disapproved of their behavior as advocates should not enter into your deliberations.

From time to time, the lawyers and I had conferences out of your hearing or discussions at sidebar. These conferences and sidebar discussions involved procedural and other matters, and none of the events relating to these conferences or sidebar discussions should enter your deliberations at all.

E.  Sympathy or Bias.

Under your oath as jurors, you are not to be swayed by sympathy or prejudice. You are to be guided solely by the evidence in this case, and the crucial, bottom-line question that you must ask yourselves as you sift through the evidence is:  Has the government proven the guilt of the defendant beyond a reasonable doubt?

It is for you alone to decide whether the government has proven the defendant is guilty of the crimes charged and to do so solely on the basis of the evidence and subject to the law as I explain it to you. It must be clear to you that once you let fear or prejudice or bias or sympathy interfere with your thinking, there is a risk that you will not arrive at a true and just verdict.

If you have a reasonable doubt as to the defendant's guilt, you should not hesitate for any reason to find a verdict of acquittal for the defendant. But on the other hand, if you find that the government has met its burden of proving the defendant's guilt beyond a reasonable doubt, you should not hesitate because of sympathy or any other reason to render a verdict of guilty for the defendant.

The question of possible punishment of the defendant is of no concern to the jury and should not enter into or influence your deliberations. The duty of imposing a sentence rests exclusively upon me. Your function is to weigh the evidence in the case and to determine whether or not the defendant is guilty beyond a reasonable doubt solely on the basis of such evidence. Under your oath as jurors, you cannot allow a consideration of the punishment that may be imposed upon the defendant if he is convicted to influence your verdict in any way or in any sense enter into your deliberations.

Similarly, it would be improper for you to allow any feelings you might have about the nature of the crimes charged to interfere with your decision-making process. Your verdict must be based exclusively upon the evidence or lack of evidence in the case.

F.   All Persons Equal Before the Law.

In reaching your verdict, you must remember that all parties stand equal before a jury in the courts of the United

States.  The fact that the government is a party and the prosecution is brought in the name of the United States does not entitle the government or its witnesses to any greater consideration than that accorded to any other party.  By the same token, you must give it no less deference.  The government and the defendant stand on equal footing before you.

It would be improper for you to consider, in reaching your decision as to whether the government sustained its burden of proof, any personal feelings you may have about the defendant's race, national origin, sex, or age.  Similarly, it would be improper for you to consider any personal feelings you may have about the race, national origin, sex, or age of any witness or anyone else involved in this case.  All persons are entitled to the same presumption of innocence, and the government has the same burden of proof with respect to all persons.  Your verdict must be based solely on the evidence or lack of evidence.

G.  Presumption of Innocence; Burden of Proof; Reasonable Doubt.

Now I will instruct you on the presumption of innocence and the government's burden of proof in this case. The defendant has pleaded not guilty.  By doing so, he denies the charges in the indictment.  Thus, the government has the burden of proving the charges against him beyond a reasonable doubt.  A defendant does not have to prove his or her

innocence.  On the contrary, he or she is presumed to be innocent of the charges contained in the indictment.  This presumption of innocence was in the defendant's favor at the start of the trial, continued in his favor throughout the entire trial, and is in his favor even as I instruct you now, and continues in his favor during the course of your deliberations in the jury room.

It is removed if, and only if, you, as members of the jury, are satisfied that the government has sustained its burden of proving the guilt of the defendant beyond a reasonable doubt.

The question that naturally comes up is -- what is a reasonable doubt?  The words almost define themselves.  It is a doubt founded in reason and arising out of the evidence in the case, or the lack of evidence.  It is a doubt that a reasonable person has after carefully weighing all of the evidence.  Reasonable doubt is a doubt that appeals to your reason, your judgment, your experience, your common sense.

If, after a fair and impartial consideration of all of the evidence, you are not satisfied of the guilt of the defendant, if you do not have an abiding conviction of the defendant's guilt -- in sum, if you have such a doubt as would cause you, as prudent persons, to hesitate before acting in matters of importance to yourselves -- then you have a reasonable doubt, and in that circumstance, it is your duty to

acquit the defendant.

On the other hand, if, after a fair and impartial consideration of all of the evidence, you do have an abiding belief of the defendant's guilt, such a belief as you would be willing to act upon without hesitation in important matters in the personal affairs of your own life, then you have no reasonable doubt, and under such circumstances, it is your duty to convict the defendant.

One final word on this subject.  Reasonable doubt does not mean beyond all possible doubt.  It is practically impossible for a person to be absolutely and completely convinced of any disputed fact which by its nature is not susceptible of mathematical certainty.  Consequently, the law in a criminal case is that it is sufficient if the guilt of a defendant is established beyond a reasonable doubt, not beyond all possible doubt.

The government is not required to prove the essential elements of the offenses by any particular number of witnesses. The testimony of a single witness may be sufficient to convince you beyond a reasonable doubt of the existence of the essential elements of the offenses you are considering if you believe that the witness has truthfully and accurately related what he or she has told you.  I will provide you with specific instructions later related to cooperating witnesses and witnesses who received immunity.

H.    What Is and Is Not Evidence.

In determining the facts, you must rely upon your own recollection of the evidence.  The evidence in this case is the sworn testimony of the witnesses, the exhibits received in evidence, and the stipulations of the parties.

However, testimony that I have stricken or excluded is not evidence and may not be considered by you in rendering your verdict.

The only exhibits that are evidence in this case are those that were received in evidence.  Exhibits marked for identification but not admitted are not evidence.  Nor are materials that were used only to refresh a witness' recollection.

As I told you at the start of this case, statements and arguments by the lawyers are not evidence, because the lawyers are not witnesses.  Similarly, demonstratives used by the lawyers during their openings or summations are not evidence.  What they have said to you in their opening statements and in their summations is intended to help you understand the evidence to reach your verdict.  However, if your recollection of the facts differs from the lawyers' statements, it is your recollection that controls.

For the same reasons, you are not to consider a lawyer's questions as evidence.  It is the witness' answers that are evidence, not the questions.

Finally, any statements that I may have made do not constitute evidence. It is for you alone to decide the weight, if any, to be given the testimony you have heard and the exhibits you have seen.

I.  Evidence Not Admitted for the Truth.

During this trial, you have heard that some evidence was admitted for a limited purpose -- namely, not as evidence of the truth of the matters asserted in that evidence. This means that you cannot use the statements contained in that evidence as proof of the facts asserted in that evidence. You may only consider this evidence for the purpose for which this evidence was admitted, for example, but not limited to, the witness's state of mind or knowledge, the defendant's state of mind or knowledge, background, or context.

You will receive a list of evidence that was admitted not for the truth of the matters asserted.

J.  Direct and Circumstantial Evidence.

Generally, there are two types of evidence that you may consider in reaching your verdict. One type of evidence is direct evidence. Direct evidence is testimony by a witness about something he or she knows by virtue of his or her own senses -- something he or she has seen, felt, touched, or heard. For example, if a witness testified that when she left the house this morning, it was raining, that would be direct evidence about the weather.

Circumstantial evidence is evidence from which you may infer the existence of certain facts. For example, assume that when you came into the courthouse this morning, the sun was shining and it was a nice day. Assume that the courtroom blinds were drawn and you could not look outside. As you were sitting here, someone walked in with an umbrella, which was dripping wet. Then a few minutes later, another person entered with a wet raincoat. Now you cannot look outside of the courtroom and you cannot see whether or not it is raining, so you have no direct evidence of that fact. But on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to conclude that it had been raining.

That is all there is to circumstantial evidence. You infer on the basis of reason, experience, and common sense from one established fact, the existence or nonexistence of some other fact.

As you can see, the manner of drawing inferences from facts in evidence is not a matter of guesswork or speculation. An inference is a logical, factual conclusion that you might reasonably draw from other facts that have been proven. Many material facts, such as what a person was thinking or intending, can rarely be proved by direct evidence.

Circumstantial evidence is as valuable as direct evidence. The law makes no distinction between direct and

circumstantial evidence but simply requires that before convicting a defendant, the jury must be satisfied of the defendant's guilt beyond a reasonable doubt, based on all of the evidence in the case -- circumstantial and direct.

There are times when difference inferences may be drawn from the evidence.  The government asks you to draw one set of inferences; the defendant asks you to draw another.  It is for you, and for you alone, to decide what inferences you will draw.

K.  Stipulations.

In this case you have heard evidence in the form of two types of stipulations.

A testimonial stipulation is an agreement among the parties that, if called, a witness would have given certain testimony.  You must accept as true that had the witness testified, he or she would have given the stipulated testimony. However, it is for you to determine the effect or weight to be given that testimony.

In this case you have also heard evidence in the form of stipulations of fact.  A stipulation of fact is an agreement between the parties that a certain fact or set of facts is true.  You must accept such facts as true.  However, it is for you to determine the effect to be given to any stipulated fact.

L.  Witness Credibility.

You have had an opportunity to observe the witnesses.

4216

It is now your job to decide how believable each witness was in his or her testimony.  You are the sole judges of the credibility of each witness and of the importance of his or her testimony.

(Continued on next page)

You should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, the impression the witness made when testifying, the relationship of the witness to the controversy and the parties, the witness's bias or impartiality, the reasonableness of the witness's statement, the strength or weakness of the witness's recollection viewed in light of all other testimony, and any other matter in evidence that may help you decide the truth and the importance of each witness's testimony.

In other words, what you must try to do in deciding credibility is to size up a witness in light of his or her demeanor, the explanations given, and all of the other evidence in the case. You should use your common sense, your good judgment, and your everyday experiences in life to make your credibility determinations.

In deciding the credibility of a witness, you may also take into account any inconsistencies or contradictions as to material matters in his or her testimony. If you find that any witness has willfully testified falsely as to any material fact, you have the right to reject the testimony of that witness in its entirety.

On the other hand, even if you find that a witness has testified falsely on one matter, you may reject as false that portion of his or her testimony and accept as true any other portion of the testimony that you believe or that you may find

corroborated by other evidence in this case.  The witness may be inaccurate, contradictory, or even untruthful in some aspects, and yet be truthful and entirely credible in other aspects of his or her testimony.

The ultimate question for you to decide in passing upon credibility is did the witness tell the truth before you? It is for you to say whether his or her testimony at this trial is truthful in whole or in part.

M. Bias of Witnesses.

In deciding whether to believe a witness, you should specifically note any evidence of hostility or affection that the witnesses may have towards one of the parties.  Likewise, you should consider the evidence of any other interest or motive that the witness may have in cooperating with a particular party.  You should also take into account any evidence of any benefit that a witness may receive from the outcome of the case.

It is your duty to consider whether the witness has permitted any such bias or interest to color his or her testimony.  In short, if you find that a witness is biased, you should view his or her testimony with caution, weigh it with care, and subject it to close and searching scrutiny.

Of course, the mere fact that a witness is interested in the outcome of the case does not mean that he or she has not told the truth.  It is for you to decide from your observations

and by applying your common sense, experience, and all of the other considerations mentioned whether the possible interest of any witness has intentionally or otherwise colored or distorted his or her testimony.

You are not required to disbelieve any interested witness. You may accept as much of his or her testimony as you deem reliable and reject as much as you deem untrustworthy of acceptance.

N. Law Enforcement Witnesses.

You have heard the testimony of law enforcement officials. The fact that a witness may be employed as a law enforcement official does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or less weight than that of an ordinary witness.

At the same time, it is quite legitimate for defense counsel to try to attack the credibility of a law enforcement witness on the grounds that his or her testimony may be colored by a personal or professional interest in the outcome of the case. It is your decision, after reviewing all of the evidence, whether to accept the testimony of a law enforcement witness and to give that testimony whatever weight, if any, you find it deserves.

O. Use of Evidence Obtained Pursuant to Search.

You have heard testimony about evidence seized in searches conducted by law enforcement officials and you have

seen some of that evidence.  Evidence obtained from these searches was properly admitted in this case and may be properly considered by you.  Whether you approve or disapprove of how it was obtained should not enter into your deliberations because I now instruct you that the use of this evidence is entirely lawful.  You must therefore, regardless of your personal opinions, give this evidence full consideration along with all of the other evidence in the case in determining whether the government has proved the defendant's guilt beyond a reasonable doubt.

P.  Specific Investigative Techniques Not Required.

During the trial you have heard reference to the fact that certain investigative techniques were or were not used by law enforcement authorities.  You may consider these facts in deciding whether the government has met its burden of proof because, as I told you, you should look at all of the evidence or lack of evidence in deciding whether the defendant is guilty.

However, you are also instructed that there is no legal requirement that the government use any of these specific investigative techniques to prove its case.  Whether you approve or disapprove of various law enforcement techniques or whether you might have chosen to use or not use any particular techniques is not the question.  Your concern, as I have said, is to determine whether or not on the evidence or lack of

evidence the defendant's guilt has been proven beyond a reasonable doubt.

Q.  Persons Not on Trial or Not Indicted.

Some of the people who may have been involved in the events leading to this trial are not on trial.  This does not matter.  There is no requirement that all members of a charged conspiracy be charged and prosecuted or tried together in the same proceeding.  You may not draw any inference, favorable or unfavorable, towards the government or the defendant from the fact that certain persons were not named as defendants in the indictment.  Nor may you speculate as to the reasons why other persons are not on trial.  Those matters are wholly outside your concern and have no bearing on your function as jurors.

Whether a person should be named as a co-conspirator or indicted as a defendant in this case or another separate case is a matter within the sole discretion of the United States Attorney and the grand jury.  Therefore, you may not consider it in any way in reaching your verdict as to the defendant.

R.  Defendant's Right Not to Testify.

Under our Constitution a defendant has no obligation to testify or to present any evidence because it is the government's burden of proving a defendant guilty beyond a reasonable doubt.  A defendant is never required to prove that he or she is innocent.  Therefore, you must not attach any

significance to the fact that a given defendant did not testify.  No adverse inference against a defendant may be drawn by you because he or she did not take the witness stand, and you may not consider or discuss it in any way in your deliberations in the jury room.

II.  Substantive Instructions.

I will now turn to my instructions to you relating to the charges brought against the defendant in this case.

A.  The Indictment.

The defendant is formally charged in an indictment. As I instructed you at the outset of this case, the indictment is merely a charge or accusation.  It is not evidence and does not prove or even indicate guilt.  As a result, you are to give it no weight in deciding the defendant's guilt or lack of guilt.  What matters is the evidence you have heard at this trial.  Indeed, as I have previously noted, the defendant is presumed innocent and it is the prosecution's burden to prove the defendant's guilt beyond a reasonable doubt.

B.  Summary of the Indictment.

The indictment contains six counts against the defendant.  Count One alleges that the defendant, together with others known and unknown, from in or about 2011 until in or about September 2015 engaged in a conspiracy, or agreement, to pay bribes or illegal gratuities to agents of the United Nations referenced in the indictment as the Antiguan

ambassador, John Ashe, and the Dominican ambassador, Francis Lorenzo, and to violate the Foreign Corrupt Practices Act, or the FCPA.

Count Two alleges that the defendant, from in or about 2011 until in or about September 2015, committed the crime of paying bribes or illegal gratuities.

Counts Three and Four allege that the defendant, from in or about 2011 until in or about September of 2015, violated the Foreign Corrupt Practices Act.

Count Five alleges that the defendant, together with others known and unknown, from in or about 2011 up till in or about September 2015, engaged in a conspiracy to commit money laundering.

Count Six alleges that the defendant, from in or about 2011 until in or about September 2015, committed the crime of money laundering.

C. Count One.

As I said, Count One charges the defendant with participating in a conspiracy or agreement to pay bribes or illegal gratuities to agents of the United Nations and to violate the Foreign Corrupt Practices Act. This means than Count One charges the defendant with participating in a conspiracy to violate the law as charged in Counts Two, Three, and Four of the indictment, which will be more fully explained later.

Conspiracy.

A conspiracy is a kind of criminal partnership, a combination or agreement of two or more persons to join together to accomplish some unlawful purpose.  The crime of conspiracy to violate the federal law, in this instance to pay bribes or illegal gratuities and violate the Foreign Corrupt Practices Act, is an independent offense.

The essence of the crime of conspiracy is an agreement or understanding to violate other laws.  It is separate and distinct from the crime that is the objective of the conspiracy, and it is separate and distinct from the actual violation of any specific federal law which the law refers to as substantive offenses.

Thus, in considering a conspiracy charge, you do not have to find that the actual substantive crime that is the object of the conspiracy was committed, here the payment of bribes or illegal gratuities and violation of the Foreign Corrupt Practices Act.  In other words, you may find the defendant guilty of a conspiracy even if the conspiracy was not successful.  It is the agreement itself, the agreement with others to commit the crime, along with the other elements of conspiracy that the law forbids and defines as a crime.

1.  Count One: Elements of the Offense.

In order for you to find the defendant guilty of the conspiracy as charged in Count One, you must find that the

government has proven beyond a reasonable doubt the following four essential elements:

First, that two or more persons entered into the unlawful agreement charged in the indictment to pay bribes or illegal gratuities or to violate the Foreign Corrupt Practices Act;

Second, that the defendant knowingly and willfully became a member of the conspiracy, that is, that he knowingly participated in the conspiracy to pay bribes or gratuities or to violate the Foreign Corrupt Practices Act, with knowledge of the conspiracy's objectives and with intent to further the aims of the conspiracy;

Third, that one of the members of the conspiracy knowingly committed at least one overt act; and

Fourth, that the overt act or acts that you find to have been committed were committed to further some objective of the conspiracy.

I will explain each of those elements more later on in my instructions.

Count One: First Element: Existence of an Unlawful Agreement.

The first element that the government must prove beyond a reasonable doubt is the existence of the conspiracy. Simply defined, a conspiracy is an agreement or an understanding by two or more persons to violate the law, here

to pay bribes or illegal gratuities or to violate the Foreign Corrupt Practices Act. The essence of the crime is the unlawful combination or agreement to violate the law.

To establish the existence of a conspiracy, the government is not required to show that two or more persons sat around a table and entered into a solemn compact orally or in writing stating that they have formed a conspiracy to violate the law and setting forth the details of the plans and means by which the unlawful project is to be carried out or the part to be played by each conspirator.

When people undertake to enter into a criminal conspiracy, they may do so with an unexpressed understanding. Express language or specific words are not required to indicate assent or attachment to a conspiracy. Nor is it required that you find that any particular number of alleged co-conspirators joined in the conspiracy in order to find that a conspiracy existed. You need only find that the defendant entered into this unlawful agreement alleged in the indictment with one or more other persons in order to find that the conspiracy existed.

In determining whether there has been an unlawful agreement, you may judge the acts and conduct of the alleged co-conspirators that are done to carry out an apparent criminal purpose. The adage "actions speak louder than words" is applicable here. Indeed, it is often true that the only

evidence that is available with respect to the existence of a conspiracy is that of disconnected acts on the part of the alleged individual co-conspirators.  When taken all together and considered as a whole, however, that conduct may warrant the inference that a conspiracy existed just as conclusively as more direct proof, such as evidence of an express agreement.

In considering whether a conspiracy exited, you should consider all of the evidence that has been admitted with respect to the conduct and statements of each alleged co-con- spirator and any inferences that may be reasonably drawn from that conduct and those statements.

If, upon consideration of all of the evidence, direct and circumstantial, you find beyond a reasonable doubt that the minds of two or more of the conspirators met, that is, they agreed as I explained a conspiracy to you, to work together to violate the laws as alleged in the indictment, then the government has proved the existence of the conspiracy.  If, on the other hand, you find that the government has not proved that the minds of two or more conspirators met, then the government has not proved the existence of the conspiracy.

Count One: First Element: Object of the Conspiracy.

Let us talk about the object of the conspiracy.  As I said, in order to find the defendant guilty of the conspiracy charged in the indictment, you must find that the government has also met its burden of proof with respect to what it is

charged or asserted was the object of the conspiracy.  The object of a conspiracy is the unlawful goal that co-conspirators agree or hope to achieve.  In other words, in order to find that the defendant is guilty of the conspiracy charged in Count One you must find that he and at least one other person agreed to violate the law as charged in Counts Two, Three, and Four, and as laid out in further detail below.

If the government fails to prove that at least one of these three objectives was an object of the conspiracy in which the defendant participated, then you must find the defendant not guilty of Count One.  On the other hand, the government need not prove all three of those were objectives of the conspiracy for you to find the defendant guilty of the conspiracy count.  It is sufficient if you find beyond a reasonable doubt that the defendant committed one of the three objectives in order to convict the defendant on the conspiracy count.

However, in order to convict the defendant on this count, all 12 of you must agree on the specific objective or objectives that the defendant agreed to try to accomplish.  If you cannot unanimously agree on at least one particular objective for the conspiracy, then you must find the defendant not guilty of Count One.

4.  Count One: Second Element: Knowing Membership in Conspiracy.

Let me now turn to the second element.  If you conclude that the government has proven beyond a reasonable doubt that the conspiracy charged in Count One of the indictment existed, then you must next determine the second question: whether the defendant knowingly, willfully, and intentionally joined the conspiracy.

The government must prove beyond a reasonable doubt that the defendant knowingly, willfully, and intentionally entered into the conspiracy with a criminal intent, that is, with an awareness of the generally unlawful nature of the facts, and that the defendant agreed to take part in the conspiracy to promote and cooperate in its unlawful objective or objectives.  The defendant need not have known which specific law or rule his acts violated in order to be aware that his acts were unlawful.

An act is done "knowingly" and "intentionally" if it is done deliberately and purposefully.  That is, the defendant's acts must have been the product of the defendant's conscious objective rather than the product of a mistake or exhibit or mere negligence or some other innocent reason.

Now, science has not yet devised a manner of looking into a person's mind and knowing what that person is thinking.  However, you do have before you evidence of certain acts, physical items, and conversations.  The government contends that these acts, items, and conversations show beyond a

reasonable doubt the defendant's knowledge of the unlawful purpose of the conspiracy.  The defendant denies that he was a member of the conspiracy.  It is for you to determine whether the government has established to your satisfaction and beyond a reasonable doubt that such knowledge and intent on the part of the defendant existed.

It is not necessary for the government to show that the defendant was fully aware of every detail of the conspiracy, nor is it necessary for a defendant to know every other member of the conspiracy.  In fact, the defendant may know only one other member of the conspiracy and still be a co-conspirator.

Neither is it necessary for the defendant to receive any monetary benefit from participating in the conspiracy or to have a financial stake in the outcome as long as he in fact participated in the conspiracy knowingly and intentionally as I have defined those terms, with knowledge of its object or objects and with the intent to further that object or objects.

The duration and extent of the defendant's partici-pation in the conspiracy has no bearing on the issue of the defendant's guilt.  He need not have joined the conspiracy at the outset.  He may have joined it at any time in its progress, and he will still be held responsible for all that was done before he joined and all that was done during the conspiracy's existence while he was a member.

Each member of a conspiracy may perform separate and distinct acts and may perform them at different times.  Some conspirators play major roles while others play minor roles.  An equal role is not what the law requires.  Even a single act may be sufficient to draw a defendant within the scope of the conspiracy.

However, I want to caution you that a person's mere association with a member of a conspiracy does not make that person a member of the conspiracy even when that association is coupled with knowledge that a conspiracy exists.  Similarly, I want to caution you that mere presence at the scene of a crime, even coupled with knowledge that a crime is taking place, is not sufficient to support a conviction.

Mere knowledge without agreement and participation is not sufficient.  A person may know or be friendly with a criminal without being a criminal himself.  Moreover, the fact that the acts of the defendant without knowledge merely happened to further the purposes or objectives of the conspiracy does not make the defendant a member.  Mere similarity of conduct or the fact that they may have assembled together and discussed the common aims and interests does not necessarily establish membership in a conspiracy.  More is required under the law.

What is necessary is that the defendant participated in the conspiracy with knowledge of its unlawful purpose and

went to aid in the accomplishment of its unlawful objective or objectives.

In sum, the defendant, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised, or assisted in it for the purpose of furthering the illegal undertaking.  He therefore becomes a knowing and willing participant in the unlawful agreement, that is to say, a conspirator.

A conspiracy, once formed, is presumed to continue until either its objective is accomplished or there is some affirmative act of termination by its members.  So, too, once a person is found to be a member of a conspiracy, he is presumed to continue his membership in the venture until its termination unless it is shown by some affirmative proof that he withdrew and disassociated himself from it.

Count One: Third Element: Commission of an Overt Act.

The third element that the government must prove beyond a reasonable doubt to establish the offense of conspiracy is that at least one overt act was knowingly committed by at least one of the conspirators within the time period alleged in the indictment.  The indictment charges the following overt acts were committed in the Southern District of New York and elsewhere.  I am now reading from the indictment.

A.  Starting in or about May 2011 and continuing into in or about March 2015, Ng Lap Seng, a/k/a David Ng, a/k/a Wu

Liseng, the defendant, caused NGO-1 to make regular payments to John Ashe's wife.

B.  On or about February 24th, Antiguan ambassador aided by the Dominican ambassador submitted the UN document to the UN secretary-general.

C.  On or about February 5, 2013, Ng and Jeff C. Yin, a/k/a Jeff Chuan, a/k/a Yin Chuan, transmitted or caused to be transmitted approximately $60,000 from a bank account of Ng in Macau, China, to the Dominican company.

D.  On or about June 5, 2013, Antiguan ambassador aided by the Dominican ambassador submitted a formal revision to the UN document identifying the Macau Real Estate Development Company as a partner in the Macau conference center project.

E.  On or about November 19, 2013, Yin sent an email to the Dominican ambassador stating that Ng was "unsatisfied" and the "wire will be on halt until any further progress is made" on the Macau convention center project.

F.  In or about March 2014, Antiguan ambassador and the Dominican ambassador traveled to China and met with Ng and Yin regarding the Macau conference center project.

G.  On or about June 3, 2014, Ng and Yin caused NGO-1 to transmit approximately $200,000 to one of the PGA accounts.

In order for the government to satisfy this element, it is not required that all of the overt acts alleged in the

indictment be proven.  Indeed, you need not find that the government has proven one of the specific overt acts alleged in the indictment, but only that the government has proven an overt act within the time period alleged in the indictment. Similarly, you need not find that the defendant in this case committed the overt act.

It is sufficient for the government to show that one of the conspirators knowingly committed an overt act in furtherance of the conspiracy since such an act becomes in the eyes of the law the act of all the members of the conspiracy. You also need not reach unanimous agreement on which particular overt act was committed in furtherance of the conspiracy.

You are further instructed that the overt act need not have been committed at precisely the time alleged in the indictment.  It is sufficient if you are convinced beyond a reasonable doubt that it occurred at or about the time and place stated so long as it occurred while the conspiracy was still in existence.

Finally, you must find that either the agreement was formed or an overt act was committed in the Southern District of New York.  The Southern District of New York includes Manhattan, the Bronx, and Westchester, Rockland, Putnam, Dutchess, Orange, and Sullivan Counties.

6.  Count One: Fourth Element: Commission of an Overt Act in Furtherance of the Conspiracy.

The fourth and final element that the government must prove beyond a reasonable doubt is that the overt act was committed for the purpose of carrying out the unlawful agreement.  In order to satisfy this element, the government must prove beyond a reasonable doubt that at least one overt act was knowingly and willfully done by at least one conspirator in furtherance of some object or purpose of the conspiracy as charged in the indictment.

In this regard you should bear in mind that the overt act standing alone may be an innocent, lawful act.  Frequently, however, an apparently innocent act sheds its harmless character if it is a step in carrying out, promoting, aiding, or assisting the conspiratorial scheme.  You are therefore instructed that the overt act does not have to be an act which in and of itself is criminal or constitutes an objective of the conspiracy.

7.  Count One: Conscious Avoidance: Deliberately Closing Eyes.

In determining whether the defendant acted knowingly with respect to the object or objects of the conspiracy, you may consider whether the defendant deliberately closed his eyes to what would otherwise have been obvious to him.

If you find beyond a reasonable doubt that the defendant was aware that there was a high probability that his co-conspirators' objective was to violate the law as charged in

Counts Two, Three, and and/or Four but that the defendant deliberately avoided confirming this fact, you may treat this deliberate avoidance of positive knowledge as the equivalent of knowledge of the object of the charged conspiracy.  However, if you find that the defendant actually believed that he or his co-conspirators were acting in a lawful manner, he may not be convicted of the charge in Count One.

Moreover, guilty knowledge may not be established by demonstrating that the defendant was merely negligent, foolish, or mistaken.  There is a difference between knowingly partici-pating in the conspiracy and knowing the objects of the conspiracy.  "Conscious avoidance" or "willful blindness" as I have described it cannot be used as a basis for finding that the defendant knowingly joined the conspiracy.  It is logically impossible for a defendant to join the conspiracy unless he or she knows the fact that the conspiracy exists.

However, if you find beyond a reasonable doubt that the defendant chose to participate in a joint undertaking, you may consider whether the defendant deliberately avoided confirming an otherwise obvious fact: that the purpose of the partnership he joined was to violate the law as charged in Counts Two, Three, and/or Four.

8.  Count One: Acts and Declarations of Co-conspirators.

When people enter into a conspiracy to accomplish an

unlawful end, each and every member becomes an agent for the other conspirators in carrying out conspiracy.  Accordingly, the reasonably foreseeable acts, declarations, statements, and omissions of any member of the conspiracy and in furtherance of the common purpose of the conspiracy are deemed under the law to be acts of all the members and all of the members are responsible for such acts, declarations, statements, and omissions.

If you find beyond a reasonable doubt that the defendant was a member of the conspiracy charged in the indictment, then any acts done or statements made in further-ance of the conspiracy by persons also found by you to have been members of that conspiracy may be considered against the defendant.  This is so even if such acts were done and state-ments made in the defendant's absence and without his know-ledge.

However, before you may consider the statements or acts of a co-conspirator in deciding the issue of the defend-ant's guilt, you must first determine that the acts and state-ments were made during the existence and in furtherance of the unlawful scheme.  If the acts were done or the statements made by someone whom you do not find to have been a member of the conspiracy, or if they were not done or said in furtherance of the conspiracy, they may be considered by you as evidence only against the member who said or did that.

9.    Count One: Time of the Conspiracy.

The indictment charges that the conspiracy charged in Count One existed from at least in or about 2011 up to and including in or about September 2015.  It is not essential that the government prove that the conspiracy charged in Count One started and ended on the exact date set forth in the indictment.  Indeed, it is sufficient if you find that in fact a conspiracy was formed and that it existed for some of the time within the period set forth in the indictment.  The law only requires a substantial similarity between the dates alleged in the indictment and the dates established by testimony or exhibits.

D.    Count Two: Indictment and Offense.

The indictment charges the defendant with paying bribes to Ambassador John Ashe and Ambassador Francis Lorenzo for the purpose of obtaining official action for the benefit of the defendant and his company as opportunities arose by John Ashe and Francis Lorenzo, and for the purpose of having John Ashe and Francis Lorenzo influence, exert pressure on, and advise other UN officials and diplomats, intending for those officials and diplomats to take official action as opportunities arose to advance the interests of the defendant and his company.  It also charges the defendant with paying illegal gratuities to reward John Ashe's and Francis Lorenzo's efforts to take and influence other UN officials and diplomats

to take official action for the benefit of the defendant and his company.

1.  Count Two: Elements of the Bribery Offense.

In order to prove the defendant guilty of bribery relating to an organization or government that receives federal funds, the government must prove each of the following elements beyond a reasonable doubt:

First, at the time alleged in the indictment John Ashe or Francis Lorenzo was an agent of an organization that received federal funds, here the United Nations;

Second, that in a one-year period the United Nations received federal benefits in excess of $10,000;

Third, that the defendant gave or agreed to give or offered something of value to this agent of the United Nations;

Fourth, that the defendant acted corruptly with respect to a transaction of the United Nations;

Fifth, that the defendant acted with the intent to influence this agent of the United Nations with respect to a transaction of the United Nations; and

Sixth, that the value of the transaction to which the payment related was at least $5,000.

2.  Count Two: First Bribery Element: Recipient Was Agent of Organization.

the first element that the government must prove beyond a reasonable doubt is that at one or more times between

in or about 2011 and in or about September 2015, John Ashe or Francis Lorenzo was an agent of the United Nations. An "agent" is a person authorized to act on behalf of another person, organization, or government. Employees, partners, directors, officers, managers, and representatives are all agents of the organization or government with which they are associated.

If you unanimously agree that at one or more times between in or about 2011 and in or about September 2015 both John Ashe and Francis Lorenzo were agents of the United Nations, this element is satisfied. If you cannot unanimously agree that both John Ashe and Francis Lorenzo were agents of the United Nations, this element may be satisfied if you all agree that either John Ashe or Francis Lorenzo was an agent of the United Nations. If you cannot unanimously agree on one person in particular, then this element has not been met and you must find the defendant not guilty of Count Two.

3. Count Two: Second Bribery Element: Organization or Government Received Federal Funds in Excess of $10,000.

The second element the government must prove beyond a reasonable doubt is that in a one-year period the United Nations received federal benefits in excess of $10,000. To prove this element the government must establish that the United Nations received during the one-year period benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or some other

form of federal assistance. This does not include legitimate, valid, and bona fide salary, wages, fees, or other compensation paid or expenses paid or reimbursed in the ordinary course of business.

I also instruct you that there is a federal statute of the United States, specifically the United Nations Participation Act, 22 U.S.C. section 287(e), which authorizes the payment of the United States due to the United Nations and can be considered to establish both a federal program and a benefit program within the meaning of section 666. The one-year period must begin no more than 12 months before the defendant committed the acts charged in the indictment and must end no more than 12 months after those acts.

4. Count Two: Third Bribery Element: Defendant Gave, Agreed to Give, or Offered Something of Value.

The third element the government must prove beyond a reasonable doubt is that the defendant gave or agreed to give or offered something of value to the agent or agents of the United Nations as I have defined that term. The statute makes no distinction between offering or giving a bribe. The mere offer of a bribe is just as much a violation of the statute as the actual giving of one. It is not necessary that the payment be made directly to the agent. If the payment was made to a third party for the purpose of bribing the agent, that is sufficient to satisfy this element. The statute does not apply

to bona fide salary, wages, fees, or compensation paid or expenses paid or reimbursed in the usual course of business.

5. Count Two: Fourth Bribery Element: Defendant Acted Corruptly in Connection with Transaction.

The fourth element the government must prove beyond a reasonable doubt that the defendant gave or agreed to give or offered something of value to the agent or agents knowingly and corruptly in connection with some business or transaction of the United Nations. To act corruptly means simply to act voluntarily and intentionally with an improper motive or purpose to influence or reward John Ashe's and/or Francis Lorenzo's actions. This requires conscious wrongdoing or, as has sometimes been expressed, a bad or evil state of mind.

6. Count Two: Fifth Bribery Element: Defendant Acted with Intent to Influence in Connection with Transaction.

The fifth element the government must prove beyond a reasonable doubt is that the defendant gave or agreed to give or offered something of value to the agent with the intent to influence the agent's actions in connection with some sort of business transaction of the United Nations. As I will discuss further below, this is different from the intent to reward the agent's acts, which relates to the payment of illegal gratuities.

In considering this element, remember that it is the defendant's intent, at least in part, to influence the agent's

actions that is important, not the subsequent actions of the agent or the United Nations. Thus, the government does not have to prove that the agent accepted the bribe offer and that the bribe actually influenced a final decision of the United Nations.

Additionally, it is not necessary that the agent had the authority to perform the act that the defendant sought. Bribery requires a specific intent to give or receive something of value in exchange for an official act. For bribery there must be a quid pro quo, a specific intent to give or receive something of value at least in part in exchange for the promise or performance of official action by the agent.

Official Act.

In describing bribery, I refer to the intent to give or receive something of value in exchange for an official act. The government must prove that the defendant acted with the intent to obtain "an official act" from the agent or agents of the United Nations to whom he gave or agreed to give or offered something of value.

An official act is a decision or action that must involve a formal exercise of power. It also must be specific and focused on something that is pending or may by law or rule be brought before the agent. The decision or action may include using the agent's official position to exert pressure on another official to perform an official act or to advise

another official, knowing or intending that such advice will form the basis for an official act by another official.

Expressing support for an idea, setting up a meeting, talking to another official, or organizing an event or agreeing to do so without more does not fit that definition of official act. This is not to say that expressing support for an idea, setting up a meeting, hosting an event, or making a phonecall is always an innocent act or is irrelevant. These actions could serve as evidence of (1) an agreement to take an official act, (2) an attempt to use the agent's official position to exert pressure on another official to perform an official act, or (3) an attempt to advise another official knowing or intending that such advice will form the basis of an official act by another official.

7. Count Two: Sixth Bribery Element: Value of Transaction.

The sixth element the government must prove beyond a reasonable doubt is that the value of the transaction to which the payment related was at least $5,000. To establish this element, the government must prove that the defendant intended to influence John Ashe or Francis Lorenzo in connection with any business or transaction or series of transactions of the United Nations involving anything of value of $5,000 or more. If you find that the business or transaction in question had a value of at least $5,000, this element is satisfied.

The government is not required to prove that the defendant paid or offered at least $5,000.  It is the value of the business or transaction that the bribe was intended to influence that is important for purposes of this element.  In determining whether the business or transaction was valued at $5,000, do not include legitimate bona fide salary, wages, fees, or other compensation paid or expenses paid or reimbursed in the ordinary course of business.

Payment to the PGA Account.

You have heard evidence relating to a payment made to a bank account held in the name of the office of the president of the General Assembly.  A payment through the president of the General Assembly account, defined as the PGA account, does not in itself and without more constitute a violation of federal law.

However, if you find that the defendant made a payment through the PGA account in exchange for an explicit promise or undertaking from John Ashe to perform a specific official act, then that is sufficient to find the defendant guilty of this count regardless of the fact that a payment was made to the PGA account, assuming that the other elements have been met.

8.  Count Two: Elements of the Illegal Gratuities Offense.

I have just given you instructions concerning the elements the government must prove beyond a reasonable doubt in

order for you to find the defendant guilty of bribery for purposes of Count Two.  However, Count Two also charges the defendant with paying illegal gratuities in addition to bribes.

If you find that the government has not proven the elements of bribery beyond a reasonable doubt with respect to the defendant, then you must consider this alternative charge of illegal gratuities.  The gratuity charge is based upon the same facts relied upon in connection with the bribery charge, but one of the essential elements is different.

I have already instructed you with respect to the first, second, third, fourth, and sixth elements in explaining the charge of bribery.  In order to prove the defendant guilty of paying illegal gratuities relating to an organization or government that receives federal funds, you should apply the same instruction here with regard to these elements except as noted below.

9.  Count Two: First Illegal Gratuities Element: Recipient was Agent of Organization.

I have already instructed you with respect to the first element in explaining the charge of bribery.  You should apply the same instruction here.

10.  Count Two: Second Illegal Gratuities Element: Organization of Government to Receive Federal Funds in Excess of $10,000.

I have already instructed you with respect to the

second element in explaining the charge of bribery.  You should apply the same instruction here.

11.  Count Two: Third Illegal Gratuities Element: Defendant Gave, Agreed to Give, or Offered Something of Value.

I have already instructed you with respect to the third element in explaining the charge of bribery.  You should apply the same charge here.  Again, this statute does not apply to bona fide salary, wages, fees, or other compensation paid or expenses paid or reimbursed in the usual course of business.

(Continued on next page)

THE COURT: 12. Count Two: Fourth Illegal Gratuities Element – Defendant Acted Corruptly in Connection with Transaction.

I have already instructed you with respect to the fourth element in explaining the charge of bribery. You should apply the same instruction here.

13. Count Two: Fifth Illegal Gratuities Element – Defendant Acted with Intent to Reward in Connection with Transaction.

The fifth element the government must prove beyond a reasonable doubt is that the defendant gave (or agreed to give or offered) something of value to the agent with the intent to reward the agent's actions in connection with some business or transaction of the United Nations. This is different from the intent to influence, which relates to the charge of bribery. Unlike a bribe, an illegal gratuity does not involve a quid pro quo exchange. The payment of an illegal gratuity in connection with this element requires only that the gratuity be given or accepted as a requirement for an official act. An illegal gratuity may constitute a reward for some future official act that the agent will take or may already have determined to take, or for a past official act that he has already taken.

When a defendant is charged with paying an illegal gratuity, there is no such requirement that the corrupt payments have influenced the agent in taking any action.

Instead, the government need prove only that there was a link between a thing of value conferred on the agent and a specific official act for or because of which the defendant gave, offered, or agreed to give the payment.  It is not sufficient that the unlawful gratuity was given merely because the agent had authorized other matters in which the defendant had an interest.

I have already instructed you on the definition of "official act," and you should apply the same instruction here.

If you find that the defendant made a bona fide donation through the PGA account, then you cannot find that the donation through the PGA account was an illegal gratuity.

14.  Count Two:  Sixth Illegal Gratuities Element – Value of Transaction.

I have already instructed you with respect to the sixth element in explaining the charge of bribery.  You should apply the same instruction here.

Count Three:  FCPA § 78dd-2 (Domestic Concern)

Count Three of the indictment charges the defendant with violating the Foreign Corrupt Practices Act, or FCPA, in connection with a provision that applies to persons or entities that are called "domestic concerns."

In Count Three, the defendant is charged as an officer, director, employee, or agent of a domestic concern, and with aiding and abetting the conduct of a domestic concern,

in connection with paying, promising to pay, and authorizing the payments to John Ashe and Francis Lorenzo in exchange for and to influence the taking of official action to benefit the defendant and/or his company and to secure an improper advantage for the defendant and/or his company with regard to advancing the defendant's interest in obtaining formal United Nations support for the center that he hoped to build in Macau.

1.  Count Three:  Elements of the Offense.

In order to prove the defendant guilty of this offense, the government must prove the following seven elements beyond a reasonable doubt:

First: that the defendant is a "domestic concern," or an officer, director, employee, or agent of a "domestic concern," or a stockholder thereof acting on behalf of such a domestic concern, or aided and abetted a domestic concern;

Second: that the defendant acted corruptly and wilfully;

Third: that the defendant made use of the mails or any means or instrumentality of "interstate commerce" in furtherance of an unlawful act under this statute -- namely, an offer, payment, promise to pay, or authorization of the payment of money or anything of value -- or aided and abetted another to do the same;

Fourth: that the defendant offered, paid, promised to pay, or authorized the payment of money or gift or anything of

value;

Fifth: the offer, promise to pay, or authorization of the payment of money or anything of value was either (a) to a foreign official, or (b) to any person while the defendant knew that all or a portion of the payment would be offered, given, or promised, directly or indirectly, to a foreign official;

Sixth: that the payment was intended for one of three purposes relevant to this action: (a) to influence an act or decision of a foreign public official in his official capacity; (b) to induce such foreign official to do or omit to do any act in violation of the lawful duty of such foreign official; or (c) to secure any improper advantage; and

Seventh: that the payment was to assist the domestic concern in obtaining or retaining business for, or with, or directing business to, any person.

Count Three:  First element – Domestic Concern.

The first element that the government must prove beyond a reasonable doubt is that the defendant was a "domestic concern," an officer, director, employee, or agent of a domestic concern, or a stockholder of a domestic concern who was acting on behalf of that domestic concern, or aided and abetted a domestic concern.

A "domestic concern" is defined to include any individual who is a citizen, national, or resident of the United States and any corporation, partnership, association,

joint stock company, business trust, unincorporated organization, or sole proprietorship which has its principal place of business in the United States or which is organized under the laws of a state of the United States or a territory, possession, or commonwealth of the United States.

In order to find this element has been satisfied, you must agree unanimously on the identity of the domestic concern. If you cannot agree unanimously on one domestic concern in particular, then you must find the defendant not guilty of Count Three.

Count Three:  Second Element – Corruptly and Wilfully.

The second element the government must prove beyond a reasonable doubt is that the defendant acted corruptly and wilfully.

A person acts corruptly if he or she acts voluntarily and intentionally, with a bad purpose or evil motive of accomplishing either an unlawful result or a lawful result by some unlawful method or means.  The term "corruptly" is intended to connote that the offer, payment, and promise was intended to influence the foreign official to misuse his or her official position.

A person acts wilfully if he or she acts voluntarily, purposefully, and deliberately, and with the intent to do something that the law forbids -- that is, with a bad purpose to disobey or disregard the law.  The government need not prove

that the defendant was aware of the specific law and rule that his conduct may be violating but must prove that the defendant acted with knowledge his conduct was, in a general sense, unlawful.

Count Three:  Third Element – Interstate Commerce.

The third element that the government must prove beyond a reasonable doubt is that the defendant made use of the mails or any means or instrumentality of "interstate commerce" in furtherance of an unlawful act under this statute.

The term "interstate commerce" means trade, commerce, transportation, or communication among the several states, or between any foreign country and any state, or between any state and any place or ship outside thereof.  The term includes the interstate use of a telephone, email service provider, or other interstate means of communication, or any other interstate instrumentality, such as a fax machine, car, or plane.  I instruct you that the sending of wire transfers through a United States bank constitutes the use of a means or instrumentality of interstate commerce.

5.  Fourth Element – Promise or Authorization to Pay.

The fourth element that the government must prove beyond a reasonable doubt is that the defendant offered, paid, promised to pay, or authorized the payment of money or gift or anything of value.

It is not necessary that the bribe or offer or promise

of a bribe was intended to be made directly by the defendant to the foreign official.  A person who engages in bribery of a foreign official indirectly through any other person or entity is liable under the FCPA, just as if the person had engaged in bribery directly.  Thus, if the person authorizes another to pay or promise a bribe, that authorization alone is sufficient to violate the FCPA.

Further, it is not necessary that the payment actually take place or that the gift actually be given.  Instead, it is the offer, promise, or authorization of the bribe that completes the crime.  Thus, this element is satisfied if the person authorized an unlawful payment or gift even if the payment was not actually made or the gift was not actually given.

6.  Count Three:  Fifth Element – Payment to a Foreign Official.

The fifth element that the government must prove beyond a reasonable doubt is that the offer, promise to pay, or authorization of payment of money or anything of value was either (a) to a foreign official, or (b) to any person while the defendant knew that all or a portion of the payment would be offered, given, or promised, directly or indirectly, to a foreign official.

The term "foreign official" means any officer or employee of a foreign government, or any department, agency, or

instrumentality thereof, or of a public international

organization, or any person acting in an official capacity for,

or on behalf of, such government, or department, agency, or

instrumentality or for or on behalf of any such public

international organization.  As a matter of law, the United

Nations qualifies as a public international organization.  If

you cannot unanimously agree on at least one foreign official

in particular, then this element has not been met and you must

find the defendant not guilty of Count Three.

The defendant's payment or offer, promise, or

authorization of payment to a recipient who is not a foreign

official is sufficient only if the defendant acted while

knowing that all or some of the payment would be offered,

given, or promised, directly or indirectly, to a foreign

official.

A person's state of mind is knowing with respect to

conduct, a circumstance, or a result if (a) such a person is

aware that such person is engaging in such conduct, that such

circumstances exist, or that such result is substantially

certain to occur; or (b) such person has a firm belief that

such circumstance exists or that such result is substantially

certain to occur.

When knowledge of the existence of a particular

circumstance is required for an offense, such knowledge is

established if a person is aware of a high probability of the

existence of such circumstance, unless the person actually believes that such circumstance does not exist. Knowledge may be proven in this manner if, but only if, the person suspects the fact, realizes its high probability, but refrains from obtaining the final confirmation because he or she wanted to be able to deny knowledge.

On the other hand, knowledge is not established in this manner if the person merely failed to learn the fact through negligence or if the person actually believed that the transaction was legal.

It is also worth noting that while a finding that a person was aware of a high probability of the existence of a fact is enough to prove that this person possessed knowledge, it is not sufficient in order to determine that the person acted wilfully or corruptly, which is a separate and distinct element of this offense.

Count Three: Sixth Element – Purpose of the Payment.

The sixth element that the government must prove beyond a reasonable doubt is that the payment was intended for one of three purposes relevant to this action: (a) to influence any act or decision of a foreign public official in his official capacity; (b) to induce such a foreign official to do or omit to do any act in violation of the lawful duty of such foreign official; or (c) to secure any improper advantage.

The government need not prove that the offer to pay,

payment, promise to pay, or authorization of payment was for all of these purposes. However, one of these purposes must have been the reason for the payment, gift, or promise.

Count Three: Seventh Element – Obtaining or Retaining Business.

The seventh element that the government must prove beyond a reasonable doubt is that the payment was made to assist the same domestic concern referenced in connection with the first element in obtaining or retaining business for, or with, or directing business to, any person.

It is not necessary that the government prove that anyone actually obtained or retained any business whatsoever as a result of an unlawful offer, payment, promise, or gift, only that the defendant intended to assist in obtaining or retaining business for or with any person. Moreover, this element is not limited to obtaining or renewal of contracts or other business but also includes the execution or performance of contracts or the carrying out of existing business.

F.   Count Four: FCPA § 78dd-3 (Within the United States)

Count Four of the indictment also charges the defendant with violating the Foreign Corrupt Practices Act, or FCPA, but in connection with a provision that applies to actions taken while in the territory of the United States. The FCPA makes it a crime for a foreign person, or any officer,

director, employee, or agent of such person, or any stockholder acting on behalf of such foreign person, corruptly to offer, promise, or authorization of payment -- or offer, gift, promise to give, authorization of the giving of anything of value -- to any foreign official for the purpose of influencing any act or decision of such foreign official in his or her official capacity or securing an improper advantage in order to obtain or retain business.

The defendant is charged in Count Four with violating the FCPA while in the territory of the United States -- specifically, by taking actions in the United States in furtherance of a payment, promise to pay, and/or authorization to pay John Ashe and/or Francis Lorenzo in exchange for and to influence the taking of official action to benefit the defendant and/or his company and to secure an improper advantage for the defendant and/or his company, with regard to advancing the defendant's interest in obtaining formal UN support for the center that he hoped to build in Macau.

1.  Count Four:  Elements of the Offense.

In order to prove the defendant guilty of this offense, the government must prove the following six elements beyond a reasonable doubt:

First: that the defendant was a foreign person or an officer, director, employee, or agent of a foreign entity, or a stockholder thereof acting on behalf of such a person -- in

other words, that the defendant was not a domestic concern or officer, director, employee, or agent of a person that was not a domestic concern, or a stockholder of such person acting on behalf of that person -- who engaged in an act in furtherance of a corrupt payment (or offer, promise, or authorization to pay) while in the territory of the United States;

Second: that the defendant acted corruptly and wilfully;

Third: that the defendant offered, paid, promised to pay, or authorized the payment of money or gift or anything of value;

Fourth: that the offer, promise to pay, or authorization of payment of money or anything of value was either (a) to a foreign official, or (b) to any person while the defendant knew that all or a portion of the payment would be offered, given, or promised, directly or indirectly, to a foreign official;

Fifth: that the payment was intended for one of three purposes relevant to this action: (a) to influence an act or decision of a foreign public official, in his or her official capacity; (b) to induce such a foreign official to do or omit to do any act in violation of the lawful duty of such foreign official; or (c) to secure any improper advantage; and

Sixth: that the payment was to assist the defendant in obtaining or retaining business for, or with, or directing

business to, any person.

As you can see, many of the same elements that apply to a violation of the FCPA for Count Three in relation to a domestic concern also apply to Count Four.  The differences are that under Count Four:  (1) the defendant must be a foreign person or not a domestic concern; (2) the defendant must have engaged in any act in furtherance of the corrupt payment (or an offer, promise, or authorization to pay) while in the territory of the United States; and (3) there is no requirement that the defendant made use of the mails or any means or instrumentality of interstate commerce in furtherance of an unlawful act.

2.  Count Four:  First Element – Foreign Person in the Territory of the United States.

The first element the government must prove beyond a reasonable doubt is that the defendant was a foreign person who, while in the territory of the United States, engaged in any act in furtherance of a corrupt payment.

A foreign person is any person other than a domestic concern.  Thus, the government must prove that the defendant was not a domestic concern, was an officer, director, employee, or agent of a company organized under the laws of a foreign nation, or of a person who is not a domestic concern, or was a stockholder of such company or acting on behalf of that company.

The territory of the United States includes the 50

states and the District of Columbia.

Count Four:  Second Element – Corruptly and Wilfully.

The second element the government must prove beyond a reasonable doubt is that the defendant acted corruptly and wilfully.  I have previously defined these terms in connection with the FCPA statute, and those definitions apply here.

4.  Count Four:  Third Element – Promise or Authorization to Pay.

The third element that the government must prove beyond a reasonable doubt is that the defendant offered, paid, promised to pay, or authorized the payment of money or gift or anything of value.  I have previously described this element, and that description applies here.

5.  Count Four:  Fourth Element – Payment to a Foreign Official.

The fourth element that the government must prove beyond a reasonable doubt is that the offer, promise to pay, or authorization of payment of money or anything of value was either (a) to a foreign official, or (b) to any person while the defendant knew that all or a portion of the payment would be offered, given, or promised, directly or indirectly, to a foreign official.  I have previously described this element, and that description applies here.

6.  Count Four:  Fifth Element – Purpose of Payment.

The fifth element that the government must prove

beyond a reasonable doubt is that the payment was intended for one of three purposes described above. I have previously described this element, and that description applies here.

Count Four: Sixth Element – Obtaining or Retaining Business.

The sixth element that the government must prove beyond a reasonable doubt is that the payment was to assist the defendant in obtaining or retaining business for, or with, or directing business to, any person. I have previously described this element, and that description applies here.

Counts Three and Four: Solicitation of Bribe Not a Defense.

For both Counts Three and Four, it does not matter who suggested that a corrupt offer, payment, promise, or gift be made. The FCPA prohibits any payment or gift intended to influence the recipient, regardless of who first suggested it. It is not a defense if the payment or gift was demanded on the part of a foreign official as a price for continuing to do business or other benefit or that the business may have been harmed if the payment was not made. That the offer to pay, payment, promise to pay, or authorization of payment may have been first suggested by the recipient is not deemed an excuse for a defendant's decision to make a corrupt payment, nor does it alter the corrupt purpose for which the offer to pay, payment, promise to pay, or authorization of payment was made.

H.   Count Five:  Conspiracy to Commit Money Laundering.

Count Five of the indictment charges the defendant with conspiracy to commit money laundering from in or about 2011 through in or about September 2015. in violation of Title 18 United States Code Section 1956(h).

1.   Count Five:  Elements of the Offense.

In order to satisfy its burden of proof, the government must establish the following two essential elements beyond a reasonable doubt:

First: the existence of the conspiracy charged in the indictment -- that is, an agreement to commit money laundering; and

Second: that the defendant intentionally and knowingly became a member of the conspiracy with knowledge of the conspiracy's objects and with intent to further the aims of the conspiracy.

I instructed you regarding these two elements in my instructions for Count One.  These instructions apply here, as do my instructions for Count One concerning liability for acts of co-conspirators, the time of the conspiracy, and conscious avoidance.  However, unlike the conspiracy charged in Count One, you need not find that an overt act was committed by anyone in furtherance of the conspiracy to commit money laundering.

2.   Count Five:  First Element - Existence of an Unlawful Agreement.

The first element the government must prove beyond a reasonable doubt is that two or more persons entered into an unlawful agreement to commit the crime charged in Count Six, or money laundering.

I have already instructed you on this element in connection with Count One, and those instructions are equally applicable here.  The only difference is that the object of the conspiracy alleged in Count Five is money laundering, which I will discuss in relation to Count Six.

Remember, though, that as I said with respect to Count One, a conspiracy and the substantive crime are distinct and independent offenses, and you may find the defendant guilty of the crime of conspiracy even if you find that he never actually committed the substantive crime that was the object of the conspiracy.  By the same token, you can find the defendant guilty of committing the substantive crime, even if you find him not guilty of conspiracy.

3.   Count Five:  Second Element - Knowing Membership in the Conspiracy.

The second element the government must prove beyond a reasonable doubt is that the defendant participated in the conspiracy with knowledge of its unlawful purpose and in furtherance of its unlawful object.

I have already instructed you on this element in connection with Count One, and you should apply the same instruction here.

I.   Count Six:  Money Laundering.

Count Six of the indictment charges the defendant with international money laundering, in violation of Title 18 United States Code Section 1956(a)(2)(A).

1.   Count Six:  Elements of the Offense.

In order to prove that the defendant committed the crime of international money laundering, the government must prove each of the following elements beyond a reasonable doubt:

First: that the defendant transported (or attempted to transport) a monetary instrument or funds from a place in the United States to or through a place outside of the United States (or to a place in the United States from or through a place outside of the United States); and

Second: that the defendant did so with the intent to promote the carrying on of specified unlawful activity.

2.   Count Six:  First Element – Transportation of Monetary Instrument or Funds to or from or through the United States.

The first element that the government must prove beyond a reasonable doubt is that the defendant transported (or attempted to transport) a monetary instrument or funds from a place in the United States to or through a place outside of the

United States, or to a place in the United States from or through a place outside of the United States.

The term "monetary instrument" means coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, money orders, investment securities in bearer form or otherwise in such form that title thereto passes upon delivery, and negotiable instruments in bearer form or otherwise in such form that title thereto passes upon delivery.

The term "funds" refers to money, wire transfer of money, or negotiable paper which can be converted into currency.

"Transportation" is not a word that requires a definition.  It is a word that has its ordinary, everyday meaning.  The government need not prove that the defendant physically carried the funds or monetary instrument in order to prove that he is responsible for transporting it.  All that is required is proof that the defendant caused the funds or monetary instrument to be transported.

To satisfy this element, the government must also prove that the funds or monetary instruments were transported from somewhere in the United States to or through someplace outside of the United States, or to someplace in the United States from or through someplace outside of the United States.

3.  Count Six:  Second Element – Intent to Promote

Specific Unlawful Activity.

The second element that the government must prove beyond a reasonable doubt is that the defendant acted with intent to promote the carrying on of "specified unlawful activity."

I instruct you as a matter of law that the term "specified unlawful activity" here includes (a) payment of bribes or illegal gratuities as charged in Count Two; (b) violation of the Foreign Corrupt Practices Act as charged in Counts Three and Four; and (c) bribery of foreign officials in violation of the laws of the Dominican Republic and/or Antigua and Barbuda, defined as Antigua. I have already explained to you the elements of the first two specified unlawful activities. Shortly, I will explain the elements of the third specified unlawful activity -- bribery of foreign officials, in violation of the laws of the Dominican Republic and/or Antigua.

To act intentionally means to act deliberately and purposefully, not by mistake or accident, with the purpose of promoting, facilitating, or assisting the carrying on of the specified unlawful activity charged here. If you find that the defendant acted with the intention or deliberate purpose of promoting, facilitating, or assisting in the carrying on of the specified unlawful activity, then the second element is satisfied.

If the government fails to prove that the defendant

intended to promote at least one of these three types of specified unlawful activities, then you must find the defendant not guilty.  On the other hand, the government need not prove that the defendant intended to promote all three types of specified unlawful activity.  It is sufficient for this element if you find beyond a reasonable doubt that the defendant intended to promote one of them.  However, all 12 of you must agree on the particular specified unlawful activity or activities that the defendant intended to promote.  If you cannot unanimously agree on at least one type of specified unlawful activity, then you must find the defendant not guilty of Count Six.

4.  Count Six:  Second Element – Foreign Law.

As I just instructed you, the third type of specified unlawful activity that the defendant is charged with intending to promote is a violation of foreign law.  The laws of both Antigua and the Dominican Republic outlaw bribery under certain circumstances.

A.  Antigua.

Section 3(1)(c) – Prevention of Corruption Act of 2004.

In Antigua, the Prevention of Corruption Act of 2004 prohibits bribery involving public officials.  In order for an individual to be in violation of Section 3(1)(c) of Antigua's Prevention of Corruption Act, the following three elements

4269

would have to be proven:

First: the individual offered or gave property, advantage, or benefit, directly or indirectly, to an Antiguan public official.  A public official includes a member, office holder, or employee of any ministry or department of the government of Antigua, as well as any board, commission, authority, committee, or other body, whether paid or unpaid, and whether or not established by or under any law to perform public functions on behalf of the government of Antigua.  The term "public official" also includes accredited diplomatic officials (such as ambassadors) serving in Antiguan diplomatic missions, such as the Mission of Antigua to the United Nations. A public official of Antigua does not include elected heads of international organizations or their constituent bodies or committees, such as President of the General Assembly or President of the High-Level Committee on South-South Cooperation, nor does it include members of political parties in Antigua.  However, a public official of Antigua may also serve in one of these other capacities as well as still remain a public official of Antigua.  An "advantage" includes, among other things, a gift, loan, fee, reward, or commission consisting of money or any valuable security or other property.

Second: the individual intended to influence or induce the public official to do or omit doing any act in exchange for the property, advantage, or benefit; and

Third: the official's act was in the performance of his functions as a public official of Antigua.

Section 3(2) – Prevention of Corruption Act of 2004.

Section 3(2) of the Prevention of Corruption Act also prohibits aiding in or procuring the commission of an act of corruption under Section 3(1).  In order for an individual to be in violation of Section 3(2) of the Prevention of Corruption Act, the following three elements would have to be proven:

First: another person committed an applicable act of corruption under Section 3(1)(c) and the elements described above were all met;

Second: the individual either (a) aided or procured the commission of an act of corruption under Section 3(1)(c) or (b) counseled another, attempted or conspired to commit that act of corruption under Section 3(1)(c); and

Third: the individual acted intentionally.

B.  Dominican Republic.

Two statutes under the laws of Dominican Republic that prohibit bribery of public officials are Article 179 of the Penal Code and Law No. 448-06 on Bribery in Trade and Investment.

Penal Code:  Article 179.

In order for an individual to be in violation of Article 179 of the Penal Code of the Dominican Republic, the following two elements would have to be proven:

First: the individual bribed, forced, or attempted to bribe or force a public official of the Dominican Republic using promises, gifts, offers, or rewards.  The term "public official" means an official or public employee from the administrative, municipal, or judicial sphere of the government of the Dominican Republic.  The term "public official" includes accredited diplomatic officials (such as ambassadors), serving in diplomatic missions on behalf of the Dominican Republic, such as the Mission of the Dominican Republic to the United Nations.  The term "public official" does not include officials of international or nongovernmental organizations.  However, a public official of the Dominican Republic may also serve as an official of an international or nongovernmental organization and still remain a public official of the Dominican Republic; and

Second: the individual did so with the purpose of obtaining favorable decisions or favorable acts which must be part of the public official's functions as a Dominican public official.

Article 3 of Law No. 448-06 on Bribery in Trade and Investment.

In order for an individual to be in violation of Article 3 of the Dominican Republic Law No. 448-06 on Bribery in Trade and Investment, the following four elements would have to be proven:

First: the individual offered, promised, or gave, either directly or indirectly, something of value to a public official.  The term "public official" is defined as any designated or elected official or employee of the national government and includes accredited diplomatic officials (such as ambassadors) serving in diplomatic missions on behalf of the Dominican Republic, such as the Mission of the Dominican Republic to the United Nations.  The term "public official" does not include officials of international or nongovernmental organizations.  However, a public official of the Dominican Republic may also serve as an official of an international or nongovernmental organization and still remain a public official of the Dominican Republic;

Second: the individual acted intentionally;

Third: the individual offered, promised, or gave that something of value in exchange for the commission or omission of any action by the public official related to the performance of his public functions as a public official of the Dominican Republic; and

Fourth: the act involved matters affecting domestic or international trade or investments.

Article 4 of Law No. 448-06 on Bribery in Trade or an Investment.

Law 448-06 on Bribery in Trade and Investment also contains a separate provision, Article 4, which concerns the

bribery of foreign officials.  In order for an individual to be in violation of Article 4, the following five elements would have to be proven:

First: the individual offered, promised, or gave, either directly or indirectly, something of value to a foreign official.  The term "foreign official" is defined as any designated or elected individual from another country performing a legislative, administrative, or judicial function at any level of government, any person performing public functions for a foreign country, at any level of government, including a public agency or company, and any official or organization, or any official or agent of an international public organization such as the United Nations.  The foreign official must have been accredited at the time he was offered, was promised, or received the item of value;

Second: the individual acted intentionally;

Third: the individual offered, promised, or gave that something of value in exchange for the commission or omission of any action by the foreign official related to the performance of his public functions as a foreign official;

Fourth: the act involved matters affecting domestic or international trade or investments; and

Fifth: the individual was either a citizen of the Dominican Republic or a noncitizen who committed acts relevant to the violation in whole or in part in the Dominican Republic

or whose acts had an effect in the Dominican Republic.

Article 8 of Law No. 448-06 of Bribery in Trade and Investment.

Article 8 of the statute makes it illegal for anyone to serve as an accomplice to a bribery offense.  A violation of Article 8 may be satisfied upon proof of the following two elements:

First: another person engaged in conduct that meets the elements of Article 3 or 4 as described above; and

Second: the individual served as an accomplice to that offense under Article 3 or 4 by aiding and abetting or wilfully causing that violation to occur.

J.  Counts Two, Three, and Six:  Aiding and Abetting and/or Willfully Causing a Crime.

In addition to charging the defendant with paying bribes or illegal gratuities, violating the FCPA, and money laundering, Counts Two, Three, and Six of the indictment also charge that the defendant aided and abetted or wilfully caused another person to commit each of these crimes.  I will take each of these concepts -- aiding and abetting and wilfully causing a crime -- in turn.

Aiding and Abetting.

Under the aiding and abetting statute, it is not necessary for the government to show that a defendant himself physically committed the crime with which he is charged in

4275

order for the government to sustain its burden of proof.  A person who aids and abets another to commit an offense is just as guilty of that offense as if he committed it himself.

Accordingly, you may find a defendant guilty of the offense charged if you find beyond a reasonable doubt that the government has proven that another person actually committed the offense with which the defendant is charged and that the defendant aided or abetted that person in the commission of the offense.

As you can see, the first requirement is that you find that another person has committed the crime charged. Obviously, no one can be convicted of aiding or abetting the criminal acts of another if no crime was committed by the other person in the first place.  But if you do find that a crime was committed, then you must consider whether the defendant aided or abetted the commission of that crime.

In order to aid or abet another to commit a crime, it is necessary that the defendant knowingly and wilfully associated himself in some way with the crime and that he knowingly and wilfully participated in the crime by doing some act to help make the crime succeed.

To establish that the defendant knowingly associated himself with the crimes charged in Counts Two, Three, or Six, the government must establish that the defendant had the same mental state required for the particular principal offense he

is charged with aiding and abetting.

Participation in a crime is willful if done voluntarily and intentionally and with the specific intent to do something which the law forbids, or with the specific intent to fail to do something the law requires to be done -- that is to say, with a bad purpose either to disobey or to disregard the law.

To establish that the defendant participated in the commission of the crime, the government must prove that the defendant engaged in some affirmative conduct or overt act for the specific purpose of bringing about that crime.

The mere presence of a defendant where a crime is being committed, even if coupled with knowledge by the defendant that a crime is being committed, or merely associating with others who were committing a crime, is not sufficient to establish aiding and abetting.  One who has knowledge that a crime is being committed or is about to be committed but inadvertently does something that aids in the commission of that crime is not an aider and abettor.  An aider and abettor must know that the crime is being committed and act in a way that is intended to bring about the success of the criminal venture.

To determine whether a defendant aided or abetted the commission of the crime with which he is charged, ask yourselves these questions:  Did he participate in the crime

charged as something he wished to bring about?  Did he knowingly associate himself with the criminal venture?  Did he seek by his actions to make the criminal venture succeed?

If he did, then the defendant is an aider and abettor and therefore guilty of the offense.  If, on the other hand, your answer to any one of these questions is no, then the defendant is not an aider and abettor and you must find him not guilty.

Wilfully Causing a Crime.

I will now describe what it means to wilfully cause another to commit a crime.  The federal statute provides:

Whoever wilfully causes an act to be done which, if directly performed by him, would be an offense against the United States, is punishable as a principal.

What does the term "wilfully causes" mean?  It does not mean that the defendant himself need have physically committed the crime or supervised or participated in the actual criminal conduct charged in the indictment.

The meaning of the term "wilfully causes" can be found in the answers to the following questions:  Did the defendant have the mental state required for the principal offenses charged?  Did the defendant intentionally cause another person to engage in the conduct charged in those principal offenses?

If you are persuaded beyond a reasonable doubt that the answer to both of these questions is yes, then the

defendant is guilty of the crime charged just as if he himself had actually committed it.

K.  Venue.

In addition to all of the elements of the charged crimes that I have described for you, you must decide whether any act in furtherance of each crime occurred within the Southern District of New York, which includes the Bronx, Manhattan, Westchester, Rockland, Putnam, Dutchess, Orange, and Sullivan counties.  This means that you must decide whether the crime charged or any act committed to further or promote the crime occurred within the Southern District of New York.

As to the venue requirement, and as to the venue requirement only, the government need not prove venue beyond a reasonable doubt but only by a mere preponderance of the evidence.  Thus, the government has satisfied its venue obligation if you conclude that it is more likely than not that the crime that you are considering or any act in furtherance of the crime occurred in the Southern District of New York.

If you find that the government has failed to prove this venue requirement, then you must acquit the defendant.

L.  Variance of Dates.

You will note that the indictment alleges that certain acts occurred on or about various dates.  It does not matter if the evidence you heard at trial indicates that a particular act occurred on a different date.  The law requires only a

substantial similarity between the dates alleged in the indictment and the dates established by the evidence.

M.    Redaction of Evidentiary Items.

Among the exhibits received in evidence, there are some documents that are redacted. "Redacted" means that part of the document, transcript, photographs, or recording was taken out. You are to concern yourselves only with the part of the item that has been admitted in evidence. You should not consider any possible reason why the other part of it has been deleted.

You should draw no adverse inference against either party as a result of these redactions or deletions, nor should you speculate on what may have been redacted or deleted.

N.    Cooperating Witness Testimony.

In this case there has been testimony from a witness called by the government who pled guilty after entering into a cooperation agreement with the government. The government promised to bring the witness' cooperation to the attention of the sentencing court for the court's consideration in connection with the witness' sentencing. I refer you to the cooperation agreement, which is in evidence.

The government is permitted to enter into this kind of plea agreement. You, in turn, may accept the testimony of such a witness and convict the defendant on the basis of this testimony alone if it convinces you of the defendant's guilt

beyond a reasonable doubt.

However, you should bear in mind that a witness who has entered into such an agreement has an interest in this case different than any ordinary witness. A witness who realizes that he may be able to avoid a term of imprisonment or receive a lighter sentence by giving testimony favorable to the prosecution has a motive to testify falsely. Therefore, you must examine his testimony with caution and weigh it with great care. If, after scrutinizing his testimony, you decide to accept it, you may give it whatever weight, if any, you find it deserves.

You are instructed that you are to draw no conclusions or inferences of any kind about the guilt of the defendant on trial from the fact that a witness called by the government pled guilty to similar charges against the witness.

You have heard reference as to what the possible punishment may be for the cooperating witness. Those statements are not to be considered by you as applicable to this defendant or what his punishment might be. If you convict, the appropriate sentencing determination is mine and mine alone.

O.  Immunity of Government Witness.

You have heard the testimony of a government witness who has testified under grant of immunity from this Court. What this means is that the testimony of the witness may not be

used against her in any criminal case except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the immunity order of this Court.

You are instructed that the government is entitled to call as a witness a person who has been granted immunity by order of this Court and that you may convict a defendant on the basis of such a witness' testimony alone if you find that the testimony proves the defendant guilty beyond a reasonable doubt.

However, the testimony of a witness who has been granted immunity should be examined by you with greater care than the testimony of an ordinary witness.  You should scrutinize it closely to determine whether or not it is colored in such a way as to place guilt upon the defendant in order to further the witness' own interests, for, such a witness, confronted with the realization that she can win her own freedom by helping to convict another, has a motive to falsify her testimony.

Such testimony should be scrutinized by you with great care and you should act upon it with caution.  If you believe it to be true and determine to accept the testimony, you may give it such weight, if any, as you believe it deserves.

P.   Preparation of Witnesses.

You have heard reference so far during trial that some of the witnesses have discussed the facts of the case or their

testimony with the lawyers before the witness appeared in court.  It is perfectly proper for a lawyer for either the government or the defense to interview a witness in preparation for trial.  Although you may consider that fact when you are evaluating a witness' credibility, that is entirely in your discretion, and there is nothing either unusual or improper about a witness meeting with lawyers from either side before testifying.

With regard to the party calling a witness, it permits, among other things, the witness to be aware of the subjects he or she will be questioned about, focus on those subjects, and have the opportunity to review relevant exhibits before being questioned about them.  Such consultation helps conserve your time and the Court's time.  Indeed, it would be unusual and surprising for a lawyer to call a witness without such consultation.

Again, the weight you give to the fact or the nature of the witness' meetings and/or preparation for his or her testimony, as well as what inferences you draw from such meetings and/or preparation, are matters completely within your discretion.

Q.  Translations.

Ladies and gentlemen, we're close to 6:00.  I would like to complete the instruction, if that's okay.

All right.

Translations.

You have been presented with English translations of certain pieces of evidence that were originally in Chinese or Spanish.  I instruct you that it is the English translations of these items that are the evidence.  I emphasize to you that even if you understand Chinese or Spanish, it is still the English translation that is the evidence.  The original Chinese or Spanish does not constitute evidence.

R.   Use of Transcripts.

You have seen one transcript of a videotaped conversation that was partially in Chinese and partially in English.  With respect to the portion of the transcript reflecting translations of statements made in Chinese, as I have just instructed you, those translations are evidence.  With respect to the portion of the transcript reflecting statements made in English, that portion was given to you as an aid or guide to assist you in listening to the recordings.  However, the portion of the transcript reflecting statements made in English is not evidence.  With respect to statements made in English contained on the recordings, you should make your own interpretation of what is contained on those recordings based on what you heard.  If you think you heard something differently than what appears on the transcript, then what you heard is controlling.

Let me say that, again, you, the jury, are the sole

judges of the facts.

S.   Uncalled Witnesses Equally Available to Both Sides.

There are several persons whose names you have heard during the course of the trial but who did not appear here to testify.  I instruct you that each party had an equal opportunity, or lack of opportunity, to call any of these witnesses.

(Continued on next page)

Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called. Their absence should not affect your judgment in any way. You should, however, remember my instruction that the law does not impose on the defendant in a criminal case the burden or duty of calling any witness or producing any evidence.

T. Charts and Summaries Admitted in Evidence.

Some of the exhibits that were admitted into evidence were in the form of charts and summaries. I decided to admit these charts in addition to the underlying documents that they represent in order to save time and avoid unnecessary incon-venience. You should consider these charts and summaries as you would any other evidence.

3. Deliberations of the Jury.

A. Right to See Exhibits and Hear Testimony, Communication with the Court.

Ladies and gentlemen of the jury, that concludes the substantive portion of my instructions to you. You are about to go into the jury room and begin your deliberations. I will send most of the exhibits into the jury room with you, and we will try to get you the balance of those exhibits tomorrow. Most of the exhibits we will send in either later day or first thing tomorrow.

However, if during your deliberations you want to see

any of the exhibits that were not sent back to the jury room, you may request that you be brought into the courtroom to see those exhibits.  If you want any of the testimony read, you may also request that.  Please remember that it is not always easy to locate what you might want, so be as specific as you possibly can in requesting exhibits or portions of the testimony.

If you want any further explanation of the law as I have explained it to you, you may also request that.  Your requests for exhibits or testimony, in fact any communications with the Court, should be made to me in writing, signed by your foreperson, and given to one of the marshals.  In any event, do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached.

B.  Notes.  Some of you have taken notes periodically throughout this trial.  I want to emphasize to you as you are about to begin your deliberations that notes are simply an aid to memory.  Notes that any of you may have made may not be given any greater weight or influence than the recollection or impressions of other jurors, whether from notes or memory, with respect to the evidence presented or what conclusions, if any, should be drawn from such evidence.  All jurors' recollections are equal.  If you can't agree on what you remember the testimony was, you can ask to have the transcript read back.

C.  Duty to Deliberate, Unanimous Verdict.

You will now retire to decide the case.  Your function is to weigh the evidence in this case and to determine whether or not the government has proven the defendant's guilt beyond a reasonable doubt.  You must base your verdict solely on the evidence and these instructions as to the law.  And you are obligated on your oath as jurors to follow the law as I instruct you, whether you agree or disagree with the particular law in question.

It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement.  Each of you must decide the case for himself or herself, but you should do so only after a consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced it is erroneous.  Discuss and weigh your respective opinions dispassionately, without regard to sympathy and without regard to prejudice or favor for either party and adopt that conclusion that in your good conscience appears to be in accordance with the truth.

Again, your verdict must be unanimous.  But you are not bound to surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors.  Each of you must make your own decision about the proper outcome of this case based on your consideration of the evidence and your discussions with your fellow jurors.  No

juror should surrender his or her conscientious beliefs solely for the purpose of returning a unanimous verdict.

Remember at all times you are not partisans. You are judges, judge of the facts. Your sole interest is to seek the truth from the evidence in the case.

If you are divided, do not report how your vote stands. And if you have reached a verdict, do not report what it is until you are asked to in open court.

D.  Verdict Form.

I have prepared a verdict form for you to use in recording your decision. Please use that form to report your verdict.

E.  Duties of Foreperson.

Finally, I referred a moment ago to a foreperson. You should by your own vote select one of you to sit as your fore-person. The foreperson does not have any more power or authority than any other juror, and his or her vote or opinion does not count for any more than any other juror's vote or opinion. The foreperson is merely your spokesperson to the Court. He or she will send out any notes, and when the jury has reached a verdict he or she will notify the marshal that the jury has reached a verdict, and you will come into open court and give the verdict.

F.  Return a Verdict.

After you have reached a verdict, your foreperson will

fill in the form that has been given to you, sign and date it, and advise the marshal outside your door that you are ready to return to the courtroom. I will stress that each of you must be in agreement with the verdict that is announced in court. Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

In conclusion, ladies and gentlemen, I am sure that if you listen to the views of your fellow jurors and if you apply your common sense, you will reach a fair verdict here.

IV. Conclusion.

Members of the jury, that concludes my instructions to you. I will ask you to remain seated while I confer with the attorneys to see if there are any additional instructions that they would like to have me give to you or anything I may not have covered in my previous statements. Just one moment, please.

If I could see counsel at side bar.

(At the side bar)

THE COURT: First, defense, are there any misstatements, other things?

MS. SHAPIRO: There was one thing that needs to be corrected in the typed charged, I believe. We must have missed it during the last charge conference. Then there was one thing I heard the Court misstate that we wanted the Court to correct.

THE COURT: What page?

MS. SHAPIRO:  The correction was on page 29.  This one needs to be corrected in the typed charge.  This is Count Two, the bribery.  It's the corruptly element, the second paragraph.  It has "or rewards."  That needs to be crossed out.  It's the third line from the bottom.

THE COURT:  What I intend to do is direct the jury to that page, I think they all have pens, and have them strike out that portion.  I'm going to have them each of their own copies so they know whose is whose.  I'll let them know that.

MS. SHAPIRO:  The other thing I had flagged was on page 34, in the middle, towards the end of the second paragraph.  For the word "authority" on the last line, your Honor said "authorize."

THE COURT:  I will read that sentence again to the jury to correct it.

MS. SHAPIRO:  That's all I had.  We are going to reserve our prior objections.

THE COURT:  Yes.  All the objections that have been previously made are preserved.  Anything else?

MR. PARK:  No, your Honor.

THE COURT:  From the government?

MS. ECHENBERG:  Yes.  On that same page, 34, the third line down, I think your Honor said instead of "given or accepted as a reward" you said "requirement."  I just saw it pop up on the transcript.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4291

THE COURT:  The sentence begins "The payment of an illegal gratuity in connection with this element."  I'll read the sentence and hopefully get it correct this time.

MS. ECHENBERG:  Then on page 53, under article 8, on the two elements I believe your Honor said "or" instead of "and."

THE COURT:  I'll read them both again and read the connector as "and."  Anything else?

MS. ECHENBERG:  Yes.  On the overt acts, and we apologize for not catching this during the charge conference, on page 22, we realized that some of the definitions from the indictment remain.  I think they are probably pretty obvious at this point, but we thought it made sense for a few of them to define them.

For NGO-1, that should be South-South News.  Obviously the defense disagrees, but I can go through what we think they should be.  The Antiguan ambassador should be John Ashe. That's defined, I'm sorry.

The next one is the UN document, that's in b on page 22.  I think a fair definition for that would be document A slash 66 slash 748.

Then the Dominican company is Terra Trading.  That's at the end of paragraph c.

The Macau Real Estate Development Company should be the Sun Kian Ip Group.

THE COURT:  Is it China or Macau?  I'm not sure.

MR. RICHENTHAL:  It's neither of those things.

THE COURT:  Let me ask the defense, is NGO-1 South-South News?

MS. SHAPIRO:  Yes.

THE COURT:  UN document is A/66/748?

MS. SHAPIRO:  The second one.

THE COURT:  Two iterations.

MS. ECHENBERG:  This is the February 24th document, the first one.  They both have the same number, one just has an asterisk.

THE COURT:  I won't say the asterisk.

MS. SHAPIRO:  Right.

THE COURT:  The Dominican company, Terra Trading?

MS. SHAPIRO:  That is correct.

THE COURT:  Is the Macau Real Estate Development Company Sun Kian Ip Group?

MS. SHAPIRO:  Right.

THE COURT:  What I intend to do is refer them back to this and say there are a couple of definitions I want to give you: NGO-1 refers to South-South News, UN document refers to, and similarly with regard to the other ones.

MS. SHAPIRO:  That's fine.

MS. ECHENBERG:  The Macau conference center project isn't defined, but we don't think that needs to be defined, and

we thought it might be more complicated.

MS. SHAPIRO:  We agree.

THE COURT:  If there is one, we're in a lot of trouble.  We're not, depending upon the case.  Anything else?

MS. ECHENBERG:  No, your Honor, that's it.

MR. RICHENTHAL:  Your Honor referred to the verdict form.  We have previously said we are fine with the verdict form.  I don't know that the defense said the same.  We would like that to be on the record.

MS. SHAPIRO:  We are fine with it.

THE COURT:  They don't have it right now.  Before we send it back to them tomorrow, because they are not going to deliberate today, we will confirm that.

MS. SHAPIRO:  Okay.

THE COURT:  Anything else?  What I intend to do is do tell them it's up to them whether they want to elect the foreperson now or first thing in the morning.  But they cannot start deliberations until everyone is present.  And I will excuse the alternates but advise them that I want them not to speak as I said at the beginning.

MS. SHAPIRO:  And not to look on the Internet and all that.

THE COURT:  That's exactly right.  In addition, they should treat themselves as if they are still jurors; they are just not going to show up tomorrow unless contacted by us.

(In open court)

THE COURT:  Ladies and gentlemen, a few brief comments.

On page 22 of the charge there are some things there that I should have defined for you, some of which you may have recognized but others not.

Where it says "I am now reading from the indictment" and then it has little a through g, references in a and in those overt acts, reference to "NGO-1," that refers to South-South News.

References in those overt acts that refer to "UN document" refer to document A slash 66 slash 748.

In item c the reference to the "Dominican company" is to Terra Trading.

In item d the reference to the "Macau Real Estate Development Company" is a reference to Sun Kian Ip Group.

Now turning to page 29 of the charge, under item number 5, Count Two, Fourth Bribery Element, the second paragraph should read, "To act corruptly means simply to act voluntarily and intentionally with an improper motive or purpose to influence" -- you should cross out "or reward." Make sure you cross that out on your copies. Cross out "or reward."  So it just reads "influence John Ashe's and/or Francis Lorenzo's actions."

The next item I would like to direct your attention to

is page 34.  These are two places where I may have misspoken. In the first full paragraph, second sentence, that sentence should have been read as, "The payment of an illegal gratuity in connection with this element requires only that the gratuity be given or accepted as a reward for an official act."

Then in the second paragraph, the last sentence, it should have been read as, "It is not sufficient that the unlawful gratuity was given merely because the agent had authority over matters in which the defendant had an interest." That was the last correction.

MS. ECHENBERG:  Your Honor, there is one on 53.

THE COURT:  My fault.  I didn't put a flag on that one.  Sorry about that, ladies and gentlemen.

53, if you look to the middle of the page, it says article 8 of law number 448-06 on bribery and trade and investment, the first element should be "First, another person engaged in conduct that meets the elements of article 3 or 4 as described above," and then it should be "and, second, the individual served as an accomplice to that offense under article 3 or 4 by aiding and abetting or willfully causing that violation to occur."

Those are the corrections.

Now, ladies and gentlemen, it is 6:30.  I'll leave it up to you whether you want to go and elect a foreperson now or wait to do that in the morning.  That is entirely up to you.

But you all should agree.  If someone says I've got to go, you've got to go and you have to wait until tomorrow morning. First thing when you get in, when you all arrive, all of you can then take a vote.  You can only start deliberating when every juror is present.  So I'll leave that up to you.

With regard to my instructions, they still apply, except tomorrow morning when you come in after you elect a foreperson and you are all here, you can begin your deliberations.  For all of you, including the alternates, you are not to discuss the case, no Googling, no research, nothing. Same rules apply going forward.  When you deliberate, you will have lunch, it will be brought here to you so you won't be going out for lunch for the lunch break.

With regard to the alternates, I would like you to treat this as if you are still on the jury.  What I mean by that is it's possible, as I mentioned earlier, that something could happen.  Obviously, I don't wish this at all, but someone could get sick so they are not able to come in or something may happen, in which case we may call upon you to come back and help us out to help the jury complete its deliberations.

What I ask you to do is the same rules apply to you. I'm going to excuse you.  In other words, you don't have to come back tomorrow morning unless we contact you for some reason.  But I ask that you not discuss the case with anyone, that you not email, text, or do anything about the case until

you receive your contact by Ms. Williams to say it is okay to do so.  And even at that point it is up to you whether you want to discuss your service as a juror.

I will say this, and I know I echo the parties' sentiments.  Obviously, we are not done yet.  But everyone has paid careful attention, and that's been obvious to all of us.  I thank the alternates for your service.  I hope we don't need to call you, but if we do, remember to abide by all of the rules.

You can leave your pads with Ms. Williams so she can hold on to them in case you are called back.  We will also hold your particular jury charges.  You should put your initials on your jury charge.  That way, if you have taken any notes and anything like that, you know which one is yours and you can keep those along with your pads.  For the alternates, Ms. Williams will collect your pads and your charge just in case you are called back.

Tomorrow morning, 10 o'clock.  I'm excusing the alternates.  I apologize, I don't have the list.  Ms. Valoy.  I apologize.  You do not have to come in tomorrow morning, but we may be in contact with you, as I mentioned.  I just ask that you not discuss the case.  Once there is a resolution of the case, Ms. Williams will contact you and let you know you are free to discuss the case.

ALTERNATE JUROR:  Is that when we are able to print

out the conclusion for service?

THE COURT:  I think yes, that will be the case once that happens.

Except for the alternates, everyone else tomorrow at 10 a.m.

Marshal, if you could step forward, please.

We'll get you all of the exhibits tomorrow.  When everyone has arrived, let Ms. Williams know and we will bring the exhibits back.

(Marshal sworn)

THE COURT:  Ladies and gentlemen, you can return to the jury room.  You can decide whether you want to vote on the foreperson now or first thing tomorrow, but you will all have to be in agreement about that.  See you tomorrow.  Have a good evening.  Remember, don't discuss the case, not until everybody is here and ready to deliberate tomorrow morning.

(6:30 p.m, the jury commenced deliberations)

(Jury not present)

THE COURT:  Is there anything that we need to deal with right now?

MR. RICHENTHAL:  Not from the government, your Honor.

THE COURT:  Anything from the defense?

MR. PARK:  Not from us, your Honor.

THE COURT:  Do you have all the exhibits assembled?

MR. RICHENTHAL:  We do, your Honor, except for the

electronics.

THE COURT:  I know you are in the process of doing that.  If Ms. Williams doesn't already have the best way to get in contact with each of you, your cell phone numbers and the like, provide it to her.  I'm not sure if everyone is going to be here throughout the week.  I would like you to remain close, a certain portion of the team, in case there are any notes so we can deal with them as efficiently as possible.

I think, I'm not sure, tomorrow morning may be the first morning that we will not be meeting with each other early, although I could be surprised.  If there is something that comes up, we will be available.  Just email us and let us know how early to be here.  Just so you know, we would have to let the court reporters know to be here earlier than 10 o'clock as well as the interpreters if that is the case.

Anything else?  We're close, I guess.  Thank you very much.  Have a good evening.  I'll see everybody tomorrow morning.

(Adjourned to 10:00 a.m., July 27, 2017)